## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| SYMPHONY HEALTH SOLUTIONS CORPORATION, SOURCE HEALTHCARE ANALYTICS LLC, and IMPACTRX, INC., Plaintiffs, v. IMS HEALTH INCORPORATED, Defendant. | Civil Action No. _____ |

## COMPLAINT

Plaintiffs Symphony Health Solutions Corporation, Source Healthcare Analytics LLC ("Source"), and ImpactRx, Inc. ("ImpactRx") (collectively, "Plaintiffs" or "Symphony") bring this Complaint against Defendant IMS Health Incorporated ("IMS"). For its Complaint against IMS, Symphony alleges as follows:

## NATURE OF THE ACTION

1.      Symphony brings this antitrust action against IMS for its unlawful abuse of its monopoly power in four pharmaceutical data markets: (i) the targeting and compensation data market, (ii) the managed markets data market, (iii) the anonymous patient longitudinal data market, and (iv) the integrated global data market. IMS is the largest pharmaceutical data and analytics company both in the United States and the world, and boasts of having "nearly every major pharmaceutical and biotech company in the world" as a customer. After swallowing every other major U.S. competitor by acquisition, IMS has engaged in an unlawful scheme to protect

its monopoly and to eliminate from these markets the only formidable competitor left standing: Symphony, a company that provides often better products than IMS but which is dwarfed by IMS in size and market power.

      2.    IMS and Symphony provide pharmaceutical data products in markets with high and costly barriers to entry. They collect and analyze a vast array of prescription, medical claims, and distribution data from thousands of sources as a part of the products and services they provide to pharmaceutical and biotechnology companies, the government, consulting services, and the financial community. In addition to providing commercial benefits, these products provide substantial public benefit, as clients use them to compile reports for public agencies (such as the United States Food and Drug Administration ("FDA")), address public safety concerns, and to disseminate safety information to doctors.

      3.    Over the past decade, IMS has engaged in a series of anticompetitive acts designed to maintain and strengthen its monopoly power in certain markets and to leverage that power to obtain monopoly power in additional markets. This scheme has included nearly every type of unlawful horizontal and vertical exclusionary conduct:

- Entering into exclusive, long-term agreements with pharmacy benefit managers, pharmacies, distributors, long-term care facilities, and other data suppliers, which has prevented Symphony from accessing over 80% of data generated by long-term care facilities and a substantial percentage of the specialty drug data in the United States;

- Requiring other data suppliers to sign most-favored-nations clauses ("MFNs"), which have enabled IMS to set artificially high prices for any data purchased from those suppliers by Symphony and other competitors;

- Acquiring data suppliers, including foreign data suppliers, to prevent Symphony and other competitors from disturbing IMS's monopoly share of the market for integrated global pharmaceutical data products;

- Bundling its products to protect its monopoly in one market, while attempting to gain a monopoly in another;

- Leveraging monopoly power in one product market (such as the markets for integrated global market data and targeting and compensation data) to monopolize or attempt to monopolize other markets;

- Acquiring competitors to eliminate competition and collaboration among its rivals;

- Revoking ImpactRx's access to critical data IMS compiled for all of its clients after Symphony, a competitor, acquired ImpactRx;

- Falsely disparaging Symphony's products and corporate ethics; and

- Poaching Symphony's employees to help IMS in its efforts to obtain a monopoly in a market where its products were traditionally weaker than Symphony's.

4.     These actions have harmed competition, hurt customers, and threaten to eliminate any meaningful competition in the relevant markets.  Symphony, in particular, has lost significant business opportunities and sales worth millions of dollars, and will continue to do so unless IMS's anticompetitive conduct is stopped.

5.     Symphony brings this action to recover lost profits that resulted directly from IMS's anticompetitive conduct and to obtain injunctive relief to prevent IMS from continuing to engage in these practices.

## THE PARTIES

6.     Plaintiff Symphony Health Solutions Corporation is a corporation organized under the laws of the State of Delaware and is headquartered in Horsham, Pennsylvania.

7.     Plaintiff Source Healthcare Analytics LLC is a subsidiary of Symphony and is a limited liability company organized under the laws of the State of Delaware.  Source is headquartered in Horsham, Pennsylvania at Symphony's headquarters.

8.     Plaintiff ImpactRx, Inc. is a subsidiary of Symphony and is a corporation organized under the laws of the State of Delaware.  ImpactRx is headquartered in Horsham, Pennsylvania at Symphony's headquarters.

9.     Upon information and belief, IMS Health Incorporated is a corporation organized under the laws of the State of Delaware, with a principal place of business for U.S. operations at One IMS Drive, Plymouth Meeting, Pennsylvania, 19462.

## JURISDICTION AND VENUE

10.     Jurisdiction is appropriate pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and § 1337 (commerce and antitrust regulations) as this case arises under Sections 1 and 2 of the Sherman Act.  Symphony is seeking treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15 and injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26.  Jurisdiction is also appropriate pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction).

11.     Venue is proper pursuant to 28 U.S.C. § 1391 and Section 12 of the Clayton Act, 15 U.S.C. § 22.  IMS regularly transacts business in the Eastern District of Pennsylvania, has a principal place of business in this District, and has prosecuted actions here.

12.     IMS sells and markets pharmaceutical data products in the relevant markets throughout the United States and worldwide; the conduct alleged herein substantially affects interstate commerce.

## FACTUAL ALLEGATIONS

### Industry Background

13.     Prescription drugs have played an essential role in the substantial improvements in global health and well-being over the past century.  Prescription drugs have vastly improved life expectancy and quality of living.  In turn, pharmaceutical companies,

4

medical providers, and healthcare companies have become an increasingly important part of the economy.

14.     The prescription drug industry is one of the largest, most complex, and innovative industries in the world. In the United States, millions of drug prescriptions are filled every week and billions are filled every year. Hospitals, physicians, patients, pharmacies, drug wholesalers, insurance companies, and pharmacy benefit managers all create enormous amounts of data when they consume, prescribe, distribute, administer, or pay for prescription drugs. Much of this data is captured electronically and can be synthesized into market intelligence that pharmaceutical and biotechnology companies, among others, find extremely useful in increasing productivity and profitability.

15.     Once data is obtained, pharmaceutical data companies place it in sophisticated computer databases and standardize, cleanse, and aggregate the data, before analyzing it. Pharmaceutical data companies process millions of records every week. Thus, survival in the pharmaceutical data business is critically dependent upon access to data.

16.     Without the help of pharmaceutical data products, pharmaceutical companies would lack meaningful insight into the factors that affect the demand, purchase, distribution, and consumption of their drugs or their competitors' drugs.

17.     Thus, pharmaceutical data products serve as the bedrock of commercial decision-making in the pharmaceutical industry. Customers use pharmaceutical data for marketing analysis, market research, measuring promotional response, analyzing and forecasting pharmaceutical sales, compensating sales representatives, assessing on- and off-label drug use, assessing physician prescribing behavior, evaluating patient behavior, implementing best

practices, assessing managed care access controls, monitoring payer contract performance, and tracking patterns of disease and treatment, as well as for a host of other reasons.

18.     IMS is the largest provider of pharmaceutical data products in the United States and the world, and has monopoly or near-monopoly positions in the four relevant markets set forth above.  IMS maintains business operations on every continent, except Antarctica.  As IMS's former chief executive officer once boasted in a financial publication, "We literally have every pharmaceutical firm in the world as a customer."  In 2009, the last full year that IMS was a publicly traded company, IMS reported operating revenue of over $2.2 billion.  That same year, the company was taken private in a transaction valued around $6 billion.

19.     IMS secures its data from a worldwide network of suppliers in more than 100 countries and has exclusive or nearly exclusive relationships with many of those data suppliers.

20.     IMS's business strategy had relied on growth through horizontal and vertical acquisitions.  Throughout its history, it exhibited a pattern of consolidating competitors and data and analytics suppliers into its company.  Between 2005 and 2008, for example, IMS spent $345 million on 28 acquisitions.  In January 2012, IMS completed the acquisition of the third and only other viable competitor (aside from Symphony) in the relevant U.S. pharmaceutical data markets, SDI Health LLC ("SDI").  In fact, SDI had recently merged with Verispan LLC, formerly the industry's fourth competitor.  In essence, IMS combined three out of the four companies that historically competed in these markets.  And, in conjunction with its rapid growth, IMS has increasingly focused on entrenching and expanding its monopoly power through other exclusionary conduct, described below.

