# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

SYMPHONY HEALTH SOLUTIONS )
CORPORATION et al., )
)
Plaintiffs, )  **Case No. 2:13-cv-04290**
)
v. )
)
IMS HEALTH INCORPORATED, )
)
Defendant. )

**PLAINTIFFS SYMPHONY HEALTH SOLUTIONS CORPORATION, SOURCE HEALTHCARE ANALYTICS LLC, AND IMPACTRX, INC.'S MEMORANDUM OF LAW IN SUPPORT OF THEIR PARTIAL MOTION TO DISMISS THE COUNTERCLAIMS OF IMS HEALTH INCORPORATED**

Dated:  October 31, 2013

Leslie E. John (I.D. No. 62290)
john@ballardspahr.com
Jason A. Leckerman (I.D. No. 87915)
leckermanj@ballardspahr.com
Ruth S. Uselton (I.D. No. 208089)
useltonr@ballardspahr.com
Marcel S. Pratt (I.D. No. 307483)
prattm@ballardspahr.com

**BALLARD SPAHR LLP**
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Telephone:  (215) 665-8500
Facsimile:  (215) 864-8999

*Attorneys for Plaintiffs Symphony Health Solutions Corporation, Source Healthcare Analytics LLC, and ImpactRx, Inc.*

# <u>TABLE OF CONTENTS</u>

<b>Page</b>

I.  INTRODUCTION ............................................................................. 1

II.  FACTS ........................................................................................... 3

    A.  Eugene Fievitz and Jason Schlesinger Decided to Leave IMS ............................ 4

    B.  Steven Stevens Decided to Leave IMS ................................................. 7

    C.  Patrick Stewart Decided to Leave IMS ................................................ 7

    D.  Gregory Hess Decided to Leave IMS .................................................. 7

    E.  Eileen Fonseca Decided to Leave IMS ................................................ 8

    F.  Symphony Engages the "De-Identification Vendor" ................................. 9

III.  LEGAL STANDARD ...................................................................... 9

IV.  ARGUMENT ................................................................................. 10

    A.  The Consent Order Entered in the <u>Fievitz</u> Action Precludes IMS's Counterclaims Based on the Same Facts ............................................. 10

        1.  Res Judicata Bars IMS's Counterclaims Relating to Fievitz and Schlesinger ........................................................................ 11

            a.  The <u>Fievitz</u> Consent Order Constitutes a Final Judgment on the Merits .................................................................. 11

            b.  Symphony Was a Party or a Privy of Parties to <u>Fievitz</u> .............. 13

            c.  IMS's Counterclaims and Its Claims in <u>Fievitz</u> Are Based on the Same Cause of Action ..................................... 14

        2.  The <u>Fievitz</u> Court Retains Jurisdiction Over IMS's Claims Against Symphony Regarding Breaches of the Consent Order ........................... 16

    B.  IMS's Claims for Tortious Interference (Counts III to IX) Relating to Symphony's Hiring of Six Former IMS Employees and a Consultant Fail as a Matter of Law ...................................................................... 16

        1.  IMS's Counterclaims for Tortious Interference Cannot Overcome the Competitor Privilege ......................................................... 17

        2.  IMS's Counterclaim That Symphony Tortiously Interfered With the Fonseca Restrictive Covenant Fails Because She Has Not Begun to Work for Symphony and IMS Misstates the Duration of the Non-Competition Provision ................................................ 22

        3.  IMS's Counterclaim That Symphony Tortiously Interfered With the Hess Restrictive Covenant Fails Because IMS Has Not Alleged That Hess Violated Any Restrictive Covenants ................................... 23

        4.  IMS's Counterclaim That Symphony Tortiously Interfered with Its Agreement with the Unidentified De-Identification Vendor Fails

i

Because IMS Has Not Alleged an Interference with Its
Relationship or Any Injury ...................................................................... 24

C.      IMS's Claims for Improper Procurement of Confidential Information
(Count II) and Unfair Competition—Interference with IMS Health's
Business Relationships (Count XI) Fail for the Same Reasons as the
Tortious Interference Claims ................................................................ 26

D.      IMS's Misappropriation Claims (Counts I and X) and Improper
Procurement Claim (Count II), to the Extent They Relate to Hess and
Fonseca, Should Be Dismissed ............................................................ 28

V.      CONCLUSION ............................................................................................. 30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**FEDERAL CASES**

Acumed LLC v. Advanced Surgical Servs.,
  561 F.3d 199 (3d Cir. 2009)................................................................................17, 19

Adefumi v. City of Philadelphia,
  445 Fed. Appx. 610 (3d Cir. 2011).................................................................................13

Allen v. McCurry,
  449 U.S. 90 (1980)................................................................................................11

Ashcroft v. Iqbal,
  556 U.S. 662 (2009)..........................................................................................10, 23

Assembly Tech., Inc. v. Samsung Techwin Co.,
  No. 09-00798, 2009 U.S. Dist. LEXIS 106934 (E.D. Pa. Nov. 16, 2009) ...........................20

Assembly Tech. Inc. v. Samsung Techwin Co.,
  695 F. Supp. 2d 168 (E.D. Pa. 2010) ................................................................................20

Bell Atl. Corp. v. Twombly,
  550 U.S. 544 (2007)............................................................................................9, 10

Bioquell, Inc. v. Feinstein,
  No. 10-2205, 2010 U.S. Dist. LEXIS 124077 (E.D. Pa. Nov. 23, 2010) ..............................29

Bradley v. Pittsburgh Board of Education,
  913 F.2d 1064 (3d Cir. 1990)...........................................................................................12

British Telecomms. PLC v. Coxcom, Inc.,
  No. 11-843, 2013 U.S. Dist. LEXIS 101845  (D. Del. July 22, 2013) ...................................25

Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.,
  140 F.3d 494 (3d Cir. 1998)..............................................................................................19

Carpenter v. Ashby,
  No. 06-1451, 2007 U.S. Dist. LEXIS 5264 (E.D. Pa. Jan. 25, 2007)....................................15

CGB Occupational Therapy v. RHA Health Servs.,
  357 F.3d 375 (3d Cir. 2004)..............................................................................................18

Commerce Nat'l Ins. Servs. v. Buchler,
  120 Fed. Appx. 414 (3d Cir. 2004)...............................................................................17, 21

DiCicco v. Willow Grove Bank,
  308 F. Supp. 2d 528 (E.D. Pa. 2004) ..................................................................................5

Duhaney v. AG of the United States,
    621 F.3d 340 (3d Cir. 2010)..............................................................................................11

Eagle v. Morgan,
    No. 11-4303, 2011 U.S. Dist. LEXIS 147247 (E.D. Pa. Dec. 22, 2011)..........................25, 28

Eagle v. Morgan,
    No. 11-4303, 2013 WL 943350 (E.D. Pa. Mar. 12, 2013) ......................................26

Federated Dep't Stores, Inc. v. Moitie,
    452 U.S. 394 (1981)..........................................................................................................12

Fintech Consulting v. Clearvision Optical Co.,
    No. 12-4956, 2013 U.S. Dist. LEXIS 61182 (D.N.J. Apr. 30, 2013) .....................................25

First Options v. Kaplan,
    913 F. Supp. 377 (E.D. Pa. 1996) ..................................................................................13

Fowler v. UPMC Shadyside,
    578 F.3d 203 (3d Cir. 2009)..............................................................................................10

Interdynamics, Inc. v. Firma Wolf,
    653 F.2d 93 (3d Cir. 1991)................................................................................................12

IPEG, Inc. v. Hamilton Avtec, Inc.,
    No. 11-574, 2011 U.S. Dist. LEXIS 103028 (W.D. Pa. Sept. 13, 2011).................................19

Jones v. Holvey,
    29 F.3d 828 (3d Cir. 1994)............................................................................................13, 14

Jurista v. Amerinox Processing, Inc.,
    No. 12-3825, 2013 U.S. Dist. LEXIS 44057 (D.N.J. Mar. 28, 2013)......................................29

Kenney v. Montgomery County,
    No. 13-2590, 2013 U.S. Dist. LEXIS 137222 (E.D. Pa. Sept. 24, 2013) ...........................9, 10

Lubrizol Corp. v. Exxon Corp.,
    929 F.2d 960 (3d Cir. 1991)..............................................................................................14

Marmon Coal Co. v. Eckman,
    726 F.3d 387 (3d Cir. 2013)..............................................................................................11

Martino v. Wolff Shoes,
    No. 06-3913, 2007 U.S. Dist. LEXIS 15266 (E.D. Pa. Mar. 5, 2007)...................................15

Munoz v. Sovereign Bank,
    323 Fed. Appx. 184 (3d Cir. 2009) ..................................................................................11

National Data Payment Sys. v. Meridian Bank,
    212 F.3d 849 (3d Cir. 2000)...................................................................................18, 19