21.     Symphony competes against IMS in the four pharmaceutical data markets described below.  In some of these markets, Symphony is IMS's only other competitor, although Symphony's market share is dwarfed by that of IMS.

22.     Launched in May 2012, Symphony Health Solutions was formed by the Symphony Technology Group by combining four complementary healthcare insight companies—AlphaDetail, ImpactRx, TargetRx, and Source—into a single customer-centric organization focused on innovation in the industry.  The combination made Symphony a provider of high-value data, analytics, and technology-based solutions for pharmaceutical and other life science manufacturers, payers, and providers.  Source is a long-standing competitor of IMS in the four relevant product markets and its competition extends back for a considerable period of time prior to Symphony's acquisition of Source.

### Relevant Antitrust Markets

23.     The relevant geographic market is the United States.  Country-specific laws and regulations create distinct geographic markets within the pharmaceutical data product markets.  While data from multiple countries can be aggregated to create global data products, country-specific data is not interchangeable.  Both IMS and Symphony provide pharmaceutical data products to customers throughout the United States.

24.     The relevant antitrust product markets in this action are the following: (i) targeting and compensation data ("T&C data market"); (ii) managed markets data ("Managed Markets data market"); (iii) anonymous patient longitudinal data ("APLD market"); and (iv) integrated global data ("global data market").  IMS has monopoly power or is dangerously close to acquiring monopoly power in each of these markets.  Symphony competes directly with IMS in the four relevant product markets.

25.     Symphony also utilizes IMS's data in other lines of business.  For example, IMS—because of its monopoly in the T&C data market—has compiled demographic data on the "target" physicians for nearly every major pharmaceutical company in the United States.  The data exists in the customer's possession, but IMS claims the data as proprietary. Symphony's ImpactRx—a healthcare market research company that measures the impact of promotion to physicians—utilizes that data to perform research projects for its clients.  As discussed below, IMS historically had allowed ImpactRx to access the data, but cut off access when Symphony acquired ImpactRx, citing as the reason Symphony's status as a competitor.

### The Targeting and Compensation Data Market

26.     Symphony and IMS compete in the U.S. T&C data market for approximately $500 million in business annually.  Of the relevant product markets, IMS derives its highest gross revenue in the T&C data market.  IMS is an indisputable monopolist in that market, with an 86% market share.  Symphony has approximately 14% of the market.  No other companies compete with Symphony and IMS in the T&C data market.

27.     The T&C data provide a range of valuable information.  In the example of retail data, every time a prescription is filled at a pharmacy it creates a record about the participants to the transaction.  The resulting data shows, among other things, the name, dosage, quantity, and fill-date for the drug; the prescribing doctor's name, area of specialty, location; anonymous information about the patient, such as age, gender, location; and the price of the product as well as the identity of the healthcare entity (if any) that paid for the drug.

28.     Thus, the T&C data comes from a number of sources but primarily from: (i) retail pharmacies (*e.g.*, RiteAid, CVS, Walgreens) and large retail establishments or mass merchandisers with pharmacies (*e.g.*, Wal-Mart, Costco); (ii) non-retail sources (*e.g.*, hospitals,

long-term care pharmacies, and mail-order pharmacies); (iii) specialty drug distributors; (iv) drug wholesalers; and (v) pharmaceutical companies.

29.    Pharmaceutical and biotechnology companies use T&C products for a variety of uses, including to: (i) improve advertising, marketing, pricing, and promotional strategies; (ii) "target" or allocate marketing resources to individual physicians based on their prescribing habits and demographics; (iii) evaluate the impact or success of marketing efforts on certain doctors; (iv) strategize and plan for new drug launches; (v) measure sales performance, sales forecasting, and market share; and (iv) obtain competitive intelligence.  T&C products are also used to administer compensation programs for sales representatives (by tracking and allocating prescription sales), establish meaningful sales goals for representatives and geographical areas, define sales force size and structure, and make important staffing decisions. Clients also use these products to report to governmental agencies, such as the FDA, and can help clients and the government direct drug safety alerts toward prescribing doctors.

30.    T&C products also offer vital information on drug sales into non-retail institutions, such as hospitals, clinics, long-term care facilities, mail-order pharmacies, prisons, and HMO-captive pharmacies.  Products with non-retail data are essential for tracking wholesaler and/or distributor sales into those non-retail institutions and to provide statistics on national market trends.

31.    Symphony's T&C products include, among others:  Source® Prescriber, Source® Prescriber Payer, Source® LaunchTrac, and Source® Territory Manager, which utilize prescription-level data, as well as Source® Non-Retail, which utilizes data from non-retail data sources to track drug distribution.  IMS offers a vast array of competing T&C products, including, but not limited to Xponent®, Xponent® PlanTrack, Xponent® Prescribing Dynamics,

Xponent® Weekly Xponent® Long Term Care, and IMS DDD (wholesaler drug distribution data).

32.     One of the fastest growing segments in the pharmaceutical industry is specialty pharmaceuticals, *i.e.*, high-cost, technologically advanced drugs used to treat complex or rare conditions and diseases, many of which are delivered to the patient via injection or infusion.  In fact, over 600 products are under development in this area.  Clients thus find T&C products that track specialty data to be extremely useful.  IMS itself recognizes that this is one of the fastest growing segments of the T&C data market.  IMS has obtained exclusive contracts and substantially foreclosed Symphony's access to a significant portion of the specialty drug data in the United States, as explained infra.

33.     Similarly, pharmaceutical companies are manufacturing more drugs that are being used in long-term care facilities and value data products that can track those drugs. IMS has obtained exclusive contracts and blocked Symphony's access to approximately 80% of the long-term care data in the United States, as explained infra.

34.     Despite Symphony's ability to offer comparable and oftentimes better T&C products, IMS has been able to maintain its 86% monopolist share of the market through unlawful practices, including not only through the use of exclusive contracts and MFNs (or similar agreements that in practice serve the same purposes) that, among other things, block access to long-term care and specialty pharmaceutical data, but also through the other anticompetitive acts discussed herein.

### The Managed Markets Data Market

35.     Symphony and IMS compete in the Managed Markets data market. Managed Markets data products are derived from benefit claims that patients and pharmacies make to health plans, insurance companies, and pharmacy benefit managers.

36.     The primary benefit of Managed Markets data products is that they give pharmaceutical companies insight into how decisions made by managed care entities impact their drugs.  For example, Symphony's Dynamic Claims Suite helps clients to: (i) capture drug switching due to health plan formulary restrictions or patient pricing sensitivities; (ii) compare their drugs' performance to competing drugs according to health plan, employer group, or pharmacy benefit manager; (iii) evaluate the return-on-investment for being a preferred formulary product or the effect of an unfavorable formulary position; and (iv) assess when discounts are necessary and optimize rebate offerings.

37.     Prior to acquiring SDI, IMS had a smaller share of the Managed Markets data market.  IMS's products were viewed in the marketplace as less useful than Source's offerings.  IMS's acquisition of SDI, including SDI's Managed Markets product, Formulary Impact Analyzer ("FIA"), however, immediately gave IMS the largest share in this market and increased its ability to bundle products.

38.     IMS has been able to grow its share of the Managed Markets data market not only through acquisition, but also through its practice of bundling its Managed Markets data products with its T&C data, and leveraging its monopoly in the T&C data market.  IMS has also engaged in other anticompetitive conduct, such as the predatory hiring of Symphony's Managed Markets experts, to grow its share of this market.

39.     Through these anticompetitive practices, as discussed below, IMS is attempting to monopolize the Managed Markets data market and has a dangerous probability of doing so in the near future.

**The Integrated Global Data Market**

40.     Symphony has attempted to compete with IMS in the integrated global data market.  Today's pharmaceutical and biotechnology companies market, sell, and distribute their products in hundreds of countries all over the world.

41.     Integrated global market data products offer a unique range of metrics that are not derivable from local data offerings.  Using massive amounts of data from numerous countries and regions, global data products can synthesize pharmaceutical data and market intelligence from multiple countries to give clients international insight and a competitive edge in the global marketplace.