Sensus United States, Inc. v. Elliott Bay Eng'g., Inc.,
    No. 10-1363, 2011 U.S. Dist. LEXIS 72540 (W.D. Pa. July 6, 2011) ....................................29

Shah v. United States,
    No. 13-2383, 2013 U.S. App. LEXIS 19906 (3d Cir. Sept. 30, 2013) .......................12, 13, 14

Shellenberger v. UPS,
    No. 05-2266, 2006 U.S. Dist. LEXIS 2636 (E.D. Pa. Jan. 25, 2006).....................................14

United States v. Athlone Industries, Inc.,
    746 F.2d 977 (3d Cir. 1984)............................................................................................15

Universal Analytics, Inc. v. MacNeal-Schwendler Corp.,
    914 F.2d 1256 (9th Cir. 1990) ........................................................................................18

Victaulic Co. v. Tieman,
    499 F.3d 227 (3d Cir. 2007)..............................................................................................9

Volunteer Firemen's Ins. Servs., Inc. v. Fuller,
    No. 12-2016, 2012 U.S. Dist. LEXIS 181215 (M.D. Pa. Dec. 21, 2012)...............................26

Walter Bennett Communs. of Pa., Inc. v. Hibbard,
    No. 09-3633, 2009 U.S. Dist. LEXIS 107703 (E.D. Pa. Nov. 18, 2009) ...............................28

Weiss v. First Unum Life Ins.,
    No. 02-4249, 2003 U.S. Dist. LEXIS 27863 (D.N.J. Aug. 27, 2003) ....................................25

Zahn v. Transamerica Corp.,
    162 F.2d 36 (3d Cir. 1946)................................................................................................5

Zimmer Spine, Inc. v. EBI, LLC,
    No. 10-03112, 2011 U.S. Dist. LEXIS 103629 (D. Colo. Sept. 14, 2011).............................21

**STATE COURT CASES**

Gilbert v. Otterson,
    550 A.2d 550 (Pa. Super. 1988)......................................................................................19

Hill v. Best Med. Int'l, Inc.,
    No. 07-1709 et al., 2011 U.S. Dist. LEXIS 123845, at *60 (W.D. Pa. Oct. 24, 2011) ..........26

IMS Health Inc. v. Fievitz et al.,
    No. 13-4768, ECF No. 1 ....................................................................................................5

IMS Health Incorporated v. Fievitz et al.,
    No. 13-4768, ECF No. 8 (Sept. 3, 2013) ................................................................. passim

Pestco, Inc. V. Associated Prods., Inc.,
    880 A.2d 700 (Pa. Super. 2005)......................................................................27

Phillips v. Selig,
    2008 PA Super 244 (Pa. Super. Ct. 2008) ...................................................18

Reading Radio, Inc. v. Fink,
    833 A.2d 199 (Pa. Super. 2003)........................................................17, 18, 24

Shiner v. Moriarty,
    706 A.2d 1228 (Pa. Super. Ct. 1998)............................................................25

**FEDERAL STATUTES**

15 U.S.C. § 14..................................................................................................19

15 U.S.C. §§ 41-58 ...........................................................................................19

15 U.S.C. §§ 1-7 ...............................................................................................19

**OTHER STATUTES**

12 Pa. Cons. Stat. § 5302..................................................................................28

**RULES**

Federal Rules of Civil Procedure 12..................................................................9

**OTHER AUTHORITIES**

Restatement (First) of Torts § 759.....................................................................27

Restatement (Second) of Judgments § 26..........................................................12

Restatement (Second) of Torts § 766.................................................................25

Restatement (Second) of Torts § 768......................................................... passim

Plaintiffs/Counterclaim-Defendants Symphony Health Solutions Corporation, Source Healthcare Analytics LLC, and ImpactRx, Inc. (collectively, "Symphony") respectfully submit this memorandum of law in support of their Partial Motion to Dismiss the Counterclaims of IMS Health Incorporated ("IMS").

## I.     INTRODUCTION

IMS is the world's largest pharmaceutical data company.  Its market share dwarfs that of Symphony, a smaller but nimble competitor.  Yet, IMS has routinely and systematically engaged in conduct prohibited by the antitrust laws in an effort to drive Symphony, its last competitor in the United States, out of the market altogether.  IMS has monopolized pharmaceutical data markets through predatory pricing, unlawful bundling of its products, entering into exclusive supply agreements with critical data suppliers, acquiring competitors and data suppliers, and utilizing many other types of anticompetitive tactics.  True to form, in response to Symphony's antirust complaint, IMS filed eleven baseless counterclaims related to Symphony's hiring of six former IMS employees and a consultant.  In other words, IMS is attempting to turn Symphony's antitrust suit on its head and use it to further injure Symphony's ability to compete.

IMS simply refuses to allow competition on a level playing field.  None of these employees threatens IMS's monopolies.  In fact, the parties have already addressed any potential competitive issues related to two of the former employees, Eugene Fievitz and Jason Schlesinger, in connection with a lawsuit IMS already filed (and resolved) concerning those employees in this District (the "Fievitz action").  The Fievitz action, filed while this suit was pending, was based on the same allegations underlying IMS's counterclaims here, *i.e.*, that Fievitz and Schlesinger breached their IMS restrictive covenants and provided Symphony with

IMS's trade secrets and confidential information.  On September 3, 2013, the Honorable Darnell C. Jones entered a Consent Order,[1] signed by Fievitz, Schlesinger, IMS, and Symphony, resolving IMS's claims with prejudice.

The ink was barely dry on the Fievitz Consent Order when IMS filed its counterclaims alleging that Symphony induced Fievitz and Schlesinger to breach their non-competes for purposes of stealing IMS's trade secrets—the same trade secrets Symphony covenanted one month prior that it did not have.  That these disputes are one and the same is underscored by the fact that IMS's counterclaims copy verbatim several pages from the complaint in the Fievitz action.  Res judicata precludes IMS's attempt to sue again.  Accordingly, all claims as to Fievitz and Schlesinger in Counts I, II, VI, VII, X, and XI should be dismissed.

Nor does the law tolerate IMS's attempt to fashion tortious interference claims against its sole (and smaller) competitor.  Those claims run directly counter to the common law's recognition that competition for employees and consultants in these circumstances is to be encouraged.  IMS's seven tortious interference claims—one per former employee and one for a consultant—fail because IMS has set forth no facts that, if true, could defeat the competitor privilege recognized under Pennsylvania law.  IMS must plead that Symphony's recruitment tactics constituted "unlawful means"—conduct so severe that it is actionable ***independent*** of the supposed contractual interference.  There are no such allegations.  Counts III through IX, therefore, fail.  And, IMS's attempt to repurpose its tortious interference claims into improper procurement and unfair competition claims also fails for the same reason.  Thus, Counts II and XI also should be dismissed.

---

[1]     A true and correct copy of the Consent Order entered in IMS Health Incorporated v. Fievitz et al., No. 13-4768, ECF No. 8 (Sept. 3, 2013) is attached hereto as Exhibit 1.

Lastly, IMS's misappropriation of trade secrets and improper procurement of confidential information claims should be dismissed with respect to two of its former employees—Eileen Fonseca and Gregory Hess—because IMS does not identify the "trade secrets" or confidential information that Symphony purportedly acquired by virtue of hiring Fonseca and Hess.  Indeed, as is apparent from IMS's own allegations, Fonseca has not yet even begun her employment with Symphony.  And, Hess has been employed by Symphony for nearly six months, yet IMS cannot plead any trade secrets or confidential information that were compromised (nor did IMS sue Hess when he left).  Accordingly, as to Fonseca and Hess, IMS's misappropriation and improper procurement claims in Counts I, II, and X fail as matter of law.[2]

## II.    FACTS[3]

Formed in May 2012, Symphony is a combination of four complementary healthcare insight companies, AlphaDetail, ImpactRx, TargetRx, and Source Healthcare Analytics ("Source").  (Compl.¶ 22; see also Answer ¶ 22.)  Symphony and IMS compete in multiple United States markets for pharmaceutical data products, and Source competed with IMS prior to Symphony's acquisition of Source.  (See Answer Preamble; ¶ 22.)

IMS is the largest pharmaceutical data company in the world with over 8,000 employees.  (See Answer ¶ 1; Complaint ¶ 1.)  In 2009, the "last full year it was a publicly traded company . . . [IMS] had operating revenues greater than $2.2 billion."  (Answer ¶ 18.)  IMS was

---

[2]    In sum, Symphony moves this Court to dismiss in their entirety all seven tortious interference claims (Counts III to IX), the improper procurement claim (Count II), the unfair competition-interference claim (Count XI), and to dismiss in part Count I (misappropriation), and Count X (unfair competition-misappropriation claim), to the extent they do not relate to Steven Stevens, Patrick Stewart, or the unnamed "De-Identification Vendor."  For the claims that Symphony moves to dismiss in their entirety, Symphony also provides alternative bases to dismiss them in part.