42.     These products can provide, among other things, detailed estimated product volumes, trends and market shares for hundreds of product and therapy classes, cross-country comparisons, and a variety of metrics for retail and non-retail channels.  Pharmaceutical companies use integrated global data to identify, among other things, global trends, patterns for diagnosis and treatment, emerging drug markets, and areas for research and development.

43.     Global data products can translate differences inherent in the market from one country to next, and permit clients to track and analyze market activity across countries, regions, and even globally.  Producing a global data product requires access to data from numerous countries.

44.     IMS offers to customers in the United States a series of global data products under the brand name "MIDAS" or the Multinational Integrated Data Analysis System.  According to IMS, "companies rely on MIDAS to gain a truly global, timely and cost-effective view of estimated product volumes, trends and market share through retail and non-retail channels."

45.     MIDAS provides market intelligence using pharmaceutical data from over 100 countries.  IMS, through MIDAS, is the only provider of national market measurements across those countries.  MIDAS is "the world's largest pharmaceutical information resource" according to IMS.  But even this statement understates the relative size of MIDAS.

46.     IMS provides detailed market information for the 11 countries that represent 75% of the world's prescription drug market: United States, Canada, Japan, United Kingdom, Germany, France, Italy, Spain, Brazil, Mexico, and Argentina.

47.     IMS is an indisputable monopolist in the market for global data products with over 90% of the market.

48.     Global data products are important to pharmaceutical clients.  Many if not all of Symphony's and IMS's major pharmaceutical clients sell pharmaceuticals globally and compete internationally.  To gain comprehensive insight into the global market, pharmaceutical companies have little choice other than to use IMS's MIDAS products.  There are other companies that offer products with foreign data, but no other company has the capability to offer in the U.S. products with integrated data from as many countries as MIDAS—mostly due to IMS's blocking access to that data.

49.     IMS recognizes that it has monopoly power in the market for global data products and has abused that power.

50.     As explained below, IMS leverages its monopoly in the market for global data into other markets and has prevented competitors from entering or competing effectively in this market.  Access to foreign data is a barrier to entry in this market, which IMS has heightened through acquiring key foreign data suppliers and through restrictive arrangements

with other foreign data suppliers. Specifically, IMS has interfered with Symphony's attempts to develop a global data product to compete with MIDAS.

### The APLD Market

51.     Symphony and IMS compete in the anonymous patient longitudinal data ("APLD") market. APLD contains information on drugs consumed by individual anonymous patients. APLD is derived from pharmacy data, managed care claims data, and patient-linked medical and hospital claims data, as well as doctor diagnoses. The data delivers information regarding patient treatment and medication consumption behavior over time for a client's pharmaceutical products within a particular therapeutic class or market, or for a particular diagnosis. In other words, APLD enables companies to see the course of the patient's treatment.

52.     APLD, with its synthesis of comprehensive data from pharmacy, medical, and hospital claims at the anonymized patient level, and prescriber-level prescription data, can show, among other things, how health plans and insurance companies and other factors impact patient behavior.

53.     IMS's APLD offerings were not as competitive until it acquired SDI. By acquiring SDI, IMS was immediately able to establish the dominant position in the APLD market. Most importantly, the SDI acquisition enabled IMS to build upon its anticompetitive bundles that now consist of IMS's T&C data products, Managed Markets data products (including SDI's Formulary Impact Analyzer), and global data products (*i.e.*, MIDAS).

54.     IMS now has a majority share of this market, while the remaining share is divided by consulting firms and Symphony.

**Barriers to Entry in All Markets**

55.     These four markets each have similar, substantial barriers to entry and expansion.

56.     Every facet of the pharmaceutical data and analytics business is driven by access to data. Data acquisition costs are extremely high. Typically, each competitor faces tens of millions of dollars per year in fixed data acquisition costs. Without a sufficient volume of data in every drug channel, *i.e.*, specialty, long-term care, mail order, retail pharmacies, etc., a company cannot offer competitive products. To compete against IMS, a market entrant would need to make significant expenditures to acquire national, subnational, and foreign data. These substantial data costs are largely sunk costs, *i.e.*, not recoverable if a potential competitor's efforts to enter the market fail.

57.     To create competitive products, a market entrant would need access to historical data, which can be acquired efficiently only through continuous operation in the industry for an appreciable period of time. For example, customers typically require at least three years of historical APLD information, and data repositories often contain five to ten years of information. Customers must be able to access historical data and analyses for a number of reasons, including to inform their present and future decision-making.

58.     Technological capability and experience also form a barrier to entry. Data volumes are enormous and require processing on massive scales. Analyzing data for the billions of drug transactions that occur in the U.S. annually (*i.e.,* 50 million per week) involves a complicated process of de-duplication, indexing, cleansing, and standardization. The average data and analytics company is not equipped to perform this type of work or to invest the tens of millions of dollars annually to purchase and process the data. Moreover, before a product can be successfully marketed, competitors must invest substantial time and money into researching

and developing the product. In addition, contract lengths are three to five years, which requires data companies to make long-term investments and maintain service for lengthy periods.

59.     Thus, to survive in a market dominated by global leader and monopolist IMS, competitors such as Symphony must work hard to differentiate themselves through identifying available data, data selection, analytical techniques, projection methodologies, and development of innovative products.

60.     IMS itself has unilaterally created barriers to entry by blocking access to data. IMS has, among other things, entered into exclusive contracts or contracts with MFN provisions with several key data providers. IMS's intent is to block current and potential competitors from accessing data, including for some of the fastest growing industry segments.

61.     The regulatory landscape also operates as a deterrent for potential competitors. The regulatory requirements that apply to the use of patient and prescriber data, at the federal and state level, are complex and consistently changing. Potential market entrants must comply with a wide range of laws and risk civil and enforcement liability for failing to comply. For example, every entrant must monitor how their products are affected by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), as well as the newer Health Information Technology for Economic and Clinical Health Act of 2009 ("HITECH"). HITECH strengthened requirements for data security and protection for health information and created additional penalties for violations.

62.     Extremely high switching costs also present a very significant barrier to entry. These are the costs that clients pay to switch from IMS and to make their internal technology compatible with different companies' products. Pharmaceutical and biotechnology clients will incur substantial costs to configure their information technology systems to integrate

new product offerings into their systems and, more importantly, their business. For large clients with sophisticated systems, switching costs can exceed $1 million. These costs include housing costs, integration costs, managing and designing the data for business uses, adjusting business practices, and paying for two data sources while switching over. Customers also spend time and money changing account and prescriber demographic information, reforecasting, setting new targets based on the new data products, validating sales force configuration, and changing sales field reports. Customers must also spend time and money on teaching employees how to use the new products and educating management and the rest of the organization about the new products and how to interpret the data. Moreover, customers often use external vendors who charge for switching and must, too, adjust to the new data sources.

### IMS's Dominant Position and Monopoly Power

63.     Historically, IMS has had a long-standing monopoly in the market for T&C data and integrated global market data products.

64.     In fact, IMS has always been the only entity with a comprehensive offering of global data products.

65.     Up until 2011, Source (now a Symphony company) and SDI sought to compete against IMS, and had some success, in the Managed Markets data and APLD markets. IMS, however, realized that it could protect and extend its T&C and global data monopolies by gaining market power in the Managed Markets data market. IMS knew that it could offer Managed Markets products in a bundle that would force customers to continue buying IMS's monopoly products. IMS also did not want other competitors, such as Source and SDI, collaborating because it would allow them to compete more effectively against IMS and to take away IMS's market share. Thus, IMS acquired SDI, the markets' last remaining competitor to IMS and Symphony, as a part of an overall scheme to prevent customers from dividing their

data uses among various providers, harm Symphony, and exclude potential competitors. IMS's anticompetitive conduct has resulted in higher net of discount prices in the relevant product markets.

### FTC Consent Decree

66.     When IMS entered into an agreement to acquire SDI, the Federal Trade Commission ("FTC") initiated an investigation. The FTC charged that IMS's agreement was a "violation of Section 5 of the FTC Act, as amended, 15 U.S.C. § 45, and that such acquisition, if consummated, would violate Section 7 of the Clayton Act . . . ." (See FTC Complaint, In the Matter of Healthcare Technology Holdings, Inc., FTC File No. 111 0097, Dkt. No. C-4340 (Oct. 28, 2011).)