[3]    For purposes of this motion to dismiss, Symphony accepts as true all well-pleaded facts in IMS's Answer and Counterclaims.

taken private in 2009 in a transaction valued at approximately $6 billion.  (Id.)  IMS "spent approximately $345 million on 28 acquisitions between 2005 and 2008."  (Id. at ¶ 20.)  The pace of acquisitions has only quickened.  In October 2011, IMS acquired SDI Health LLC ("SDI") for $340 million.  Notably, SDI was the last significant competitor to IMS (apart from Symphony).  IMS admits that it bought SDI "to improve its APLD products [one of the relevant markets, here]."  (Countercl. ¶ 16.)  SDI itself had recently merged with another competitor in the industry, "Verispan LLC before IMS Health acquired SDI."  (Answer ¶ 20.)  The result of these acquisitions is that Symphony is IMS's sole remaining competitor in many of these markets.

In its counterclaims, IMS asserts that, in hiring six of IMS's former employees, Symphony tortiously interfered with the employees' agreements with IMS.  Those employees are:  Eugene Fievitz, Jason Schlesinger, Steven Stevens, Patrick Stewart, Gregory Hess and Eileen Fonseca (collectively, the "Employees").  All of them were "at-will" employees.[4]  IMS claims that the Employees "inevitably" will disclose to Symphony various IMS trade secrets or confidential information, but IMS does not allege any specific instances of actual disclosure.  IMS also contends that Symphony tortiously interfered with IMS's contractual relations with an unnamed consultant—the "De-Identification Vendor."

### A.    Eugene Fievitz and Jason Schlesinger Decided to Leave IMS

Eugene Fievitz and Jason Schlesinger were both managers in IMS's Global Technology Services and Operations Department.  (Id. at ¶¶ 52-53.)  Fievitz entered into

---

[4]        See, e.g., IMS/SDI Restrictive Covenants at ¶ 7.1:

> NOR SHALL IT INTERFERE IN ANY WAY WITH HIS/HER RIGHT OR THE COMPANY'S RIGHT TO TERMINATE HIS/HER EMPLOYMENT AT ANY TIME, WITH OR WITHOUT CAUSE.

(Countercl. Exs. A, B, E-M.)

Proprietary and Restrictive Covenant Agreements on April 14, 2004, and July 20, 2010, which are attached to IMS's counterclaims as Exhibits H and I, respectively.  (Id. at ¶¶ 67-68.) Schlesinger entered into a Restrictive Covenant Agreement on November 13, 2006, which is attached to IMS's Counterclaim as Exhibit J.  (Id. at ¶ 69.)  The agreements purportedly restricted Fievitz's and Schlesinger's ability to work for competitors and required them not to disclose any of IMS's trade secrets or confidential information.  (Id. at ¶¶ 42-43.)

According to IMS, on August 5, 2013, Fievitz and Schlesinger resigned their employment with IMS in order to accept employment with Symphony.[5]  (Id. at ¶ 58; see also IMS Health Inc. v. Fievitz et al., No. 13-4768, ECF No. 1, Compl. ¶ 2.)  On August 16, 2013, IMS filed the Fievitz action seeking to enjoin Fievitz and Schlesinger from breaching their restrictive covenants and misappropriating IMS's trade secrets and confidential information. Symphony was not named as a party to the suit.[6]  (See Fievitz Compl. ¶¶ 61-74.)  Notably, the same restrictive covenants that formed the basis of IMS's misappropriation of trade secrets and breach of covenant claims in the Fievitz action and were attached to the Fievitz complaint *also* form the basis of and are attached to IMS's Counterclaim against Symphony.  (Compare Fievitz Compl. Exs. A, B, C, with Countercl. Exs. H, I, J.)   IMS did not allege in either action that Fievitz and Schlesinger would be interfacing with IMS's former clients or engaging in business development.

---

[5]    While IMS claims that Fievitz and Schlesinger refused to answer questions about their future employer (see Countercl. ¶ 58), the evidence in this case will show that, in fact, IMS knew that they would be joining Symphony.  An IMS Senior Vice President confronted Fievitz and Schlesinger after learning that they were leaving and called them "traitors" in front of a large group of their peers.

[6]    The Court may take judicial notice of all documents filed in the Fievitz action.  See DiCicco v. Willow Grove Bank, 308 F. Supp. 2d 528, 536 (E.D. Pa. 2004) (DuBois, J.) (citing Zahn v. Transamerica Corp., 162 F.2d 36, 48 (3d Cir. 1946) (holding that the court may take judicial notice of pleadings because they are part of the public record)).

In Fievitz, as in this case, IMS claimed that "Defendants will, inevitably or intentionally, disclose to Symphony . . . confidential information and trade secrets of IMS . . . ." (Fievitz Compl. ¶71.)  IMS alleged that "Symphony is hiring IMS employees . . . undoubtedly because it plans to use these hires in ways that require contravention of the employees' contractual obligations to IMS."  (Fievitz Compl. ¶ 51.)  IMS further alleged that Symphony would misappropriate its trade secrets, alleging that "Symphony . . . would receive a tremendous unfair competitive advantage if it employed [Fievitz/Schlesinger] during the period of their non-competition obligation.  Symphony . . . would learn IMS's data acquisition and architecture technologies and process . . . ."  (Fievitz Compl. ¶ 56.)

On September 3, 2013, the Honorable Darnell C. Jones of this District entered a Consent Order that resolved the litigation.  Fievitz, Schlesinger, *IMS and Symphony* were signatories to the Consent Order.[7]  (Ex. 1, p. 4.)  The Consent Order "permitted" Fievitz and Schlesinger to begin work for Symphony, but only under various conditions imposed therein. (Ex. 1, ¶¶ 1-3.)  The Order also imposed various obligations upon Symphony.  Specifically:

> Symphony represents and warrants that Defendants have not
> provided it with IMS's confidential information or trade secrets, and
> neither Symphony nor its affiliates . . . will require or permit
> Defendants to use or disclose IMS's confidential information or
> trade secrets in the future.

(Id. at ¶ 4.)  Further, the Consent Order resolves "with prejudice all matters in this Civil Action, absent any claims for a breach or violation of the terms or this Consent Order."  (Id. at ¶ 8.) Judge Jones retains jurisdiction over Fievitz for purposes of enforcing the Consent Order through February 16, 2014.  (Id. at ¶ 7.)

---

[7]     Prior to entry of the Consent Order, IMS was also permitted to take the deposition of a
Symphony corporate representative.  (Fievitz, Stipulated Order ¶ 4, ECF No. 5.)

### B.      Steven Stevens Decided to Leave IMS

Steven Stevens was SDI's Director of Application Architecture Data Acquisition and continued in a similar role at IMS after IMS acquired SDI.  (Countercl. ¶ 22.)  Stevens allegedly entered into Proprietary Information and Restrictive Covenant Agreements in 2003 and 2010, which are attached as Exhibits A and B to IMS's counterclaims.  IMS alleges that Stevens had access to and developed trade secrets and confidential information for use at IMS.  (Id. at ¶ 28.)  Over ten months ago, Symphony hired Stevens.  (Id. at ¶ 24.)  IMS alleges that Symphony "placed him in a role where he would inevitably use or disclose" IMS trade secrets and confidential information.  (Id.)  IMS does not allege that Steven's role at Symphony involves interfacing with clients.

### C.      Patrick Stewart Decided to Leave IMS

Patrick Stewart was a Senior Manager of Advanced Analytics at IMS.  (Id. at ¶ 43.)  Stewart allegedly entered into Proprietary Information and Restrictive Covenant Agreements in 2007 and 2010, which are attached as Exhibits E and F to IMS's counterclaims. (Id. at ¶¶ 64-65.)  IMS claims that Stewart had knowledge of IMS's trade secrets and proprietary and confidential information.  (Id. at ¶ 44.)  IMS alleges that Symphony hired Stewart (id. at ¶ 47), and placed him in a role at Symphony where he would "inevitably" disclose IMS's trade secrets.  (Id. at ¶ 77.)

### D.      Gregory Hess Decided to Leave IMS

Dr. Gregory Hess was the Chief Medical Officer of SDI and became the Regional Head of Health Economic Outcomes Research at IMS.  (Id. at ¶50.)  IMS alleges that Hess entered into a Proprietary Information and Restrictive Covenant Agreement on June 24, 2002,

which is attached to IMS's counterclaims as Exhibit G.[8]  (Id. at ¶ 66.)  IMS does not allege that

Hess entered into any subsequent restrictive covenants after IMS acquired SDI.  IMS claims that

Hess had knowledge of IMS's trade secrets and proprietary and confidential information.  (Id. at

¶ 44.)  IMS does not identify those trade secrets; nor does IMS explain his former duties.

According to IMS, Hess resigned from IMS on April 30, 2013.  IMS alleges that Symphony

hired Hess in a role working with pharmaceutical company clients.  (Id. at ¶ 50.)