67.     The FTC investigation appeared to target IMS's and SDI's market shares in the audits product market, another pharmaceutical data market. Audit products can include various types of audits, including: (i) prescription audits (nationally projected estimates of the rates at which prescriptions flow from doctors to pharmacies to patients); (ii) pharmaceutical sales audits (measures sales of products from manufacturers and wholesalers into pharmacies and hospitals); (iii) medical audits (disease-specific diagnoses made, and therapies prescribed by, physicians), and (iv) promotional audits (measures how much promotional activity is occurring by drug, therapeutic class, and other categories).

68.     Ultimately, the FTC determined that permitting IMS to keep SDI's promotional and medical audits business would have anticompetitive consequences in the market. The FTC required IMS to sell SDI's promotional audit and medical audit businesses to an FTC-approved buyer to resolve the agency's charges that IMS's acquisition of SDI, as originally proposed, was "anticompetitive and likely would increase prices for market research products in the healthcare industry." (See FTC Press Release, "FTC Requires Parent of Market

Research Firm IMS Health to Sell Two Product Lines Before Acquiring Rival SDI Health," In the Matter of Healthcare Technology Holdings, Inc., FTC File No. 111 0097 (Oct. 28, 2011).) As a result, IMS had to divest SDI's promotional and medical audit business, but kept its own promotional and medical audit business.

69.   Even after selling SDI's medical audit business per the FTC's mandate, IMS maintains a monopolist's share of 78% of the United States audit market.

### IMS's Anticompetitive Acts:
### Bundling of T&C and Global Data Products

70.   IMS has monopoly power in the U.S. market for T&C data (approximately 86% market share) and for global data products (approximately 90% market share).  IMS is the only pharmaceutical data company with comprehensive global data product offerings and holds a dominant position in the market for global data products.

71.   IMS's MIDAS line of products integrates global data from over 100 different countries, including the 11 countries that represent 75% of the world's prescription drug market.  MIDAS offers the world's largest compilation of integrated global pharmaceutical data.

72.   To gain insight into the foreign markets, pharmaceutical companies are forced to use IMS's MIDAS products.  No other company selling products in the U.S., e.g., T&C, Managed Markets, or APLD products, has the capability to offer such a broad compilation of integrated global market data.

73.   Taking full advantage of its dominant positions, IMS leverages its 90% monopolist share of the global data market to protect and grow its 86% percent monopolist share of the T&C data market.

74.    For at least the last five years, IMS has unlawfully bundled its global data products with its domestic T&C data products (in a bundle that often includes its Managed Markets and APLD products) to coerce clients not to purchase Symphony's T&C data products.

75.    IMS offers customers "discounts" for purchasing a bundle of products, including its T&C products (Xponent, DDD, etc.) and MIDAS. If a customer attempts to break the bundle by buying products from Symphony, however, IMS begins to revoke the discounts.

76.    IMS in particular threatens its customers that it will raise prices on its industry-essential MIDAS, the global data product, if the client does not buy its U.S. T&C data from IMS. In other words, if an IMS customer buys its T&C data from Symphony, IMS will punish that customer by dramatically raising pricing for MIDAS and related services. In some instances, IMS has threatened to increase the price of its MIDAS offering by over 50%. Because Symphony does not offer a competitive global data product, IMS can dictate prices customers must pay in the market for global data products—a hallmark trait of a monopolist.

77.    Thus, Symphony's current and potential customers have no choice but to adhere to IMS's bundle. There have been several instances where this bundled price has proven to be the major factor in multinational pharmaceutical companies' decisions not to switch their T&C data subscriptions from IMS to Symphony, despite Symphony's ability to offer a T&C data product with a better sampling of retail data. Because of IMS's bundling, some customers have declined to purchase T&C data from Symphony. Symphony has lost market share in the T&C data market, and over time, will continue to lose market share.

78.    IMS impresses on customers that discounts are dependent upon purchasing a bundle of its products. There have been reports that when a pharmaceutical company customer switched to or threatened to switch to Symphony, pricing for IMS's MIDAS

product and other IMS services increased dramatically.  Moreover, IMS pays rebates to the headquarters of multinational pharmaceutical companies that are dependent upon the total volume of purchases.

79.     Thus, IMS has threatened and coerced customers into buying its T&C products and refusing to purchase competing products from Symphony.  IMS's threat is credible because pharmaceutical companies are susceptible to retaliation by IMS as they can never substitute all of their IMS products with competing products.  Straying from IMS's bundle creates a competitive disadvantage for pharmaceutical companies by causing them to pay higher costs than their competitors for similar data and analytics.  This penalizes or "taxes" customers' transactions with Symphony and other competitors, which permits IMS to maintain supracompetitive net of discount prices in the T&C data market.

80.     Symphony continues to be unable to grow its 14% market share and, in fact, is continuing to lose market share to IMS's growing monopoly in the T&C data market.  In addition, Symphony cannot counter IMS's bundling of its global data products with its T&C data products as Symphony lacks a competitive global data product.  Symphony's efforts to compete have been thwarted; IMS creates barriers to entry principally by acquiring or entering into exclusionary contracts with global data suppliers with whom Symphony has sought to collaborate.

81.     Thus, IMS is using its monopoly power from its 90% share of the global data market (where it offers the only integrated product) to protect its 86% monopolist share of the T&C data market (where Symphony is its only competitor).

82.     The principal anticompetitive effect of IMS's conduct is that when IMS, a monopolist, threatens to increase prices of its global data products if a customer purchases its

T&C data subscription from Symphony, it forecloses the T&C market to Symphony and other potential market entrants because they cannot produce an equally diverse group of products. IMS's conduct has the tendency to increase prices for customers and eliminates competition.

### IMS's Anticompetitive Acts:
### Bundling and Predatory Pricing of Managed Markets Products

83.     IMS also engages in unlawful bundling and predatory pricing of its Managed Markets products, such as its Formulary Impact Analyzer ("FIA"), with the intent to obtain monopoly power in the Managed Market data market, maintain its dominant share in the T&C data market, and drive Symphony out of business. IMS has approached Symphony's current and potential customers and has either offered them FIA and other services for free or at a substantial discount if the customer buys or continues to buy IMS's T&C products. IMS used its acquisition of SDI, the pharmaceutical data industry's third largest competitor, to further this strategy. Through the acquisition, IMS was able to enhance its Managed Markets offerings by among other things acquiring FIA and was able to remove SDI as a competitive threat.

84.     Upon information and belief, IMS often masks its pricing by offering clients bundles of its products across the four relevant product markets. Instead of a pricing contract displaying that a particular product is free or significantly discounted, IMS will "spread" the discount across the entire bundle to mask the size of the discount(s).

85.     Symphony has learned of various examples of IMS's predatory offerings. For example, in late 2012 to early 2013, one international pharmaceutical company that has subscribed to Symphony's DCL service (a Managed Markets data product) and uses IMS's T&C data products discussed renewal options with Symphony. Simultaneously, former Symphony employees that IMS poached were engaging that customer and detailing purported advantages that FIA had over DCL. Symphony fashioned a competitive package for the

company and submitted a bid.  Afterwards, the company informed Symphony that IMS was offering FIA for a significantly reduced price.  Symphony had to significantly adjust its price to respond to IMS's extremely low price for FIA.  IMS then began offering the company its FIA product for free.  "Free" is below any measure of IMS's incremental costs and, therefore, is predatory.  The company still decided to buy Symphony's products, but only after Symphony cut its prices in response to IMS's anticompetitive offering.  Symphony lost significant profits as a result of IMS's conduct.

86.     A customer's true cost of buying Symphony's products is the low price it pays Symphony plus the amount of rebates and discounts it forgoes on products it continues to purchase from IMS.  This type of "discounting" by IMS is not the type of pricing that antitrust laws encourage because the true net of discount prices that customers pay are higher than they would be in a competitive market.

87.     Another customer subscribes to Symphony's DCL service and uses IMS's T&C products.  During informal discussions about the customer's renewal of DCL, the customer informed Symphony that IMS offered FIA for free.  A representative from the customer informed Symphony that it will not be contacting Symphony to provide alternative pricing because Symphony could not compete with IMS's offer to supply Managed Markets data for free.