     **E.**     **Eileen Fonseca Decided to Leave IMS**

IMS alleges that Eileen Fonseca resigned from IMS on September 20, 2013—just

10 days before IMS filed its counterclaims.  (Countercl. ¶ 60.)  IMS asserts that Fonseca was

IMS's Project Director of Health Economic Outcome Research.  (Id. at ¶ 61.)  IMS's sole

assertion regarding Fonseca's supposed knowledge of IMS's trade secrets and proprietary

information is a vague reference to her knowledge of IMS "software, data systems and

strategies."  (Id. at ¶ 62.)   Beyond this vague and conclusory assertion, IMS does not allege any

facts demonstrating the type of trade secrets or information about which Fonseca supposedly has

knowledge or what her former duties were that gave her access to such trade secrets.

IMS also alleges that Fonseca entered into Proprietary Information and Restrictive

Covenant Agreements in 2006 and 2010 ("Fonseca Restrictive Covenant"), which are attached to

IMS's Counterclaims as Exhibit L and M, respectively.  The 2010 Fonseca Restrictive Covenant

supersedes the 2006 Fonseca Restrictive Covenant.  (See Countercl. Ex. M, ¶ 8.4 ("This

Agreement . . . supersedes any prior written agreement or understanding between the Company

---

[8]     The narrowly-tailored non-competition provision of the Hess Restrictive Covenant was restricted to "commercial operation and sale to third parties of syndicated market research studies that track and report on illnesses such as colds and flu, influenza, stomach illness, head lice, allergies, and asthma . . . ."  (Countercl. Exhibit G ¶ 3.)

and Employee.").)  In the superseding 2010 Fonseca Restrictive Covenant, the duration of

Fonseca's non-competition clause was limited to one month.  (See id. at ¶ 3.1.)  IMS does not

allege that Fonseca has begun her employment with Symphony, because she has not yet done so

as of the date of this filing.

    **F. Symphony Engages the "De-Identification Vendor"**

    IMS claims that in the "early 2000s," SDI retained an unnamed consultant to help

build and run SDI's de-identification engine based on technology developed and owned by SDI.

(Countercl. ¶ 86.)  IMS continues to work with the consultant.  (Id. ¶ 88.)  IMS asserts that a

series of written agreements required the vendor to maintain the confidentiality of IMS's data.

(Countercl. ¶ 89.)  IMS claims that Symphony recently engaged the De-Identification consultant

to perform unspecified services.  (Id. at ¶ 87.)  IMS does not allege that consultant actually

disclosed IMS's alleged trade secrets or confidential information.  Rather, IMS conclusorily

accuses that it is "inevitable that De-Identification Vendor's knowledge of IMS Health's trade

secrets and confidential information will be imparted to and misused by Symphony and

incorporated into Symphony's de-identification engine.  Symphony is counting on this disclosure

to happen."  (Id. at ¶ 92.)

**III. LEGAL STANDARD**

    Rule 12(b)(6) of the Federal Rules of Civil Procedure provides that, in response to

a pleading, a defense of "'failure to state a claim upon which relief can be granted'" may be

raised by motion to dismiss.  See Kenney v. Montgomery County, No. 13-2590, 2013 U.S. Dist.

LEXIS 137222, *7 (E.D. Pa. Sept. 24, 2013) (DuBois, J.) (citations and quotations omitted).  To

survive a motion to dismiss, a plaintiff must allege facts that "'raise a right to relief above the

speculative level.'"  Victaulic Co. v. Tieman, 499 F.3d 227, 234 (3d Cir. 2007) (quoting Bell Atl.

Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  A complaint must contain "sufficient factual

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570).  To satisfy the plausibility standard, a plaintiff's allegations must show that defendant's liability is more than "a sheer possibility."  Id.  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  Id. (quoting Twombly, 550 U.S. at 557) (internal quotation marks omitted).

"In Twombly, the Supreme Court used a 'two-pronged approach' later formalized in Iqbal."  Kenney, 2013 U.S. Dist. LEXIS 137222, at *7 (citing Iqbal, 556 U.S. at 679; Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009)).  Under this approach, a district court identifies those factual allegations that constitute nothing more than "legal conclusions" or "naked assertion[s]."  Twombly, 550 U.S. at 555, 564.  Such allegations are "not entitled to the assumption of truth" and must be disregarded.  Iqbal, 556 U.S. at 679.  The court then assesses "the 'nub' of the plaintiff['s] complaint—the well-pleaded, nonconclusory factual allegation[s]"—to determine whether it states a plausible claim for relief.  Id. at 680.

## IV.   ARGUMENT

### A.   The Consent Order Entered in the Fievitz Action Precludes IMS's Counterclaims Based on the Same Facts

IMS litigated its present counterclaims in the Fievitz action.  And, because the Fievitz action ended in final judgment on the merits, involved the same parties or their privies, and was based on the same series of events, res judicata precludes the re-litigation of IMS's counterclaims here.  Thus, IMS's tortious inference, misappropriation, improper procurement, and unfair competition claims, to the extent they relate to Fievitz and Schlesinger, should be dismissed.  Further, pursuant to the Consent Order, Judge Jones retains jurisdiction over disputes

regarding the employment of Fievitz and Schlesinger, including whether they have disclosed

trade secrets or confidential information.

### 1. Res Judicata Bars IMS's Counterclaims Relating to Fievitz and Schlesinger

Res judicata bars a party from initiating a subsequent suit against the same

adversary based on the same cause of action as a prior suit.  See Duhaney v. AG of the United

States, 621 F.3d 340, 347 (3d Cir. 2010).  The purpose of res judicata is to "relieve parties of the

cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing

inconsistent decisions, encourage reliance on adjudication."  Allen v. McCurry, 449 U.S. 90, 94

(1980).  A party seeking to invoke res judicata must establish three elements: (1) a final

judgment on the merits in a prior suit involving (2) the same parties or their privies and (3) a

subsequent suit based on the same cause of action.  See  Marmon Coal Co. v. Eckman, 726 F.3d

387 (3d Cir. 2013) (citing Duhaney, 621 F.3d at 347).  "The doctrine of res judicata bars not only

claims that were brought in a previous action, but also claims that could have been brought."

Duhaney, 621 F.3d at 347.  All three elements of res judicata exist for all of IMS's counterclaims

to the extent they relate to Fievitz and Schlesinger.[9]

### a. The Fievitz Consent Order Constitutes a Final Judgment on the Merits

On September 3, 2013, the Court entered the Fievitz Consent Order that

Symphony, Fievitz, Schlesinger, and IMS signed.   "A *consent decree is a final judgment on the*

*merits*, unless there is an 'express reservation of rights[.]'"  See Munoz v. Sovereign Bank, 323

---

[9]       IMS may argue that certain language in the Order precludes mention of the Order in this
action.  (Ex. 1 ¶ 6 ("this Consent Order may [not] be used as evidence or otherwise in any
subsequent proceedings, litigation or disputes involving Symphony or IMS.").)  The
obvious purpose of this provision, however, is to prevent the parties from using the Order
to prove liability in subsequent disputes, not to limit its preclusive effect.  A contrary
interpretation would render the Consent Order meaningless.

Fed. Appx. 184, 187 (3d Cir. 2009) (emphasis added); see also Interdynamics, Inc. v. Firma Wolf, 653 F.2d 93, 96-97 (3d Cir. 1991) (holding that "a consent decree, although negotiated by the parties, is a judicial act.  Such a decree possesses the same force with regard to res judicata … as a judgment entered after a trial on the merits.") (citations omitted).  Indeed, the Fievitz Consent Order resolved "***with prejudice all matters in this Civil Action***," (Ex. 1, ¶ 7 (emphasis added)), except that Judge Jones retained jurisdiction over alleged breaches of the Consent Order through February 16, 2014.  (Ex. 1, ¶¶ 7-8.)  Through IMS and Symphony's agreement to specific start dates and activity restrictions for Fievitz and Schlesinger (see Ex. 1, ¶¶ 2-4) and IMS's acceptance of Symphony's warranty that it did not possess IMS trade secrets (see Ex. 1, ¶4), the Order resolved any claims that Symphony stole IMS's trade secrets or confidential information.

Nor did the Consent Order reserve IMS's rights to bring these counterclaims.  To avoid the res judicata effect of a Consent Order, a claimant must expressly and specifically reserve the right to maintain a second action.  See Bradley v. Pittsburgh Board of Education, 913 F.2d 1064, 1072 (3d Cir. 1990) (explaining that a reservation of rights occurs where "[t]he court in the first action has expressly reserved the plaintiff's right to maintain the second action.") (quoting Restatement (Second) of Judgments § 26(1)).[10]  The Consent Order contains no reservation of rights for IMS to maintain these counterclaims relating to Fievitz and Schlesinger.