88.     Symphony's Managed Markets contract with a different client ends in March 2014.  IMS has approached that customer and offered FIA for free as a part of a bundle. The offer included free Managed Markets data for the product markets for gout, irritable bowel syndrome, oral diabetes, anti-hypertensive, and PPI.

89.     Symphony had a contract with another customer that it had to restructure downward because IMS made an offer to that customer that bundled Managed Markets data with T&C data.  After IMS's offer, the customer insisted that it would only buy Symphony's data "a la carte" and decreased the number of therapeutic classes it purchased from Symphony.

90.     In yet another example, Symphony lost a T&C contract worth millions of dollars with one of the largest pharmaceutical companies in the world because of IMS's bundling practices.  The company believed that Symphony's product was "better" but could not ignore the cost savings from IMS's bundle of T&C products with its Managed Markets and APLD products.

91.     Immediately before Symphony filed this action, IMS approached one of Symphony's most valuable customers and offered that customer an anticompetitive bundle in an attempt to steal that client's T&C business (which amounts to millions of dollars) from Symphony.  IMS offered the customer its Managed Markets products (*i.e.*, FIA) for free.  IMS also touted that its data products have the specialty data that Symphony cannot obtain because of IMS's exclusive contracts with data suppliers.

92.     These companies, each current or former clients of Symphony, either have entered into agreements with IMS or are in danger of doing so in the near future when their current contracts with Symphony expire.

93.     IMS's market share in the Managed Markets data market is growing and IMS has a dangerous probability of attaining a monopoly in that market as well.

**IMS's Anticompetitive Acts:**
**Exclusive Dealing Contracts with Suppliers**

94.     IMS has a practice of entering into exclusive contracts with suppliers of data, preventing Symphony and other actual or potential competitors from obtaining the same data.

95.     One example of this anticompetitive practice is IMS's dealings with long-term care ("LTC") providers for their prescription-level information.  Long-term care prescription data comes from long-term care facilities, nursing home facilities and mental health facilities.  Long-term care data is extremely valuable to customers, particularly those who manufacture products utilized by long-term care providers.

96.     IMS has entered into exclusive contracts with the largest and second largest LTC providers in the United States, as well as other LTC providers, effectively preventing Symphony and other actual and potential competitors from competing with IMS.

97.     The data of these providers combined—which Symphony cannot access—constitutes over 80% of the long-term care data in the United States.  It is believed that these exclusive contracts are at least three to five years in length.  Thus, IMS is the only pharmaceutical company in the country with access to that data and has the ability to charge supracompetitive prices for it.

98.     When Symphony approached one of the long-term care providers to purchase access to its LTC data, the entity refused to provide the data because of IMS's exclusive contract.

99.     As a result of these contracts, Symphony has lost business with then-existing customers and has been unable to secure additional business from new or existing customers.

100.   The exclusive contracts effectively force pharmaceutical clients with products used in nursing homes, LTC facilities, and mental health facilities to use IMS for their physician T&C data needs.

101.   IMS also has substantially foreclosed all competitors from accessing a significant portion of the specialty drug data in the United States. For years, IMS has had an exclusive dealing relationship with Caremark (CVS), a key distributor of specialty drugs. Caremark generates data on classes of specialty drugs that are critically important to many pharmaceutical manufacturers. IMS has been the only data company with access to Caremark's specialty data and has the ability to charge supracompetitive prices for it.

102.   Upon information and belief, IMS also maintains an exclusive relationship with another key distributor of specialty drugs, which constitutes the second largest source of specialty drug data. Without access to these two sources, Symphony cannot compete meaningfully with IMS in the T&C data market.

103.   Due to IMS's exclusive contracts with these providers of specialty drug data, Symphony has lost and continues to lose significant profits. In 2012, for example, Symphony's Source line of business lost a customer who had a contract with Symphony that was worth millions of dollars in annual revenue. The client did not renew with Symphony because Symphony could not access the specialty drug data that IMS blocked off from its competitors, including Symphony.

104.   By being the only provider of essential specialty and long-term care data, IMS is able to prevent customers from buying Symphony's products by bundling that data into their T&C product offerings. Because of the increasing importance of specialty and long-term care drugs, pharmaceutical companies cannot effectively market their entire drug portfolios

without this data. While Symphony offers comprehensive data for the traditional drug channels, IMS's restriction of competitor access to specialty and long-term care data forces customers to purchase their needs from IMS.

105. IMS also uses exclusionary and exclusive agreements with foreign data providers. For instance, Symphony cannot obtain certain pharmaceutical data generated by one of the largest drug wholesalers in the United Kingdom because of an exclusive agreement between that provider and IMS.

106. In still another example, Symphony entered into a data supply contract with a Swiss company, Pharmexpert, which was the leading local provider of market intelligence for pharmaceutical industry in Russia and countries participating in the Commonwealth of Independent States. The contract provided Symphony with access to Russian pharmaceutical data. Afterwards, IMS acquired all of the intellectual property assets of Pharmexpert, and subsequently threatened to shut off part of the data feed to Symphony.

107. Similarly, IMS acquired a data supplier in Canada, Brogan, Inc., to prevent Symphony from acquiring Canadian data, which gave IMS the exclusive ability to offer Canadian data in its integrated global data products.

108. Given its entrenched position globally, and its predatory pricing and bundling practices, these contracts have a substantial impact on competition and hurt customers. In particular, these practices have diminished the market presence of Symphony, have impeded its ability to compete, and have prevented other entrants into the market. IMS's purpose in entering into these agreements is to protect its monopoly power in the relevant markets.

109.    These exclusive and exclusionary contracts have blocked Symphony's access to critical data for years. As a result, Symphony lost significant profits and continues to lose profits.

### IMS's Anticompetitive Acts:
### Most Favored Nations Clauses

110.    IMS has contracted with numerous data suppliers for their valuable data. Access to data is the lifeblood of this industry.

111.    Where IMS has not negotiated exclusive contracts with data suppliers to choke off access to Symphony, IMS integrated anticompetitive Most Favored Nations clauses ("MFNs") into its contracts that have substantial exclusionary effects.

112.    IMS's MFNs required data suppliers to sell their data at a higher price to IMS's competitors, such as Symphony. Thus, IMS was able to control and artificially raise the price that Symphony pays for critical data.

113.    IMS's MFNs have caused data suppliers to raise prices charged to IMS's competitors by substantial amounts. In some instances, the prices that IMS has caused the suppliers to charge are so high that purchasing that data has become unprofitable. Because of IMS's MFNs with data suppliers, Symphony has been unable to acquire data and cannot compete effectively.

114.    Even where IMS has entered into new contracts with critical data suppliers that do not contain MFNs, the effects of IMS's MFNs persisted because IMS inflated the price that suppliers charged for its data. As IMS intended, prices have been inflated to an amount that only IMS can afford.

115.    IMS's MFNs exclude competitors from the market and protect IMS's monopoly share. These MFNs serve as barriers to entry into the relevant product markets.

116.    IMS has aggressively enforced its MFN rights against data suppliers. IMS's MFNs also permit IMS to charge supracompetitive prices to customers for the data protected under the MFNs.

117.    The antitrust enforcement agencies—the Antitrust Division of the Department of Justice ("DOJ") and the Federal Trade Commission—have begun scrutinizing MFNs, particularly in the healthcare context.  As the former head of the DOJ Antitrust Division recognized, "[MFNs] have the potential to inflict significant harm to consumers and competitors."

118.    IMS's MFNs significantly restrain competition and serve no purpose other than to preserve and increase IMS's market shares and to harm Symphony.

### IMS's Anticompetitive Acts:
### Anticompetitive Acquisitions

119.    IMS has engaged in a series of anticompetitive acquisitions that are designed to prevent collaboration among its smaller competitors and serve to maintain and enhance its monopoly power and ability to engage in unlawful monopoly practices, such as bundling.  As noted above, IMS acquired SDI, resulting in the merger of the first (IMS) and third (SDI) largest firms providing pharmaceutical data.  The acquisition has since had anticompetitive effects in the T&C, Managed Markets data, and APLD markets.  By acquiring SDI, IMS's intent was to protect its monopolies by expanding its bundles with SDI products. As noted above, IMS bundles SDI's legacy product, FIA, oftentimes offering it for free, with IMS's T&C data products.  IMS includes SDI's APLD products in its bundles as well.