---

[10]  Further, "[r]es judicata does not require the precluded claim to actually have been litigated; its concern, rather, is that the party against whom the doctrine is asserted had a full and fair opportunity to litigate the claim."  Shah v. United States, No. 13-2383, 2013 U.S. App. LEXIS 19906, * 6-7 (3d Cir. Sept. 30, 2013) (citing Federated Dep't Stores, Inc. v. Moitie, 452 U.S. 394, 398 (1981) (res judicata extends to all claims that "were or could have been raised in that action")).

### b.      Symphony Was a Party or a Privy of Parties to <u>Fievitz</u>

The <u>Fievitz</u> action involved the same parties as the present case.  Although Symphony was not named as a defendant in <u>Fievitz</u>, Symphony was a party and signatory to the <u>Fievitz</u> Consent Order and made promises before the Court in order to resolve the litigation.  The obvious reason for Symphony's involvement was that Symphony was inextricably intertwined with the dispute; arguably, Symphony was an indispensable party.[11]  The Court and parties could not fashion adequate relief, *i.e.*, protecting against disclosure of IMS's alleged trade secrets and confidential information, without Symphony obligating itself under the Consent Order.

Even when a litigant was not a party to a prior action, it can assert res judicata defensively so long as it was in privity with a party to the prior action.  <u>See, e.g.</u>, <u>Adefumi v. City of Philadelphia</u>, 445 Fed. Appx. 610, 611 (3d Cir. 2011) (permitting defendant City of Philadelphia to invoke res judicata based on plaintiff's prior action against the Free Library because City and the Free Library were in privity based *inter alia* on their "alignment of interests"); <u>Jones v. Holvey</u>, 29 F.3d 828, 830 (3d Cir. 1994) (permitting defendant-employees of a department of corrections to claim res judicata to a § 1983 suit based on a prior action where the department was a party).  Privity is a flexible concept that courts apply practically.   As the Third Circuit opined, "[p]rivity 'is merely a word used to say that the relationship between one who is a party on the record and another is close enough to include that other within the res judicata.'"  <u>Shah</u>, 2013 U.S. App. LEXIS 19906, at *7; <u>see also</u> <u>First Options v. Kaplan</u>, 913 F. Supp. 377, 384 (E.D. Pa. 1996) ("The Third Circuit has long recognized that privity is a legal

---

[11]      IMS demanded and was permitted to take the deposition of a Symphony corporate representative.  (<u>Fievitz</u>, Stipulated Order ¶ 4, ECF No. 5.)

conclusion; the privity inquiry should be flexible enough to acknowledge the realities of parties' relationships.").[12]

Thus, even though Symphony was not a named party to the Fievitz action, Symphony is in "privity" with Fievitz and Schlesinger and can invoke res judicata defensively. Indeed, the employer-employee relationship between Symphony and Fievitz/Schlesinger is sufficient to confer privity for res judicata purposes.  See, e.g., Jones, 29 F.3d at 830 (defendant-employees of a department of corrections were the privies of the department for purposes of res judicata); Shellenberger v. UPS, No. 05-2266, 2006 U.S. Dist. LEXIS 2636, at *17 (E.D. Pa. Jan. 25, 2006) ("because the other Defendants are in privity with Defendant UPS because of the employer-employee relationship, this prerequisite is met . . .").  Notably, the alleged harm that IMS complains of in both actions resulted from alleged *collective and coordinated* actions of Symphony, Fievitz, and Schlesinger, *i.e.*, Symphony's hiring of Fievitz and Schlesinger.

Moreover, Symphony's interests in Fievitz are clearly aligned and unified with Fievitz's and Schlesinger's interests, further signifying that they are in privity.  Symphony, Fievitz, and Schlesinger made complementary promises under the Consent Order, which assured IMS that there would be no breach of IMS's non-competes or disclosure of trade secrets and permitted Fievitz and Schlesinger to begin employment.

### c.    IMS's Counterclaims and Its Claims in Fievitz Are Based on the Same Cause of Action

The cause of action in the Fievitz action is the same as the cause of action underlying IMS's counterclaims in this case.  See Shah, 2013 U.S. App. LEXIS 19906, at *9

---

[12]    An even lesser showing of privity is required here, since Symphony is invoking res judicata *defensively*.   See Lubrizol Corp. v. Exxon Corp., 929 F.2d 960, 966 (3d Cir. 1991) ("[A] lesser degree of privity is required for a new defendant to benefit from claim preclusion than for a plaintiff to bind a new defendant in a later action.").

("Claim preclusion **turns not on the specific legal theory asserted** but on the essential similarity of the underlying events that give rise to the various legal claims.") (emphasis added) (citing inter alia United States v. Athlone Industries, Inc., 746 F.2d 977, 983 (3d Cir. 1984); see also Martino v. Wolff Shoes, No. 06-3913, 2007 U.S. Dist. LEXIS 15266, at *12 (E.D. Pa. Mar. 5, 2007) (Dubois, J.) (concluding that plaintiff's FMLA and ADA claims are based on the same cause of action for purposes of claim preclusion).[13]

IMS's claims in Fievitz and this action arise from the "same transaction or occurrence." In both actions, IMS's claims are based on Symphony's hiring of Fievitz and Schlesinger and the alleged subsequent disclosure of IMS's trade secrets and confidential information in violation of the same non-compete and non-disclosure agreements attached as exhibits in both actions. IMS's allegations in each suit are nearly identical and, indeed, are repeated verbatim in substantial part.[14] Indeed, if both cases went to trial, they would require the same evidence, *i.e.*, the same witnesses, same documentation (the non-competes IMS attached as exhibits in both cases), and duplicative discovery from Symphony.[15]

---

[13]    It is immaterial that, in addition to the misappropriation claims in both actions, IMS asserted claims for breach of covenant in Fievitz and tortious interference in this action. The key inquiry is the similarity of the facts. See Carpenter v. Ashby, No. 06-1451, 2007 U.S. Dist. LEXIS 5264, *8 (E.D. Pa. Jan. 25, 2007) ("mere difference in legal theory does not create a separate cause of action for purposes of claim preclusion").

[14]    It is apparent that IMS "copied and pasted" several pages of its Fievitz Complaint into the present Counterclaim. (Compare Fievitz Compl. ¶¶ 25(a) to 26(d) with Countercl. ¶¶ 52(a) to 53(d).)

[15]    In Fievitz, the crux of IMS's complaint was that "Symphony is hiring IMS employees and . . . plans to use these hires in ways that require contravention of the employees' contractual obligations to IMS." (Fievitz Compl. ¶ 51.) In the counterclaims, IMS complains that "Symphony has interfered with IMS Health's employment contract[s] . . . by inducing [Fievitz/Schlesinger] to leave . . . in violation of the [Fievitz/Schlesinger non-competes]. . . ." (Countercl. ¶¶ 135, 140.) In Fievitz, IMS alleged that Fievitz and Schlesinger "will . . . disclose to Symphony . . . confidential information and trade secrets of IMS." (Fievitz Compl. ¶ 71.) In this action, IMS's central allegation is that

2.    The <u>Fievitz</u> Court Retains Jurisdiction Over IMS's Claims Against Symphony Regarding Breaches of the Consent Order

Judge Jones retained jurisdiction over disputes regarding Symphony's compliance with the Consent Order.  The Consent Order states:

> 7.    The Court also retains jurisdiction over this action through February 16, 2014 for purposes of enforcing this Consent Order. Thereafter, the matter will be dismissed with prejudice . . . provided that the Court will continue to have jurisdiction as to any alleged breaches of this Consent order ***or any disputes*** relating to the rights or obligations of the parties hereunder.
>
> 8.    This Consent Order ***otherwise resolves with prejudice all matters in this Civil Action***, absent any claims for a breach or violation of the terms or this Consent Order. No additional pleadings or appearances will be required.

(Ex. 1 ¶¶ 7-8 (emphasis added).)  Symphony warranted under the Consent Order that "Defendants have not provided it with IMS's . . . trade secrets . . . nor anyone affiliated with Symphony . . . will require or permit [Fievitz and Schlesinger] to disclose IMS's confidential information or trade secrets in the future."  (<u>Id.</u> at ¶ 4.)  In its counterclaims, IMS contends, without explicitly stating so, that Symphony has breached its promises under the Consent Order. If IMS believes Fievitz and Schlesinger provided trade secrets (or "inevitably will" according to the conclusory counterclaims) to Symphony, IMS must take that issue up in the <u>Fievitz</u> action.