120.    More recently, IMS used an acquisition to interfere with Symphony's agreement with Tarheel Trading ("THT").  Symphony had an agreement with THT to supply THT with hundreds of thousands of dollars' worth of data in three tranches to be delivered in

June, August, and December of 2012. The first two deliveries were made without incident. In or around August of 2012, IMS purchased THT, and THT refused to pay monies owed to Symphony. THT claimed that it could not pay Symphony because IMS would not allow it.

121.   In 2012, IMS acquired Pharmexpert, a Swiss company that was a leading provider of market intelligence for the pharmaceutical industry in Russia and countries participating in the Commonwealth of Independent States. Prior to IMS's acquisition, Symphony entered into a data supply contract with Pharmexpert that provides Symphony with access to Russian pharmaceutical data. Symphony desired access to this data to increase its ability to compete with IMS's MIDAS line of products. IMS, having acquired Pharmexpert, has threatened to shut off part of the data feed to Symphony.

122.   In July 2010, IMS acquired Brogan, Inc., a company in the business of tracking drug sales in the Canadian healthcare market. According to IMS, Brogan had the largest drug claims database in Canada. Symphony had intended for Brogan to be a key participant in a network of non-U.S data suppliers of international data. IMS's acquisition eliminated Symphony's ability to obtain any data from Brogan. Thus, the acquisition gave IMS the exclusive ability to offer Canadian data in its integrated global data products to U.S. customers. IMS's reason for acquiring Brogan was to protect IMS's monopolies and to prevent Symphony from accessing the data. And, as a result, Symphony lost access to a potentially significant data supplier.

123.   In March 2013, IMS acquired Appature, Inc., a technology company that provides cloud-based marketing solutions designed exclusively for healthcare companies. Symphony entered into a contract with Appature to provide Appature's marketing tool in

conjunction with Symphony's data products for a particular client.  Symphony anticipates that IMS will use this acquisition to further injure and interfere with Symphony's business.

### IMS's Anticompetitive Acts:
### Refusal to Sign Third Party Agreements

124.     Clients of pharmaceutical data companies historically have used outside companies to provide pharmaceutical consulting and analytics services.  Oftentimes, a competitor performing a project for a mutual client will need access to another competitor's data compiled for the same client.  A customary practice in the industry—dating back decades—is for companies who have compiled data for clients to grant access to the data if the competitor company signed a Third Party Agreement restricting use, commonly referred to as a "TPA."  For years, IMS followed this industry practice.

125.     Before Symphony acquired ImpactRx, IMS routinely granted TPAs to ImpactRx.  ImpactRx is a pharmaceutical research company that analyzes physicians' prescribing behaviors, measures the impact of its clients' promotional efforts, and gauges physicians' attitudes toward certain drugs.  ImpactRx garners information from thousands of doctors across the country through surveys and syndicated panels.  ImpactRx can tell clients, among other things, whether they are leaders in certain therapeutic areas; what companies and drugs are most competitive; how aggressive their competitors' promotion efforts are; and key data sales representative visit to certain doctors.

126.     Pharmaceutical companies value syndicated data for physicians that prescribe their drugs (as well as those of their competitors) with relatively high frequency.  These doctors are "target doctors," because their prescribing habits and impressions of clients' drugs are of significant commercial interest to pharmaceutical companies.  Thus, ImpactRx's

products are only valuable to clients if they measure information about the client's target doctors.

127.    Because of its monopoly in the T&C data market, IMS has compiled national "target lists" of prescribing doctors for almost every major pharmaceutical company in the United States. IMS has claimed these lists as proprietary and does not permit its clients, *i.e.,* the pharmaceutical companies for whom IMS compiled the lists, to freely share these lists with non-IMS researchers and consultants.

128.    Prior to ImpactRx becoming a Symphony company, IMS would freely sign TPAs for ImpactRx to access the target lists that IMS compiled. For years, ImpactRx had unfettered access.

129.    After Symphony acquired ImpactRx, however, IMS refused to sign TPAs for ImpactRx. The U.S. Director of Sales at IMS stated via email on October 5, 2012 that the reason for IMS's change of heart was that "in March of this year, ImpactRx was purchased by Symphony Health which is a direct competitor of IMS." IMS was able to abuse its monopoly power in the T&C data market to prevent ImpactRx from doing business with its clients. IMS's obvious goal was to injure Symphony.

130.    Upon information and belief, Symphony lost at least hundreds of thousands of dollars of business as a result of IMS's refusal to sign TPAs. IMS also caused significant damage to Symphony's and ImpactRx's goodwill and reputation by causing project delays and aggravating ImpactRx's clients.

131.    For example, Symphony (per Impact Rx) was engaged by an international pharmaceutical company to perform a pilot project that required access to that client's list of target doctors in multiple U.S. territories. The list, which IMS compiled,

included basic (and some publicly available) information, such as each doctor's name, address, specialty, and Medical Education number. The client had the list in its possession, but IMS told that client that it could not share the list with ImpactRx because ImpactRx had been acquired by Symphony. The client explicitly stated that Symphony could not proceed with the pilot project because of IMS's refusal to provide Symphony with access to the data. As a result, Symphony lost a significant amount of profits, including hundreds of thousands of dollars in recurring profits from future projects that would have been awarded after Symphony successfully completed the pilot project.

132. IMS refused to deal with ImpactRx in an attempt to injure Symphony as a whole—because Symphony is a competitor and a threat to IMS's unlawful monopoly maintenance or attempted monopolization in the relevant product markets.

133. Moreover, upon information and belief, IMS further induces customers not to deal with Symphony by offering them discounts on data if they agree not to sign a third party agreement with any vendors without coming to IMS first with the opportunity.

134. While IMS has on occasion and belatedly offered certain "workarounds" (*e.g.*, access only at the pharmaceutical company's location and on its hardware, using a third party to do matches), these workarounds are pretextual and are not feasible for much of the business. IMS's refusal to grant TPAs lacks any business justification and is designed to inflict harm on Symphony, as a competitor to IMS.

135. As a result of these refusals to permit access, Symphony has been foreclosed from certain work with customers, and thereby has lost a substantial amount of money and will continue to lose a substantial amount of money.

**IMS's Anticompetitive Acts:**
**Misrepresentations to Symphony's Customers**

136.    IMS has initiated a campaign to defame and disparage Symphony's business in an attempt to steal clients and to prevent prospective clients from buying Symphony's products.

137.    IMS has made misrepresentations that are false and material.  Clients and potential clients, who have no independent knowledge of the subject matter, have relied on IMS's misrepresentations.

138.    For example, an IMS representative told the senior vice president of sales for a pharmaceutical company customer that Symphony did not get complete weekly data and as a result, Symphony performs "modeling" rather than using or analyzing real data.  IMS also stated that Symphony's data feeds were less accurate and could not support weekly reports; IMS then touted that it had more accurate data.  As a result, the client expressed its desire to move away from Symphony and to IMS.

139.    IMS told another customer's business and procurement teams that Symphony Health is "unethical and [you] should not do business with [Symphony]."

140.    IMS sales representatives also told Symphony's customers that Symphony would lose access to a key data supplier.  This false representation benefitted IMS.  IMS's statements caused customers and potential customers to delay purchasing and switching decisions.

141.    IMS told another customer that Symphony will never have access to key data on specialty drug products.  IMS hid the fact that it uses exclusionary contracts to block Symphony from that data.

142.    Symphony has worked to undo the effects of IMS's defamation, but upon information and belief, clients have decided to buy products from IMS instead of Symphony, as a result of IMS's disparaging statements.

143.    Symphony has lost and continues to lose profits, as well as suffer damage to its reputation and goodwill.

### IMS's Anticompetitive Acts:
### Misappropriation of Trade Secrets and Predatory Hiring of Symphony Employees

144.    IMS has targeted Symphony's employees to expand its monopoly in the T&C data market and to attempt to monopolize the market for Managed Markets data products. Between 2011 and 2012, IMS poached three key Symphony employees who had contributed to the success of Symphony's Managed Markets products.  These employees possessed Symphony's institutional knowledge and trade secrets about Symphony's business and products.