**B.    IMS's Claims for Tortious Interference (Counts III to IX) Relating to Symphony's Hiring of Six Former IMS Employees and a Consultant Fail as a Matter of Law**

Each of IMS's seven counterclaims for tortious interference with contractual relations fails.  To state a claim for interference with contractual relations a complaint must allege facts showing: (1) the existence of a contractual relationship between the plaintiff and a

---

"Symphony has engaged in this conduct [*i.e.*, hiring Fievitz and Schlesinger] for the purpose of wrongfully obtaining and exploiting IMS Health's trade secrets and confidential information."  (Countercl. ¶¶ 136, 141.)

third-party; (2) purposeful action on the part of the defendant intended to harm that existing relationship; (3) *absence of privilege* or justification on the part of defendant; and (4) actual legal damage as a result of the defendant's conduct.  See Reading Radio, Inc. v. Fink, 833 A.2d 199, 211 (Pa. Super. 2003).  Indeed, "Pennsylvania courts require the plaintiff, *as part of [its] prima facie case*, to show that the defendant's conduct was not justified."  Acumed LLC v. Advanced Surgical Servs., 561 F.3d 199, 214 (3d Cir. 2009) (emphasis added).  IMS's allegations—even if accepted as true—cannot overcome that privilege.

**1.    IMS's Counterclaims for Tortious Interference Cannot Overcome the Competitor Privilege**

A competitor does not "wrongfully interfere" with its competitor's at-will employees or consultants by simply competing for their services.  See Commerce Nat'l Ins. Servs. v. Buchler, 120 Fed. Appx. 414, 419 (3d Cir. 2004).  Restatement (Second) of Torts § 768 ("Section 768"), adopted by Pennsylvania courts, recognizes that competitors are privileged in the course of competition to interfere with their competitors' contractual relationships, *i.e.*, the competitor privilege.  See Acumed, 561 F.3d at 214.

Section 768 provides that:

[o]ne who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if

(a)  the relation concerns a matter involved in the competition between the actor and the other and

(b)  the actor does not employ wrongful means and

(c)  his action does not create or continue an unlawful restraint of trade and

(d)  his purpose is at least in part to advance his interest in competing with the other.

Rest. 2d Torts § 768.[16]

Under the competitor privilege, therefore, Symphony's hiring of IMS's "at-will employee[s] is not actionable in and of itself."  Reading Radio, Inc. v. Fink, 833 A.2d at 212; see also  CGB Occupational Therapy v. RHA Health Servs., 357 F.3d 375, 388 & n.15 (3d Cir. 2004) (holding that Section 768 applies to tortious interference claims with contracts for at-will employees).  To state a claim for tortious interference under Pennsylvania and Third Circuit law, IMS therefore must specifically plead facts that, if proven true, would show that Symphony's alleged conduct was not justified under the competitor privilege.[17]

IMS's tortious interference allegations are insufficient, because IMS has not pleaded facts that are remotely capable of overcoming the competitor's privilege.  By IMS's own admissions and omissions, Symphony easily satisfies Section 768 subsections (a), (c), and (d). IMS admits that Symphony is a competitor (Countercl. ¶ 3) and therefore acted to advance its own business by hiring the Employees and De-Identification Vendor, satisfying subsections (a) and (d).  See, e.g., National Data Payment Sys. v. Meridian Bank, 212 F.3d 849, 857 (3d Cir.

---

[16]     Comment b to §768 explains, "One's privilege to engage in business and to compete with others implies a privilege to induce third persons to do their business with him rather than with his competitors.  In order not to hamper competition unduly, the rule stated in this Section entitles one not only to seek to divert business from his competitors generally but also from a particular competitor."  Phillips v. Selig, 2008 PA Super 244, P27 (Pa. Super. Ct. 2008) (quoting Rest. 2d of Torts § 768); see also id. at P28 ("Pennsylvania appellate courts have cited section 768 and its comment b with approval.") (citing cases).

[17]     Unlike IMS, Symphony has alleged that IMS's recent and ongoing raiding of Symphony's employees constitutes one of the many coordinated anticompetitive tactics employed by IMS to drive its only remaining competitor out of the market.  In other words, Symphony has asserted that IMS's raiding of Symphony employees is an abuse of its monopoly power.  Universal Analytics, Inc. v. MacNeal-Schwendler Corp., 914 F.2d 1256, 1257-58 (9th Cir. 1990) (explaining that predatory hiring is actionable when done by a monopolist to willfully maintain its monopoly power).  Further, IMS is no stranger filing lawsuits against business partners to protect its monopolies.  See IMS Health Inc. v. Caremark, LLC, No. 6174-CVL, (Del. Ch. Feb. 22, 2011) (breach of contract claim against same data supplier that IMS prohibited from doing business with Symphony).

2000) (elements (a) and (d) are readily satisfied in a competitive relationship).[18]  And there are

no allegations that Symphony's conduct constituted an unlawful restraint of trade or restrained

competition within the meaning of subsection (c).[19]  Id. (finding element satisfied when there

was "no allegation that [the alleged] interference created any unlawful restraint of trade").

        The determinative question is whether Symphony employed "wrongful means" in

the hiring of the Employees.  Rest. 2d § 768(c).  Comment e to Section 768, explaining

"wrongful means," provides that "'physical violence, fraud, civil suits and criminal prosecutions,

are all wrongful in the situation covered by this Section.'"  See Acumed, 561 F.3d at 215

(quoting Rest. 2d § 768, cmt. e).  The Third Circuit has interpreted "the wrongful means element

to require that a plaintiff, to be successful in a tortious interference action, demonstrate that a

defendant engaged in conduct that was actionable **_on a basis independent of the interference_**

**_claim_**."  Id. (emphasis added) (citing inter alia Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.,

140 F.3d 494, 531 (3d Cir. 1998)).[20]  "Under this standard, wrongful means are those that are

themselves capable of forming the basis of liability for the defendant."  National Data Payment

Systems v. Meridian Bank, 212 F.3d 849, 857 (3d Cir. 2000) (recognizing wrongful means must

---

[18]    See, e.g, IPEG, Inc. v. Hamilton Avtec, Inc., No. 11-574, 2011 U.S. Dist. LEXIS 103028, at *15-16 (W.D. Pa. Sept. 13, 2011) (noting that it was the "essence of competition and purpose of the competitive privilege" to engage in activities intended to divert funds away from a competitor).

[19]    In defining unlawful restraints of trade, Comment f to Section 768 invokes the federal antitrust laws, e.g., the Sherman Act, 15 U.S.C. §§ 1-7, the Clayton Act, 15 U.S.C. § 14, and the Federal Trade Commission Act, 15 U.S.C. §§ 41-58.  IMS does not allege Symphony committed antitrust violations.

[20]    In National Data, the Third Circuit recognized that Pennsylvania courts have adopted the approach set forth in Section 768 and predicted that the Pennsylvania courts would adopt a meaning that included conduct that was "independently actionable."  See 212 F.3d at 858.  See also Gilbert v. Otterson, 550 A.2d 550, 554 (Pa. Super. 1988) (recognizing Pennsylvania's adoption of § 768).

be "independently actionable" and that even blatant misrepresentations about business capabilities used to induce a breach of contract with a third party did not qualify).

The court's opinion in Assembly Tech., Inc. v. Samsung Techwin Co., No. 09-00798, 2009 U.S. Dist. LEXIS 106934 (E.D. Pa. Nov. 16, 2009), is on point. There, Assembly Tech, Inc. ("ATI") collaborated with competitor Samsung Techwin Co. ("Samsung") to develop software that Samsung used in its manufacturing of high-speed chip mounting machinery. Id. at *1-2. When Samsung hired away ATI's consultants to perform identical services, ATI alleged that Samsung committed tortious interference with the consulting agreements, which contained non-competition and non-disclosure agreements. Id. at *12-14. The court found that the competitor privilege applied to ATI's claims and dismissed ATI's tortious interference claims for failure to allege "unlawful means." See id. at *14-21. The court did so despite ATI's allegations that: (1) "[Samsung] engaged in concealed discussions with the ATI consultants"; (2) "ATI consultants breached their duty of good faith . . . in the terms of the consulting agreements,"; (3) "[Samsung] knowingly induced the ATI consultants to breach their . . . agreements," so that Samsung could obtain "virtually identical" services. See id. at *18-20. The court reasoned that "[a]lthough [Samsung's] conduct in this case may have hurt plaintiff's business, 'it simply does not constitute the sort of criminal, fraudulent, or independently-actionable conduct required to support a claim for tortious interference against a business competitor.'" Id. at *20-21 (citations omitted). The court therefore dismissed ATI's amended complaint.[21]

Here, IMS has not alleged that Symphony did anything "criminal, fraudulent or independently actionable" in how it hired the Employees or De-Identification Vendor. Rather,

---

[21]    ATI filed a second amended complaint, which the Court dismissed again for the same reason. See Assembly Tech. Inc. v. Samsung Techwin Co., 695 F. Supp. 2d 168 (E.D. Pa. 2010).

IMS merely claims that Symphony "induced" the Employees or De-Identification Vendor, which is simply not actionable.  See Rest. 2d Torts § 768, cmt. e (recognizing that the essence of the privilege is the ability to lawfully "induce third persons" who have relationships with competitors).