145.    Due to IMS's poaching of these key employees, and its use of Symphony's trade secrets, Symphony's revenues in the Managed Markets data market has declined.

146.    Through use of Symphony's trade secrets, these employees have targeted Symphony's existing and prospective clients.

147.    These actions are ongoing.  IMS continues to target Symphony's employees through unsolicited communications and with offers of substantial raises.

148.    As a direct result of IMS's anticompetitive poaching of Symphony's employees, Symphony lost significant profits while IMS has increased its market shares and profits.

35

### Lack of Pro-Competitive Justifications

149.    There are no pro-competitive justifications for any of IMS's actions. The only reason for IMS's conduct is that IMS intends to foreclose competition from rivals such as Symphony. IMS's behavior does not benefit consumers, will drive up net of discount prices, and stunt innovation of new products.

150.    In particular, the anticompetitive acts have no corresponding efficiencies and offer no downstream enhancements. For instance, the exclusive dealing arrangements and MFNs provide no benefit to the customers that they impact. Likewise, IMS's refusal to sign TPAs has no conceivable pro-competitive justification. IMS's stated purpose of restricting access to ImpactRx was to injure Symphony. Further, IMS's bundling practices are not beneficial to customers because these practices penalize customers when they buy products from Symphony and result in higher net of discount market prices. Rather, IMS's bundling protects IMS's monopoly power and inhibits the ability of its only remaining rival, Symphony, to compete. There is no market justification for the pricing behavior or any of the other behavior.

### Antitrust Injury

151.    Symphony is seeking redress under Sections 4 and 16 of the Clayton Act, because it has suffered injury and/or competes against IMS in the relevant antitrust markets, which have been restrained and monopolized by IMS. It has suffered direct antitrust injury as a result of IMS's conduct.

152.    Symphony's business has suffered injuries that the antitrust laws were intended to prevent and those injuries flow directly from IMS's anticompetitive conduct, including IMS's bundling of products, entering into exclusive contracts or requiring MFN

clauses, engaging in anticompetitive acquisitions intended to restrict data access to competitors, disparaging competitors, and refusals to deal.

153. But for IMS's anticompetitive scheme to restrain trade and monopolize the relevant markets, Symphony would have increased its size, profitability, market shares, and market value.

154. IMS's anticompetitive conduct has had the effect of excluding Symphony from the relevant markets and denying customers the benefit of lower net of discount prices that would prevail in a more competitive environment. IMS's bundling, exclusionary contracts, MFNs, acquisition of domestic and foreign data suppliers, and refusals to deal have prevented current and potential customers from doing business with Symphony.

155. IMS's anticompetitive conduct has harmed competition and customers by limiting customer choice, eliminating checks on IMS's pricing and coercive power, stunting technological innovation in the industry, and excluding efficient and formidable competitors, such as Symphony, among others. IMS's conduct also has prevented Symphony from researching, developing, and investing in new products that would increase efficiency and profitability of the pharmaceutical and biotechnology industry. IMS's conduct creates disincentives for Symphony and other potential competitors to engage in research and development because they know sales of their products will be "taxed" by IMS's coercive bundling and discounts, thus reducing the profitability of new products. Thus, IMS is the only competitor with an unfettered incentive to innovate.

156. Symphony's presence in the market is good for competition and customers. Without Symphony's continued presence in the relevant markets, IMS's abuse of its monopoly power and its market manipulation would increase and cause further harm to

customers through increased prices and reduced innovation.  Symphony's continued presence will curb IMS's harmful concentration and abuse of monopoly power.

## COUNT ONE

### Unlawful Monopolization
### (Section 2 of the Sherman Act, 15 U.S.C. § 2)
### All Plaintiffs Against IMS

157.    Plaintiffs incorporate by reference the preceding paragraphs as if set forth fully herein.

158.    IMS possesses monopoly power in the relevant product markets for T&C data and integrated global market data.  IMS has the power to control prices and exclude competition in those markets, and has used that power for anticompetitive purposes.

159.    IMS has willfully acquired and maintained its monopoly power through exclusionary and anticompetitive conduct, including but not limited to, bundling products, entering into exclusionary contracts and contracts with MFN clauses, making anticompetitive acquisitions intended to restrict data access to competitors, disparaging competitors, and engaging in refusals to deal.

160.    IMS's anticompetitive and exclusionary conduct has injured competition and deprived customers of access to diverse product offerings and lower prices.

161.    The anticompetitive effects of IMS's conduct far outweigh any purported procompetitive justifications.

162.    Substantial barriers to entry exist in all relevant markets, including the targeting and compensation market, the managed markets data market, the integrated global market data, and the anonymous patient longitudinal data market.

163.    The willful acquisition and/or maintenance of IMS's monopoly power have not occurred due to growth or development as a consequence of IMS's superior products, business acumen, or historic accident.

164.    As a direct result of IMS's exclusionary and anticompetitive conduct, Plaintiffs have suffered and continue to suffer injury to their business and property, including but not limited to lost sales and profits.

## COUNT TWO

### Attempted Monopolization
### (Section 2 of the Sherman Act, 15 U.S.C. § 2)
### All Plaintiffs Against IMS

165.    Plaintiffs incorporate by reference the preceding paragraphs as if set forth fully herein.

166.    IMS has willfully and wrongfully attempted to obtain and maintain monopoly power in the managed markets data market and the anonymous patient longitudinal data market through exclusionary and anticompetitive conduct, including but not limited to, bundling products, engaging in predatory pricing, entering into exclusionary contracts and contracts with MFNs, and engaging in refusals to deal.

167.    IMS has unlawfully obtained, maintained, and abused its monopoly power in the T&C data market and the integrated global data market; however, Symphony pleads, in the alternative, that IMS is unlawfully attempting to obtain monopoly power in the T&C data market and integrated global data market through exclusionary and anticompetitive conduct, including but not limited to, bundling products, engaging in predatory pricing, entering into exclusionary contracts and contracts with MFNs, and engaging in refusals to deal.

168.     IMS acted with specific intent to monopolize the T&C data market, the managed markets data market, the integrated global data market, and the anonymous patient longitudinal data market.

169.     IMS's exclusionary and anticompetitive conduct has given IMS a dangerous probability of successfully attaining monopoly power.  In fact, IMS already has a dominant position and possesses a monopoly share of the pharmaceutical data markets, including 90% of the market for global data products, 86% of the market for T&C data, and over half of the APLD market.

170.     IMS's anticompetitive and exclusionary conduct has injured competition and deprived customers of access to diverse product offerings and lower prices.

171.     The anticompetitive effects of IMS's conduct far outweigh any purported procompetitive justifications.

172.     Substantial barriers to entry exist in the four relevant markets.

173.     As a direct result of IMS's exclusionary and anticompetitive conduct, Symphony and Source have suffered and continue to suffer injury to their business and property, including but not limited to lost sales and profits.

## COUNT THREE

**Monopoly Leveraging**
**(Section 2 of the Sherman Act, 15 U.S.C. § 2)**
**Plaintiffs Symphony and Source Against IMS**

174.     Plaintiffs incorporate by reference the preceding paragraphs as if set forth fully herein.

175.   IMS possesses monopoly power in the market for integrated global data. IMS has the power to control price and exclude competition and is the only U.S. pharmaceutical data company with comprehensive global data product offerings.

176.   IMS uses its monopoly power in the market for integrated global data to gain an unlawful, competitive advantage in the markets for other pharmaceutical data products. In particular, IMS uses its monopoly power in the market for global data products to grow and maintain its monopoly in the market for T&C data and to exclude Symphony from the T&C data market.

177.   IMS also possesses monopoly power in the market for T&C data.  IMS has the power to control price and exclude competition.

178.   IMS uses its monopoly power in the market for T&C data to gain an unlawful, competitive advantage in the markets for other pharmaceutical data products.  In particular, IMS uses its monopoly power in the market for T&C data in an attempt to monopolize the market for Managed Markets data products and to attempt to exclude Symphony from the T&C data market.

179.   Thus, IMS leverages its monopoly power in certain product markets to (i) protect and strengthen its monopolies in other product markets; or (ii) attempt to gain monopoly power in other product markets.  IMS's actions constitute unlawful monopoly leveraging.