Nor could IMS's other claims—*e.g.*, misappropriations of trade secrets—constitute "wrongful means," because the alleged conduct was not the means or method through which the tortious interference occurred.  The Third Circuit holds that "'[w]rongful means' are ***tactics*** which are sufficiently 'predatory' that they form an independent basis for liability on the part of the defendant."  Commerce Nat'l Ins. Servs., 120 Fed. Appx. at 419 (emphasis added).

The opinion in Zimmer Spine, Inc. v. EBI, LLC, No. 10-03112, 2011 U.S. Dist. LEXIS 103629 (D. Colo. Sept. 14, 2011), is instructive on this point.  There, the plaintiff Zimmer Spine, Inc. employed a sales agency (Pro Medical) to sell Zimmer's spine-care medical products to doctors and hospitals.  Id. at *2.  A former Pro Medical sales manager formed his own agency (GIO Medical), and induced Zimmer's sales representatives to join GIO and sell products for Biomet, Zimmer's competitor.  Id. at *2-4.  Zimmer's suit alleged that Biomet and GIO, intending to misappropriate Zimmer's trade secrets and clients, induced Zimmer's former sales personnel to breach their actual and/or prospective contracts with Zimmer.  Id.  Granting defendants' motion to dismiss, the court found that Zimmer could not overcome the Section 768 competitor privilege because it failed to allege that the defendants employed "unlawful means." It found that:

> Defendants' alleged actions in inducing Pro Medical . . . to improperly breach its obligations sales agreement, and in misappropriating Zimmer Spine's trade secrets, constituted the facilitation of the interference with the prospective relationship, ***not the means by which it was accomplished***. . . .  Zimmer Spine's allegations do not constitute "wrongful means" sufficient to

> overcome application of the competitor's privilege to dismiss the
> claim of intentional interference

Id. at *20 (emphasis added).  Here, IMS's counterclaims are devoid of any allegations that

Symphony used unlawful tactics or means in recruiting the Employees or the De-Identification

Vendor.  Accordingly IMS's tortious interference claims relating to the Employees and De-

Identification Vendor (Counts III to IX) must be dismissed.

### 2. IMS's Counterclaim That Symphony Tortiously Interfered With the Fonseca Restrictive Covenant Fails Because She Has Not Begun to Work for Symphony and IMS Misstates the Duration of the Non-Competition Provision

IMS claims that Symphony has interfered with the Fonseca Restrictive Covenant

by "inducing Fonseca to leave IMS Health and accept employment with Symphony in violation

of the Fonseca Agreement" (see Countercl. ¶145)—which "prohibit[s] . . . Fonseca from being

employed or performing services for another company that competes with [IMS] . . . during [her]

employment and for ***one-year thereafter***."  (Countercl. ¶ 75 (emphasis added).)  But there are no

allegations that she has begun to work for Symphony (because she has not) and the very contract

that IMS attaches as an exhibit to its Counterclaim contradicts IMS's characterization of the non-

compete provision.  Section 3 of the 2010 Fonseca Restrictive Covenant shows that Fonseca

rejected IMS's one-year term, and SDI (now IMS) agreed to a one-month non-competition

period:

> 3.   <u>Non-Competition</u>.  Employee agrees that during his/her employment by the Company and for a period of one year [month] after that employment terminates (regardless of the reason for termination), Employee shall not, either individually or on behalf of any other person or

(Countercl. Ex. M (the signature page clearly shows that both Fonseca and the chief executive

officer of SDI, Andrew Kress, executed the 2010 Fonseca Restrictive Covenant).)

Thus, IMS has not pleaded any allegations that demonstrate that Symphony induced Fonseca to violate this one-month non-competition provision or that she has provided Symphony with trade secrets or confidential information.  IMS asserts that Fonseca resigned from IMS on September 20, 2013 (Countercl. ¶ 60)—just 10 days before it filed this Counterclaim—but does not and *cannot* allege that Fonseca started employment with Symphony within one-month of her resignation, because she has not yet started her employment.  Thus, not only is it implausible that Symphony induced her to breach the non-compete, but also that she has already been "placed . . . in roles" where she has disclosed trade secrets or confidential information.  (*See* Counterclaim ¶77.)  Accordingly, the allegations cannot withstand scrutiny and fail under Iqbal.  Count VIII should therefore be dismissed.

### 3. IMS's Counterclaim That Symphony Tortiously Interfered With the Hess Restrictive Covenant Fails Because IMS Has Not Alleged That Hess Violated Any Restrictive Covenants

IMS's allegations relating to Symphony's hiring of Hess are insufficient to support IMS's claim that Symphony tortiously induced Hess to commit a "violation of the Hess Agreement and other contractual and fiduciary obligations."  (Countercl. ¶ 130.)  IMS claims that after Symphony hired Hess, Symphony allegedly stated Hess "would not be working directly with pharmaceutical company clients," but "Symphony continued Hess in a role working with pharmaceutical company clients."  (Counterclaim ¶ 50.)  *No other allegations* specific to Hess appear on the face of the Answer or Counterclaims.  IMS does not offer any allegations to support the conclusory assertion that Hess breached the terms of his narrow and discrete non-competition provision, which was limited to "commercial operation and sale to third parties of syndicated market research studies that track and report on illnesses such as colds and flu, influenza, stomach illness, head lice, allergies, and asthma . . . ."  (Countercl. Ex. G § 3.)  Neither has IMS sufficiently pleaded that Hess provided Symphony with any of IMS's proprietary

information, as defined in the Hess Restrictive Covenant.  IMS's sole allegation that "Symphony continued Hess in a role working with pharmaceutical company clients" is vague and conclusory and fails to state a claim that Symphony tortiously interfered with the narrow non-compete and confidentiality provisions.  Accordingly, Count V should be dismissed.[22]

### 4.    IMS's Counterclaim That Symphony Tortiously Interfered with Its Agreement with the Unidentified De-Identification Vendor Fails Because IMS Has Not Alleged an Interference with Its Relationship or Any Injury

To support IMS's claim that Symphony tortiously interfered with IMS's contractual relationship with the unnamed De-Identification Vendor, IMS must allege facts sufficient to show "purposeful action on the part of [Symphony] intended to **_harm_** that existing relationship . . . and **_actual legal_** damage as a result of [Symphony's] conduct."  Reading Radio, Inc., 833 A.2d at 211 (Pa. Super. 2003) (emphasis added).  IMS's allegations fall well short.

First, IMS has not alleged that its relationship with the De-Identification Vendor, in fact, has been harmed or that Symphony's engagement of the De-Identification Vendor resulted in interference or interruption with the De-Identification Vendor's provision of services to IMS under the alleged agreements.  In fact, IMS admits that it "continues to work with the De-Identification Vendor."  (See Countercl. ¶88.)  IMS merely claims that disclosure of its trade secrets and confidential information is "inevitable" and "Symphony is counting on this disclosure to happen" (see id. at 92); however, such hypothetical and speculative allegations are

---

[22]    IMS's delay in attempting to enforce this non-compete underscores the hollowness of IMS's claims that Hess possessed or exposed any trade secrets or confidential information.  IMS alleges that Hess resigned on April 30, 2013 and that IMS met with Symphony to discuss his hiring.  (See Countercl.¶ 48-50.)  Yet, IMS waited five months—almost half the alleged duration of the non-competition provision—to seek judicial relief and only in response to Symphony's antitrust suit.  Notably, Steven Stevens resigned from IMS even earlier—in December 2012—but despite the supposed danger of his revealing trade secrets and confidential information to Symphony, IMS waited nearly a year to assert these claims.

not sufficient to plead actual interference with the relationship.  See, e.g., Restatement 2d of

Torts, § 766 (tortious interference requires "inducing or otherwise cause the third person not to

perform the contract"); British Telecomms. PLC v. Coxcom, Inc., No. 11-843, 2013 U.S. Dist.

LEXIS 101845, at *8 (D. Del. July 22, 2013) (dismissing tortious interference claim because

"[plaintiff] has not sufficiently pled that the contract was actually breached").

　　　　　Nor does IMS allege "actual legal damage" flowing directly from Symphony's

engagement of the De-Identification Vendor.  "Actual legal damage is '***pecuniary loss*** flowing

from the alleged interference with contract[.]'"  Eagle v. Morgan, No. 11-4303, 2011 U.S. Dist.

LEXIS 147247, at *42 (E.D. Pa. Dec. 22, 2011) (emphasis added, citations omitted).   "Non-

pecuniary harms" are not recoverable. See Shiner v. Moriarty, 706 A.2d 1228, 1239 (Pa. Super.