180.   IMS's market power in the relevant markets results from IMS's abuse of monopoly power, not from any lawful advantages as a result of size and integration.

181.   As a direct result of IMS's exclusionary and anticompetitive conduct, Plaintiffs have suffered and continue to suffer injury to their business and property, including but not limited to lost sales and profits.

## COUNT FOUR

**Unlawful Use of Exclusionary Contracts**
**(Section 1 and Section 2 of the Sherman Act, 15 U.S.C. §§ 1, 2)**
**Plaintiffs Symphony and Source Against IMS**

182.   Plaintiffs incorporate by reference the preceding paragraphs as if set forth fully herein.

183.   IMS entered into long-term, exclusive contracts with the providers of long-term care data.  The contracts prohibited the data providers from selling their data to Symphony.  Through these exclusionary contracts, IMS has blocked Symphony's access to over 80% of the long-term care data in the entire country.  IMS has deprived customers of access to diverse product offerings and lower prices for long-term care data offerings.

184.   IMS has also required key data suppliers to sign MFNs with IMS. Through these MFNs, IMS artificially raises prices to a level that eliminates competition by making data acquisition cost-prohibitive for competitors.

185.   IMS entered into long-term, exclusive contracts with the providers of specialty drug data.  The contracts prohibited the data providers from selling their data to Symphony.  Through these exclusionary contracts, IMS has substantially foreclosed Symphony's access to a significant portion of the specialty drug data in the entire country.  IMS has deprived customers of access to diverse product offerings and lower prices for specialty-drug data offerings.

186.   IMS also acquired key foreign data suppliers to prevent competitors from accessing their data.

187.    The contracts have achieved their intended effect:  Symphony cannot compete on equal footing with IMS in the relevant markets for global data products and T&C data products.

188.    IMS's exclusionary contracts unreasonably restrain trade and harm competition in the relevant markets.

189.    IMS has used these exclusive contracts to protect its monopolies in the relevant product markets and in an attempt to monopolize the relevant product markets.

190.    As a direct result of IMS's exclusionary and anticompetitive conduct, Symphony and Source have suffered and continue to suffer injury to their business and property, including but not limited to lost sales and profits.

## COUNT FIVE

**Tortious Interference with Existing and Prospective Contractual Relationships**
**(Pennsylvania Common Law)**
**All Plaintiffs Against IMS**

191.    Plaintiffs incorporate by reference the preceding paragraphs as if set forth fully herein.

192.    Plaintiffs had existing and prospective contractual relationships with multiple clients to offer them pharmaceutical data products.

193.    IMS has taken purposeful action, specifically intended to harm existing relationships between Plaintiffs and their customers and to prevent new ones from forming.

194.    IMS has bundled and predatorily priced its products, which was intended to and has tortiously interfered with Plaintiffs' existing and potential contractual relationships.

195.    IMS has entered into exclusionary contracts and MFNs to block Plaintiffs' access to critical data, which unfairly limited the data it could provide to current and potential clients.

(a)    IMS has entered into exclusionary contracts with key data suppliers to limit Symphony's access to data, which was intended to and has tortiously interfered with Symphony's existing and potential contractual relationships.

(b)    IMS has entered into exclusionary contracts with providers of long-term care data to block Symphony's access to critical data, which unfairly limited the data Symphony could provide to current and potential clients.

(c)    IMS has entered into exclusionary contracts with providers of specialty drug data to block Symphony's access to critical data, which unfairly limited the data Symphony could provide to current and potential clients.

(d)    IMS has entered into exclusionary contracts in the market for global data products to block Symphony's access to critical data, which unfairly limited the data Symphony could provide to current and potential clients.

196.    IMS has falsely represented and disparaged the quality of Plaintiffs' products and its corporate character, which was intended to and has tortiously interfered with Plaintiffs' existing and potential contractual relationships.

197.    IMS stopped granting customary access to data to ImpactRx after Symphony acquired ImpactRx, which resulted in clients terminating projects or declining to buy products from Symphony. In other instances, IMS's conduct stonewalled or delayed Symphony's performance of projects for clients, causing harm to goodwill and reputation.

198.    IMS purposefully interfered with the aforementioned contracts and prospective contracts in violation of the common law of the Commonwealth of Pennsylvania.

199.    Such interference caused harm to Plaintiffs.  Moreover, IMS's conduct not only was not privileged or justified, but also was intentionally undertaken to harm Plaintiffs' current and prospective contractual relationships and to undermine competition.

200.    Plaintiffs have been damaged as a result of IMS's conduct and will continue to be as a result of IMS's tortious interference with its current and prospective customers.

## COUNT SIX

### Unfair Competition
### (Pennsylvania Common Law)
### All Plaintiffs Against IMS

201.    Plaintiffs incorporate by reference the preceding paragraphs as if set forth fully herein.

202.    Symphony and IMS are direct competitors and vie against one another for market share in the relevant markets.

203.    IMS has wrongfully and intentionally injured and attempted to injure Symphony's business by, among other things:

- bundling and predatorily pricing its pharmaceutical data products;

- entering into exclusive contracts and MFNs with key data suppliers of long-term care data and specialty drug data;

- refusing to deal with ImpactRx because it was acquired by Symphony, a competitor of IMS;

- making intentional misrepresentations regarding Symphony's service and products to Symphony customers and prospective customers;

- improper inducement of Symphony employees;

- acquiring data suppliers in order to deny Symphony access to key data; and

- tortiously interfering with Symphony's current and prospective contracts.

204.    IMS's conduct is without privilege or justification in that, through its actions, IMS intended to create or continue an illegal restraint of competition.

205.    IMS's improper business practices have harmed, and threaten to further harm, Plaintiffs by stifling competition and interfering with Plaintiffs' actual and prospective business relationships and goodwill.

206.    IMS's actions have been willful and wanton and have been carried out with a specific intent to injure Plaintiffs in the conduct of their business, and to gain an unfair competitive advantage over Plaintiffs.

207.    The acts and conduct of IMS, as alleged above in this Complaint, constitute unfair competition pursuant to the common law of the Commonwealth of Pennsylvania.

208.    The acts and conduct of IMS, as alleged above in this Complaint, are contrary to honest commercial business practices.

209.    As a direct result of IMS's unlawful conduct, Plaintiffs have suffered and continue to suffer injury to their business and property, including but not limited to lost sales and profits.

## **PRAYER FOR RELIEF**

For the foregoing reasons, Plaintiffs pray for a judgment against IMS and respectfully request that this Court:

a.      Award Plaintiffs their actual damages, trebled pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, along with the appropriate interest;

b.      Award Plaintiffs the costs of this action, including reasonable attorneys' pursuant to 15 U.S.C. § 15;

c.      Order IMS to pay punitive damages for its willful violation of state laws;

d.      Grant injunctive relief prohibiting IMS from engaging in any of the unlawful anticompetitive practices set forth in this Complaint, including ordering IMS to:

    (i)      terminate all discount bundling programs that involve T&C data products, integrated global market data products, Managed Markets data products, and APLD products;

    (ii)     terminate all of its exclusive contracts with providers of long-term care and specialty data that have anticompetitive effects in the relevant markets;

    (iii)    void all MFNs that require competitors to pay anticompetitive prices for data;

    (iv)     cease unreasonable refusals to sign TPAs with Symphony;

    (v)      permit Symphony access on reasonable terms to data held by domestic and international suppliers that IMS has acquired; and

    (vi)     refrain from disparaging Symphony to its current and potential clients.

e.      Order any other relief that the Court deems just and proper as may be in the interests of justice.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs request a trial by jury of any issues so triable by right.

Dated:  July 24, 2013

Leslie E. John (I.D. No. 62290)
john@ballardspahr.com
Jason A. Leckerman (I.D. No. 87915)
leckermanj@ballardspahr.com
Ruth S. Uselton (I.D. No. 208089)
useltonr@ballardspahr.com
Marcel S. Pratt (I.D. No. 307483)
prattm@ballardspahr.com

**BALLARD SPAHR LLP**
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Telephone:  (215) 665-8500
Facsimile:  (215) 864-8999

*Attorneys for Plaintiffs Symphony Health Solutions Corporation, Source Healthcare Analytics LLC, and ImpactRx, Inc.*