Ct. 1998).  IMS does not allege that Symphony's engagement of the De-Identification Vendor

specifically resulted in pecuniary loss, such as lost profits; IMS asserts a vague allegation that

Symphony has "de-valued" the underlying technology.  Such a conclusory assertion of injury

and damages is not enough.  See, e.g.,  Fintech Consulting v. Clearvision Optical Co., No. 12-

4956, 2013 U.S. Dist. LEXIS 61182 (D.N.J. Apr. 30, 2013) (dismissing tortious interference

claims for "fail[ure] to identify the kind or amount of damages").  Further, merely repeating the

conclusory allegation in every count that IMS "suffered damages" and was "harmed" is similarly

insufficient.  See, e.g., Weiss v. First Unum Life Ins., No. 02-4249, 2003 U.S. Dist. LEXIS

27863, at *14 (D.N.J. Aug. 27, 2003) (merely "repeating the conclusory allegation" that

"plaintiff has suffered and will continue to suffer substantial injury to his property and person,"

could not save a tortious interference claim).  Count IX should therefore be dismissed.

C.   **IMS's Claims for Improper Procurement of Confidential Information (Count II) and Unfair Competition—Interference with IMS Health's Business Relationships (Count XI) Fail for the Same Reasons as the Tortious Interference Claims**

Because IMS has failed to adequately plead its claims for tortious interference, its improper procurement (Count II) and unfair competition-interference (Count XI) claims also fail.[23]  The gist of each of these claims is the same: Symphony allegedly tortiously interfered with IMS's employment and de-identification contracts to obtain IMS's information.  As set forth *ante*, IMS's tortious interference claims fail for several reasons.  Thus, IMS's improper procurement and unfair competition claims—based solely upon IMS's allegations of tortious interference—must also fail.

"[T]he unfair competition doctrine may not be applied as a 'virtual catch-all' for any form of wrongful business conduct."  Volunteer Firemen's Ins. Servs., Inc. v. Fuller, No. 12-2016, 2012 U.S. Dist. LEXIS 181215, at *38 (M.D. Pa. Dec. 21, 2012).  Accordingly, courts have dismissed unfair competition claims when they merely duplicate deficient tortious interference claims.  See Hill v. Best Med. Int'l, Inc., No. 07-1709 et al., 2011 U.S. Dist. LEXIS 123845, at *60 (W.D. Pa. Oct. 24, 2011) (dismissing unfair competition claims based on tortious interference with employment contracts because the independent tortious inference claim failed); see also Eagle v. Morgan, No. 11-4303, 2013 WL 943350, at *17 (E.D. Pa. Mar. 12, 2013) (unfair competition counterclaim failed when it rested entirely on misappropriation counterclaim that failed to show counterclaim plaintiff's entitlement to relief).

In Count XI, consisting of a sum total of six conclusory paragraphs, IMS attempts to bootstrap an unfair competition claim to its deficient tortious interference claims.  (See

---

[23]   IMS asserts two counts for unfair competition—one based on misappropriation (Count X) and one based on tortious interference (Count XI).

Countercl. ¶¶ 163-64.)  IMS claims that, as a result of Symphony's alleged "interference with IMS Health's business relationships with its employees and De-Identification Vendor," Symphony has engaged in "improper and unacceptable practices," which "resulted in damages to IMS Health."  (Id. at ¶¶ 161-166.)  Thus, IMS's tortious interference claims are indistinguishable from the unfair competition-interference claim.  Because IMS's tortious interference claims are incapable of overcoming the competitor privilege, the unfair competition-interference claim (Count XI) fails as well.

Similarly, because IMS cannot prove wrongful means to support its tortious interference claims, it has also failed to allege "improper means" required to prove an improper procurement claim.  See Pestco, Inc. V. Associated Prods., Inc., 880 A.2d 700, 708-09 (Pa. Super. 2005) (applying Restatement (First) of Torts § 759 (Procurement of Information by Improper Means), which provides, "One who, for the purpose of advancing a rival business interest, procures **by improper means** information about another's business is liable to the other for the harm caused by his possession, disclosure or use of the information.") (emphasis added); see also Rest. Torts § 759 cmt. b (the Section states that the rule of liability is applicable only when information is procured by "improper means").[24]  IMS's improper procurement claim, just like its tortious interference claims, asserts that Symphony attempted to obtain its confidential information from the Employees and the De-Identification Vendor in violation of its agreements. (Countercl. ¶¶ 112-115).  Because IMS has not sufficiently alleged "wrongful means" to support

---

[24]    Much like the definition of "wrongful means" from Comment e to Rest. 2d Torts § 768, Comment c to Rest. 1st Torts 759 defines improper means as "theft, trespass, bribing or otherwise inducing employees or others to reveal the information in breach of duty, fraudulent misrepresentations, threats of harm by unlawful conduct, wire tapping . . . espionage."

its tortious interference claims, it has not alleged "improper means" to support its improper

procurement claim.  Accordingly, Counts II and XI should be dismissed.

> **D.    IMS's Misappropriation Claims (Counts I and X) and Improper Procurement Claim (Count II), to the Extent They Relate to Hess and Fonseca, Should Be Dismissed**

Symphony seeks dismissal of IMS's misappropriation, improper procurement,

and "unfair competition—misappropriation"[25] claims to the extent they relate to Hess and

Fonseca because IMS fails to identify any trade secrets or confidential information that

Symphony allegedly misappropriated.  A trade secret is defined under the Pennsylvania Uniform

Trade Secrets Act ("PUTSA") as:

> Information, including a formula, drawing, pattern, compilation including a customer list, program, device, method, technique or process that:  (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use. (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

12 Pa. Cons. Stat. § 5302.  "Absent the identification of a potentially cognizable 'trade secret,'

Defendant's claim under the PUTSA must fail."  Eagle v. Morgan, No. 11-4303, 2011 U.S. Dist.

LEXIS 147247, at *33 (E.D. Pa. Dec. 22, 2011); see also Walter Bennett Communs. of Pa., Inc.

v. Hibbard, No. 09-3633, 2009 U.S. Dist. LEXIS 107703, at *1 (E.D. Pa. Nov. 18, 2009)

(dismissing claim where "no attempt has been made to identify trade secrets as defined by the

statute.") (citing PUTSA).

At no point does IMS identify or define the trade secrets or confidential

information belonging to IMS that were allegedly misappropriated by Symphony through hiring

---

[25]    No practical differences exist between IMS's misappropriation of trade secrets claim and its misappropriation claim based on unfair competition.

Fonseca or Hess.  IMS's only allegations about Fonseca are that she was the "Project Director of Health Economic Outcome Research" (Countercl. ¶ 61) and was knowledgeable about confidential "software, data systems, and strategies."  (Id. at ¶ 62.)  Similarly, IMS's only allegations about Hess are that he was a Chief Medical Officer and Regional Head of Health Economic Outcomes Research, and generally "had extensive knowledge of IMS's trade secrets and propriety and confidential information."  (Id. at ¶¶ 49-50.)  The counterclaims offer no other allegations specific to Fonseca's or Hess's possession of trade secrets or confidential information.  This lack of specificity is especially fatal given that the parties operate in the complex pharmaceutical data industry, where the technologies and purported trade secrets are boundless.  Courts have found similar rhetoric insufficient for purposes of identifying a trade secret.  See, e.g., Bioquell, Inc. v. Feinstein, No. 10-2205, 2010 U.S. Dist. LEXIS 124077, at *16 (E.D. Pa. Nov. 23, 2010) (allegations that "trade secrets were acquired during the course of [employees'] employment with Plaintiff, said trade secrets were not generally available to the public, and that Defendant . . . induced . . . misappropriation" were insufficient); see also Sensus United States, Inc. v. Elliott Bay Eng'g., Inc., No. 10-1363, 2011 U.S. Dist. LEXIS 72540, at *20 (W.D. Pa. July 6, 2011) (dismissing counterclaim alleging misappropriation of "information, methods, and techniques" because it "does not provide even a general description of what . . . . 'information, methods, and techniques' the alleged trade secrets consist of"); Jurista v. Amerinox Processing, Inc., No. 12-3825, 2013 U.S. Dist. LEXIS 44057, *133 (D.N.J. Mar. 28, 2013) (dismissing misappropriation claim for failure to "identify or define what trade secrets . . . were allegedly misappropriated"; mere reference to assets was insufficient).

Thus, IMS's counterclaims for misappropriation (Counts I and X) and improper procurement of confidential information (Count II) to the extent they relate to Fonseca and Hess, should be dismissed.

## V.    CONCLUSION

For the foregoing reasons, Symphony respectfully requests that the Court grant Plaintiffs' Partial Motion to Dismiss IMS's Counterclaims.

Respectfully submitted,

Dated:  October 31, 2013

/s/ Leslie E. John
Leslie E. John (I.D. No. 62290)
john@ballardspahr.com
Jason A. Leckerman (I.D. No. 87915)
leckermanj@ballardspahr.com
Ruth S. Uselton (I.D. No. 208089)
useltonr@ballardspahr.com
Marcel S. Pratt (I.D. No. 307483)
prattm@ballardspahr.com

BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Telephone:  (215) 665-8500
Facsimile:  (215) 864-8999

Attorneys for Plaintiffs Symphony Health
Solutions Corporation, Source Healthcare
Analytics LLC, and ImpactRx, Inc.