# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| SYMPHONY HEALTH SOLUTIONS CORPORATION, SOURCE HEALTHCARE ANALYTICS LLC, and IMPACTRX, INC., <br><br> Plaintiffs, <br><br> v. <br><br> IMS HEALTH INCORPORATED, <br><br> Defendant. | Civil Action No. 13-04290 |

## AMENDED AND SUPPLEMENTAL COMPLAINT

Plaintiffs Symphony Health Solutions Corporation, Source Healthcare Analytics LLC ("Source"), and ImpactRx, Inc. ("ImpactRx") (collectively, "Plaintiffs" or "Symphony") bring this Amended and Supplemental Complaint against Defendant IMS Health Incorporated ("IMS"). For its Amended and Supplemental Complaint against IMS, Symphony alleges as follows:

## NATURE OF THE ACTION

1.      Symphony brings this antitrust action against IMS for its unlawful abuse of monopoly power and other anticompetitive conduct in the market(s) and/or sub-markets for pharmaceutical data products.

2.      IMS is the largest pharmaceutical data and analytics company both in the United States and the world, and boasts of having "nearly every major pharmaceutical and biotech company in the world" as a customer. Including swallowing every other major U.S. competitor

by acquisition, IMS has engaged in an unlawful scheme to acquire, protect and expand its monopoly and to eliminate from this market(s) and/or sub-markets the only formidable competitor left standing: Symphony, an innovator that often provides better products and competes vigorously on price to benefit customers, is losing market share due to IMS's long-running campaign to suppress and stamp out competition.

3.     IMS and Symphony provide pharmaceutical data products in a market(s) and/or sub-markets with high and costly barriers to entry. They collect and analyze a vast array of prescription, medical claims, and distribution data from thousands of sources as a part of the products and services they provide to pharmaceutical and biotechnology companies, the government, consulting services, and the financial community. In addition to providing commercial benefits, these products provide substantial public benefit, as clients use them to compile reports for public agencies (such as the United States Food and Drug Administration ("FDA")), address public safety concerns, and disseminate safety information to doctors.

4.     Over the past decade, IMS has engaged in an interconnected web of anticompetitive and conspiratorial acts designed to acquire, maintain, and strengthen its monopoly power in the market(s) and/or sub-markets for pharmaceutical data products, including:

- Entering into exclusive and/or *de facto* exclusive dealing agreements with data suppliers, which has prevented competitors' access to over 80% of data generated by long-term care facilities and a substantial percentage of the specialty drug data in the United States;

- Entering into agreements with data suppliers that contain most-favored-nations clauses ("MFNs"), *de facto* MFNs, and other clauses which have enabled IMS to artificially raise rivals' costs for data;

- Acquiring data suppliers, including foreign data suppliers, to prevent Symphony and other competitors from competing with IMS's monopoly in integrated global pharmaceutical data products;

- Bundling its products to exclude competition;

- Leveraging its monopoly power through bundling, conditional sales, and other means of anticompetitive conduct;

- Entering into exclusionary, long-term, staggered agreements with customers to exclude competition and further entrench its monopoly and/or to acquire monopoly power;

- Acquiring competitors, potential competitors, and other entities to eliminate competition;

- Revoking or delaying ImpactRx's access to critical data IMS compiled for all of its clients after Symphony, a competitor, acquired ImpactRx;

- Disparaging Symphony's products and corporate ethics; and

- Improperly poaching Symphony's employees to steal customers away from Symphony, to misappropriate Symphony confidential information, and to help IMS in its efforts to acquire a monopoly in products or sub-markets where IMS was traditionally weaker than Symphony.

5.      Since the filing of the original complaint in this case, IMS has knowingly and intentionally continued and in some respects accelerated its anticompetitive conduct, including entering into and maintaining exclusionary data supply contracts; entering into and maintaining exclusionary, long-term, staggered agreements with customers; acquiring competitors and other entities to eliminate competition, including the Amundsen Group and Cegedim; and leveraging its monopoly power through bundling, conditional sales, or other means of anticompetitive conduct.  Indeed, in 2015, IMS stripped away from Symphony a significant book of business by stealing one of Symphony's customers using this host of anticompetitive conduct to force the customer to move all of its business to IMS.

6.      Symphony has made substantial investments in data and innovation and prices its products competitively, but nothing Symphony does to compete will be enough so long as IMS continues to abuse its monopoly power in the relevant market(s) and/or sub-markets.

3

7.     IMS uses its monopoly power to force customers to purchase IMS's products. Customers complain of IMS's poor service and voice serious concerns that IMS abuses its monopoly power.  With regard to pricing its products, in particular, IMS engages in monopoly pricing.

8.     IMS's actions have harmed competition, hurt customers, and inhibited competition in the relevant market(s) and/or sub-markets.  Symphony has lost significant business opportunities and profits worth millions of dollars, and will continue to do so unless IMS's anticompetitive conduct is stopped.  Meanwhile, customers are forced to pay higher prices, have a lack of choice, and are forced to contract with IMS, despite their dissatisfaction with IMS's products, services, and prices.  Ultimately, if IMS succeeds in driving Symphony from the market(s) and/or sub-markets, customers will suffer even higher prices as no new competitors have entered, nor will enter, the market(s) and/or sub-markets, leaving IMS without any rivals in the market(s) and/or sub-markets.

9.     Symphony brings this action to recover treble damages that have resulted directly from IMS's anticompetitive conduct and to obtain injunctive relief to prevent IMS from continuing to engage in these practices that harm competition and consumers.

**THE PARTIES**

10.     Plaintiff Symphony Health Solutions Corporation ("Symphony") is a corporation organized under the laws of the State of Delaware and is headquartered in Horsham, Pennsylvania.  Launched in May 2012, Symphony Health Solutions was formed by the Symphony Technology Group ("STG") by combining four complementary healthcare insight companies—AlphaDetail, ImpactRx, TargetRx, and Source Healthcare Analytics ("Source")—into a customer-centric organization focused on innovation in the industry.  The combination

made Symphony a provider of high-value data, analytics, and technology-based solutions for pharmaceutical and other life science manufacturers, payers, and providers.

11.     Plaintiff Source Healthcare Analytics LLC is a subsidiary of Symphony and is a limited liability company organized under the laws of the State of Delaware.  Source is headquartered in Horsham, Pennsylvania at Symphony's headquarters.  Source is a long-standing competitor of IMS in the relevant market(s) and/or sub-markets and its competition extends back for a considerable period of time prior to Symphony's acquisition of Source.

12.     Plaintiff ImpactRx, Inc. (ImpactRx) is a subsidiary of AlphaImpactRx and is a corporation organized under the laws of the State of Delaware.  In 2015, AlphaImpactRx was formed from the spin-out of AlphaDetail and ImpacRx from Symphony Health Solutions. ImpactRx is headquartered in Horsham, Pennsylvania.

13.     Upon information and belief, IMS Health Incorporated is a corporation organized under the laws of the State of Delaware, with a principal place of business for U.S. operations at One IMS Drive, Plymouth Meeting, Pennsylvania, 19462.

## JURISDICTION AND VENUE

14.     Jurisdiction is appropriate pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and § 1337 (commerce and antitrust regulations) as this case arises under Sections 1 and 2 of the Sherman Act.  Symphony is seeking treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15 and injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26. Jurisdiction is also appropriate pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction).

15.     Venue is proper pursuant to 28 U.S.C. § 1391 and Section 12 of the Clayton Act, 15 U.S.C. § 22.  IMS regularly transacts business in the Eastern District of Pennsylvania, has a principal place of business in this District, and has prosecuted actions here.

16.     IMS sells and markets pharmaceutical data products in the relevant market(s) and/or sub-markets throughout the United States and worldwide; the conduct alleged herein substantially affects interstate commerce.

## FACTUAL ALLEGATIONS

### Industry Background

17.     Prescription drugs have played an essential role in the substantial improvements in global health and well-being over the past century.  Prescription drugs have vastly improved life expectancy and quality of living.  In turn, pharmaceutical companies, medical providers, and healthcare companies have become an increasingly important part of the economy.

18.     The prescription drug industry is one of the largest, most complex, and innovative industries in the world.  In the United States, millions of drug prescriptions are filled every week and billions are filled every year.  Hospitals, physicians, patients, pharmacies, drug wholesalers, insurance companies, and pharmacy benefit managers all create enormous amounts of data when they consume, prescribe, distribute, administer, or pay for prescription drugs.  Much of this data is captured electronically and can be synthesized into market intelligence that pharmaceutical and biotechnology companies, among others, find extremely useful in increasing productivity and profitability and directing future innovation.

19.     Once data is obtained, pharmaceutical data companies place it in sophisticated computer databases and standardize, cleanse, and aggregate the data, before analyzing it. Pharmaceutical data companies process millions of records every week.  Survival in the pharmaceutical data business is critically dependent upon access to data.

20.     Without the help of pharmaceutical data products, pharmaceutical companies would lack meaningful insight into the factors that affect the demand, purchase, distribution, and consumption of their drugs or their competitors' drugs.

21.     Pharmaceutical data products serve as the bedrock of commercial decision-making in the pharmaceutical industry and help to drive competition, spur innovation and create efficiencies in the pharmaceutical industry.  Customers use pharmaceutical data for marketing analysis, market research, measuring promotional response, analyzing and forecasting pharmaceutical sales, compensating sales representatives, assessing on- and off-label drug use, assessing physician prescribing behavior, evaluating patient behavior, implementing best practices, assessing managed care access controls, monitoring payer contract performance, and tracking patterns of disease and treatment, as well as for a host of other reasons.

22.     It is therefore critically important to customers and to U.S. consumers that pharmaceutical data products continue to improve to spur competition, drive efficiencies and keep pace with innovation in the healthcare sector.

23.      IMS's dominant position in the market(s) and/or sub-markets for pharmaceutical data products, however, has stunted innovation by stamping out competition, removing or reducing customer choice, raising prices, and hobbling competitors through an interconnected web of anticompetitive conduct.  IMS's own customers recognize that IMS does not innovate and that its technology is dated and overpriced.  Indeed, IMS rarely invests in leading edge solutions, operating on aging legacy systems.

24.     Despite IMS's lack of innovation and customers' dissatisfaction with IMS's pricing, products, and services, IMS is the largest provider of pharmaceutical data products in the United States and the world, and has monopoly or near-monopoly positions in the relevant market(s) and/or sub-markets for pharmaceutical data products set forth above.  IMS maintains business operations on every continent, except Antarctica, and has a monopoly or near monopoly in a multitude of countries.   As IMS's former chief executive officer once boasted in a financial

7

publication, "We literally have every pharmaceutical firm in the world as a customer." In 2014, after IMS's private equity owners took the company public through an IPO, IMS reported operating revenue of over $2.64 billion.

25. IMS secures its data from a worldwide network of suppliers in more than 100 countries and has exclusive or nearly exclusive relationships with many of those data suppliers and in some cases has acquired those suppliers, leaving no suppliers from which a competitor could secure data.

26. IMS's business strategy has relied on growth through horizontal and vertical acquisitions, not organic innovation. Indeed, its voracious appetite for acquisitions has masked slow organic growth. Throughout its history, IMS exhibited a pattern of consolidating the industry by acquiring competitors and data and analytics suppliers. Between 2005 and 2008, for example, IMS spent $345 million on 28 acquisitions. Between 2011 and 2014 IMS nearly doubled these efforts, spending approximately $650 million on acquisitions. In January 2012, IMS completed the acquisition of the third and only other viable competitor (aside from Symphony) in the relevant U.S. pharmaceutical data market(s) and/or sub-markets, SDI Health LLC ("SDI"). In fact, SDI had recently merged with Verispan LLC, formerly the industry's fourth competitor. In essence, IMS combined three out of the four companies that historically competed in this market(s) and/or sub-markets.

27. Customers have felt the impact of this acquisition binge, expressing concern that the more IMS acquires competitors the less incentive IMS has to innovate and drive efficiencies. Customers rightly perceive the acquisitions as reinforcing IMS's monopolistic position. Concerns around IMS's global acquisitions of competitors abound as customers are dependent on IMS's globally integrated product and have no viable alternatives.

28.     In conjunction with its anticompetitive growth, IMS has increasingly focused on entrenching and expanding its monopoly power through an interconnected array of exclusionary conduct, described below.

29.     Symphony competes against IMS in the market(s) and/or sub-markets for pharmaceutical data products described below.  Often, Symphony is IMS's only other competitor, although Symphony's market share is dwarfed by that of IMS.

### The Relevant Antitrust Market(s) and/or Sub-Markets

30.     Symphony brings this antitrust action against IMS for its unlawful abuse of monopoly power and other anticompetitive and conspiratorial conduct in the relevant antitrust market(s) and/or sub-markets in this action.

31.     One of the relevant antitrust markets is the market for pharmaceutical data products, which includes four pharmaceutical data product sub-markets: (i) the targeting and compensation data sub-market, (ii) the managed markets data sub-market, (iii) the anonymous patient longitudinal data sub-market (also referred to as anonymous patient level data), and (iv) the integrated global data sub-market.  Customers purchase an array of these pharmaceutical data products, often purchasing multiple products, if not all products.  There are significant barriers to entry, including substantial and sustained fixed costs.  At present, there are only two competitors: Symphony and IMS.  Symphony and IMS compete for the same customers and substantially the same data supply/suppliers.  IMS, due to its abuse of monopoly power, is the only competitor that is able to offer the full line of products.  Symphony does not have a global data offering. IMS has more than 80% market share.  Upon in formation and belief, IMS's market share has grown since the original complaint was filed and is continuing to grow.

32.     In the alternative, the relevant antitrust markets consist of four markets for pharmaceutical data products, including: (i) the targeting and compensation ("T&C") data market, (ii) the managed markets data market, (iii) the anonymous patient longitudinal data market (also referred to as anonymous patient level data) ("APLD"), and (iv) the integrated global data market.  There are significant barriers to entry, including substantial and sustained fixed costs.  At present, there are only two competitors: Symphony and IMS.  Symphony and IMS compete for the same customers and substantially the same data supply/suppliers.  IMS, due to its abuse of monopoly power, is the only competitor that is able to offer the full line of products.  Symphony does not have a global data offering.  As of the filing of the original complaint in this case, IMS's market share in the four sub-markets was: 100% for global data products in the U.S. (approximately 87% for global data products sold worldwide); 86% for T&C products; 82% for APLD products; and at least a majority share for Managed Markets products.  Upon information and belief, IMS's market share has grown and is continuing to grow in these markets.

33.     The relevant geographic market is the United States.  Country-specific laws and regulations create distinct geographic markets within the pharmaceutical data product markets.  While data from multiple countries can be aggregated to create integrated global data products, country-specific data is not interchangeable.  IMS and Symphony provide pharmaceutical data products to customers throughout the United States, however, IMS is the only firm in the United States that can provide integrated global data products to customers (both foreign and domestic).

34.     IMS has monopoly power or is dangerously close to acquiring monopoly power in the market(s) and/or sub-markets for pharmaceutical data products.  IMS has the power to raise prices and exclude competition in the market(s) and/or sub-markets for pharmaceutical data

products.  Symphony competes or has attempted to compete directly with IMS in the relevant antitrust market(s) and/or sub-markets.

35.     IMS—because of its monopoly in targeting and compensation data products—has also compiled demographic data on the "target" physicians for nearly every major pharmaceutical company in the United States.  The data exists in the customer's possession, but IMS claims the data as proprietary.  Plaintiff ImpactRx—a healthcare market research company that measures the impact of promotion to physicians—utilizes that data to perform research projects for its clients.  As discussed below, IMS historically had allowed ImpactRx to access the data, but used its monopoly power to cut off access when Symphony acquired ImpactRx.  IMS's conduct was specifically intended to harm competition and lacked any pro-competitive or business justification.

### Targeting and Compensation ("T&C") Data Products

36.     Symphony and IMS compete in the U.S. for approximately $500 million in business annually for T&C data products.  Of all of the pharmaceutical data products in the relevant antitrust market(s) and/or sub-markets, IMS derives its highest gross revenue from T&C data products.  IMS is an indisputable monopolist in the market(s) and/or sub-markets for T&C data products, with an 86% market share of the T&C data market.  Symphony has approximately 14% of the market.  No other company competes with Symphony and IMS in the sale of T&C data products.

37.     The T&C data provide a range of valuable information.  In the example of retail data, every time a prescription is filled at a pharmacy it creates a record about the participants to the transaction.  The resulting data shows, among other things, the name, dosage, quantity, and fill-date for the drug; the prescribing doctor's name, area of specialty, location; anonymous

information about the patient, such as age, gender, location; and the price of the product as well as the identity of the entity (if any) that paid for the drug.

38.     Thus, the T&C data comes from a number of sources but primarily from: (i) retail pharmacies (*e.g.*, RiteAid, CVS, Walgreens) and large retail establishments or mass merchandisers with pharmacies (*e.g.*, Wal-Mart, Costco); (ii) non-retail sources (*e.g.*, hospitals, long-term care pharmacies, and mail-order pharmacies); (iii) specialty drug distributors; (iv) drug wholesalers; and (v) pharmaceutical companies.

39.     Pharmaceutical and biotechnology companies use T&C products for a variety of uses, including to: (i) improve advertising, marketing, pricing, and promotional strategies; (ii) "target" or allocate marketing resources to individual physicians based on their prescribing habits and demographics; (iii) evaluate the impact or success of marketing efforts on certain doctors; (iv) strategize and plan for new drug launches; (v) measure sales performance, sales forecasting, and market share; and (iv) obtain competitive intelligence.  T&C products are also used to administer compensation programs for sales representatives (by tracking and allocating prescription sales), establish meaningful sales goals for representatives and geographical areas, define sales force size and structure, and make important staffing decisions.  Clients also use these products to report to governmental agencies, such as the FDA, and can help clients and the government direct drug safety alerts toward prescribing doctors.

40.     T&C products also offer vital information on drug sales into non-retail institutions, such as hospitals, clinics, long-term care facilities, mail-order pharmacies, prisons, and HMO-captive pharmacies.  Products with non-retail data are essential for tracking wholesaler and/or distributor sales into those non-retail institutions and to provide statistics on national market trends.

41.     Symphony's T&C products include, among others:  Source® Prescriber, Source® Prescriber Payer, Source® LaunchTrac, and Source® Territory Manager, PHAST®, which utilize prescription-level data, as well as Source® Non-Retail and PHAST Institution, which utilizes data from non-retail data sources to track drug distribution.  IMS offers a vast array of competing T&C products, including, but not limited to Xponent®, Xponent® PlanTrack, Xponent® Prescribing Dynamics, Xponent® Weekly Xponent® Long Term Care, National Prescription Audit, National Sales Perspective, and IMS DDD (manufacturer and wholesaler drug distribution data).

42.     One of the fastest growing segments in the pharmaceutical industry is specialty pharmaceuticals, *i.e.*, high-cost, technologically advanced drugs used to treat complex or rare conditions and diseases, many of which are delivered to the patient via injection or infusion.  In fact, over 600 bio-pharmaceutical products are under development in this area.  Clients find T&C data products that track specialty data to be extremely useful.  IMS itself recognizes that this is one of the fastest growing segments of the T&C data market or sub-market.  IMS has obtained exclusive contracts and substantially foreclosed Symphony's access to a significant portion of the specialty drug data in the United States, as explained infra.

43.     Similarly, pharmaceutical companies are manufacturing more drugs that are being used in long-term care facilities and they therefore value data products that can track those drugs.  IMS has obtained exclusive contracts and blocked Symphony's access to approximately 80% of the long-term care data in the United States, as explained infra.

44.     Using its monopoly power in the market(s) and/or sub-markets for pharmaceutical data products, IMS also requires its customers to enter into a de facto exclusionary "reciprocal arrangement" whereby hundreds of pharmaceutical companies in more than fifty countries report

to IMS on the volume of products they ship directly to their customers as a condition to purchasing IMS data on their competitors. This direct shipment data informs IMS's DDD product (a product within the T&C market or sub-market), over which IMS has had a monopoly for decades. IMS forces pharmaceutical manufacturers to provide to IMS their direct shipment data in order for the manufacturers to purchase IMS DDD. No other competitor has an offering comparable to IMS DDD.

45. Through bundling and leveraging, IMS uses its monopoly power in its DDD product, as well as its global data product, to maintain or expand its monopoly in the T&C market or sub-market, and/or to maintain, expand, or acquire monopoly power in the market(s) and/or sub-markets for Managed Markets and/or APLD data products.

46. Despite Symphony's ability to offer often comparable and even better T&C products, IMS has been able to maintain its 86% monopolist share of the market or sub-market through a combination of unlawful practices, including but not limited to the use of exclusionary or de facto exclusionary contracts and MFNs with data suppliers and pharmaceutical manufacturers that, among other things, block access to critical channels of data and/or artificially inflate the cost of the data, including, but not limited to: long-term care data, specialty pharmaceutical data, and pharmaceutical manufacturer direct shipment data.

47. In doing so, IMS creates choke points that cause competitors to have gaps in their data, either because the data is blocked by IMS or because the cost has been artificially inflated by IMS to ensure that competitors of smaller scale cannot afford to purchase as much as IMS, the market leader.

14

48. These choke points engendered by IMS's anticompetitive contracting strategies with data suppliers enable IMS to lock down the vast majority of customers because IMS has the broadest coverage in its data.

49. Even when Symphony has the same breadth of data, the significantly inflated costs for data forces Symphony to choose between product competitiveness and financial viability. As a result, competition is starved of capital to invest in innovation for customers. In addition, although Symphony's products are on the whole equal to or better than IMS's products, they lack critical data inputs that customers require. Alternatively, even if Symphony pays for the inflated cost of data created by IMS's anticompetitive conduct on the supply side, Symphony is simultaneously forced to sell its products at a loss in order to win business due to IMS's anticompetitive and predatory practices on the demand side.

50. This is exemplary of IMS's collective anticompetitive and conspiratorial conduct that is intended to, and does, squeeze Symphony on both ends.

**Managed Markets Data Products**

51. Symphony and IMS also compete in the sale of their Managed Markets data products. Managed Markets data products are derived from benefit claims that patients and pharmacies make to health plans, insurance companies, and pharmacy benefit managers.

52. The primary benefit of Managed Markets data products is that they give pharmaceutical companies insight into how decisions made by managed care entities impact their drugs. For example, Symphony's Dynamic Claims Suite helps clients to: (i) capture drug switching due to health plan formulary restrictions or patient pricing sensitivities; (ii) compare their drugs' performance to competing drugs according to health plan, employer group, or pharmacy benefit manager; (iii) evaluate the return-on-investment for being a preferred

15

formulary product or the effect of an unfavorable formulary position; and (iv) assess when discounts are necessary and optimize rebate offerings.

53.     Prior to acquiring SDI, IMS had a smaller share of the sales of Managed Markets data products.  IMS's products were viewed in the marketplace as less useful than Symphony's offerings.  IMS's acquisition of SDI, including SDI's Managed Markets product, Formulary Impact Analyzer ("FIA"), however, immediately gave IMS the largest share in this market for Managed Markets data products and further enhanced IMS's ability to bundle products and exclude competition.

54.     IMS has been able to grow its share of the market or sub-market for Managed Markets data products not only through its anticompetitive acquisition of SDI, but also through its unlawful practice of bundling its Managed Markets data products with its T&C data products, and leveraging its monopoly in the T&C data market or sub-market.  IMS has also engaged in other anticompetitive conduct to acquire a monopoly in Managed Markets products, such as giving away Managed Markets data products for free and the predatory hiring of Symphony's Managed Markets experts, discussed infra.

55.     Through these anticompetitive practices, and as discussed below, IMS is attempting to monopolize the Managed Markets data market or sub-market and has a dangerous probability of doing so in the near future.

### Integrated Global Data Products

56.     Symphony has attempted to compete with IMS in the market or sub-market for integrated global data products.  Today's pharmaceutical and biotechnology companies market, sell, and distribute their products in hundreds of countries all over the world.

57.     Integrated global data products offer a unique range of metrics that are not derivable from local data offerings.  Using massive amounts of data from numerous countries

16

and regions, global data products can synthesize pharmaceutical data and market intelligence from multiple countries to give clients international insight and a competitive edge in the global marketplace.

58.     These products can provide, among other things, detailed estimated product volumes, trends and market shares for hundreds of product and therapy classes, cross-country comparisons, and a variety of metrics for retail and non-retail channels.  Pharmaceutical companies use integrated global data to identify, among other things, global trends, patterns for diagnosis and treatment, emerging drug markets, and areas for research and development.

59.     Global data products can translate differences inherent in the market from one country to the next, and permit clients to track and analyze market activity across countries, regions, and even globally.  Producing a global data product requires access to data from numerous countries.

60.     IMS offers to customers in the United States a series of global data products under the brand name "MIDAS" (the Multinational Integrated Data Analysis System).  According to IMS, "companies rely on MIDAS to gain a truly global, timely and cost-effective view of estimated product volumes, trends and market share through retail and non-retail channels."

61.     MIDAS provides market intelligence using pharmaceutical data from over 100 countries.  IMS, through MIDAS, is the only provider of national market measurements across those countries.  MIDAS is "the world's largest pharmaceutical information resource" according to IMS.  But even this statement understates the relative size of MIDAS.

62.     IMS provides detailed market information for the 11 countries that represent 75% of the world's prescription drug market: United States, Canada, Japan, United Kingdom, Germany, France, Italy, Spain, Brazil, Mexico, and Argentina.

17

63.     IMS is an indisputable monopolist in the market or sub-market for global data products with more 100% share of the U.S. market and/or sub-market for global data products, and 87% share of the worldwide market(s) for global data products.  Furthermore, IMS is a monopolist (with approximately 90% - 100% market share) within many foreign markets, including Australia, Canada, China, Italy, Poland, Russia, South Korea, Turkey, and the United Kingdom.  IMS is also a monopolist (with approximately 75% - 90% market share) in several additional foreign markets, including: Argentina, Brazil, Spain, Germany, India, Japan, and Venezuela.

64.     For example, since 1999, IMS has been subject to oversight by competition authorities in the United Kingdom, due to IMS's monopoly status there.  Specifically, the UK competition authorities required IMS to "license its data on reasonable terms to other parties," "to price all its specialized data services according to a transparent price list," "not to enter into or enforce any exclusive contract" for the acquisition of data, and prohibited IMS from "bundling and tying its products with other IMS goods or services."   As recently as March 2014, the UK Competition Commission concluded that in the fourteen years that these restrictions had been in place, there still remains "insufficient countervailing power in the market" and that the restrictions must remain in place due "IMS being the only current provider …[and] its ability to offer a range of services … which it could bundle … and its advantage of being the incumbent."

65.     Global data products are important to pharmaceutical clients.  Many if not all of Symphony's and IMS's pharmaceutical clients sell pharmaceuticals globally and compete internationally.  To gain comprehensive insight into the global bio-pharmaceutical market, pharmaceutical companies have little choice other than to use IMS's MIDAS products.  There are other foreign companies that offer products with foreign data, but no other company has the

capability to offer in the U.S. products with integrated data from as many countries as MIDAS—mostly due to IMS's blocking competitors' access to that data.

66.     IMS recognizes that it has monopoly power in the market or sub-market for global data products and has abused that power.

67.     As explained below, IMS leverages its monopoly in the market or sub-market for global data into other markets or sub-markets and has prevented competitors from entering or competing effectively in the market or sub-market for global data.  IMS treats MIDAS as a non-discountable product line.  IMS also threatens to tax its MIDAS customers if they "break the bundle" and award business to competitors.

68.     IMS has also interfered with Symphony's attempts to develop a competitive global data product by acquiring key foreign data suppliers and entering into restrictive arrangements with foreign data suppliers.  Access to foreign data is a barrier to entry in this market or sub-market, and IMS's conduct creates additional artificial barriers that have effectively foreclosed any competition in the market or sub-market for global data.

### APLD Data Products

69.     Symphony and IMS compete in the market or sub-market for anonymous patient level data or anonymous patient longitudinal data ("APLD") products.  APLD products contain information on drugs consumed by individual anonymous patients.  APLD data is derived from pharmacy data, managed care claims data, and patient-linked medical and hospital claims data, as well as doctor diagnoses.  The data delivers information regarding patient treatment and medication consumption behavior over time (*i.e.*, longitudinal data) for a client's pharmaceutical products within a particular therapeutic class or market, or for a particular diagnosis.  In other words, APLD products enable pharmaceutical companies to see the course of the patient's treatment.

19

70.     APLD products, with their synthesis of comprehensive data from pharmacy, medical, and hospital claims at the anonymized patient level, and prescriber-level prescription data, can show, among other things, how health plans and insurance companies and other factors impact patient behavior.

71.     IMS's APLD offerings were not as competitive as Symphony's APLD products until IMS acquired SDI.  By acquiring SDI, IMS was immediately able to establish the dominant position in the market for APLD products.  The SDI acquisition enabled IMS to continue to build upon its anticompetitive bundles that now consist of IMS's T&C data products, Managed Markets data products (including SDI's Formulary Impact Analyzer), and global data products (*i.e.*, MIDAS).

72.     IMS has a greater than 80% share of the market or sub-market for APLD products.

### Barriers to Entry

73.     The market(s) and/or sub-markets for pharmaceutical data products face substantial barriers to entry and expansion.

74.     Every facet of the pharmaceutical data and analytics business is driven by access to data.  Data acquisition costs are extremely high.  Typically, each competitor faces tens of millions of dollars per year in fixed data acquisition costs.  Without a sufficient volume of data in every drug channel, *i.e.*, specialty, long-term care, mail order, retail pharmacies, etc., a company cannot offer competitive products.  To compete against IMS, a market entrant would need to make significant expenditures to acquire national, subnational, and foreign data.  These substantial data costs are largely sunk costs, *i.e.*, not recoverable if a potential competitor's efforts to enter the market fail.

75.     To create competitive products, a market entrant would need access to historical data, which can be acquired efficiently only through continuous operation in the industry for an appreciable period of time.  For example, customers typically require at least three years of historical APLD data, and data repositories often contain five to ten years of information. Customers must be able to access historical data and analyses for a number of reasons, including to inform their present and future decision-making.

76.     Technological capability and experience also form a barrier to entry.  Data volumes are enormous and require processing on massive scales.  Analyzing data for the billions of drug transactions that occur in the U.S. annually (*i.e.,* 50 million per week) involves a complicated process of de-duplication, indexing, cleansing, and standardization.  The average data and analytics company is not equipped to perform this type of work or to invest the tens of millions of dollars annually to purchase and process the data.  Moreover, before a product can be successfully marketed, competitors must invest substantial time and money into researching and developing the product.

77.     Thus, to survive in a market dominated by global leader and monopolist IMS, competitors such as Symphony must work hard to differentiate themselves through identifying available data, data selection, analytical techniques, projection methodologies, and development of innovative products.

78.     Compounding these barriers to entry, IMS has created additional barriers to entry. IMS maintains exclusionary long-term, staggered contracts with both suppliers and customers (typically spanning at least three to five years).  Thus, current and potential competitors must first wait for IMS's exclusionary, staggered, long-term data supply contracts to expire before they can even begin to slowly make the substantial investment required to buy, house, and use

the data.  Furthermore, IMS's exclusionary data supply contracts artificially inflate the cost of data supply for competitors, making the upfront investment in data supply even more challenging, if not impossible, for current and potential competitors.  Then, even if a competitor can hurdle these significant barriers to acquiring the necessary data, it must wait several more years before any critical mass of customer contracts are up for renewal.  Thus, IMS's contracting schemes on both the supply side and the customer side combine to create a self-reinforcing and very powerful barrier to entry.

79.    IMS's intent is to erect barriers that block current and potential competitors from accessing data, including for some of the fastest growing industry segments

80.    The regulatory landscape also operates as a deterrent for potential competitors. The regulatory requirements that apply to the use of patient and prescriber data, at the federal and state level, are complex and consistently changing.  Potential market entrants must comply with a wide range of laws and risk civil and enforcement liability for failing to comply.  For example, every entrant must monitor how their products are affected by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), as well as the newer Health Information Technology for Economic and Clinical Health Act of 2009 ("HITECH").  HITECH strengthened requirements for data security and protection for health information and created additional penalties for violations.

81.    Extremely high switching costs also present a very significant barrier to entry. These are the costs that clients pay to switch from IMS and to make their internal technology compatible with different companies' products.  Pharmaceutical and biotechnology clients will incur substantial costs to configure their information technology systems to integrate new product offerings into their systems and, more importantly, their business.  For large clients with

sophisticated systems, switching costs can exceed $1 million. These costs include housing costs, integration costs, managing and designing the data for business uses, adjusting business practices, and paying for two data sources while switching over. Customers also spend time and money changing account and prescriber demographic information, reforecasting, setting new targets based on the new data products, validating sales force configuration, and changing sales field reports. Customers must also spend time and money on teaching employees how to use the new products and educating management and the rest of the organization about the new products and how to interpret the data. Moreover, customers often use external vendors who charge for switching and must, too, adjust to the new data sources.

### IMS's Dominant Position and Monopoly Power

82.     Historically, IMS has had a long-standing monopoly in the market(s) and/or sub-markets for pharmaceutical data products and, in particular, the market(s) and/or sub-markets for T&C data and integrated global data products.

83.     In fact, IMS has always been the only entity with a comprehensive offering of global data products. This product line forces customers that operate globally to work with IMS, despite its arrogant behavior, high prices and poor product quality. It also means that IMS's bundling of its global data product (MIDAS) is extremely harmful to competition, because it forces the largest multi-national customers away from Symphony. As of 2015, IMS is closing in on its goal of 100% market share for core data contracts with the top global biopharmaceutical companies.

84.     Up until 2011, Source (now a Symphony company) and SDI sought to compete against IMS, and had some success with Managed Markets data products and APLD data products. IMS, however, realized that it could protect, and entrench its T&C and global data product monopolies by acquiring SDI to gain market power in the sale of APLD and Managed

Markets data products.  IMS knew that it could offer SDI's Managed Markets products in a long-term bundled contract that would further entrench IMS's monopoly products with customers. IMS also did not want other competitors, such as Source and SDI, collaborating because it would allow them to compete more effectively against IMS.

**IMS's Interconnected Web of Anticompetitive and Conspiratorial Acts**

85.     IMS has engaged in an interconnected web of anticompetitive acts that have individually and collectively harmed competition and consumers.  Though the individual acts are alone anticompetitive, when viewed in the collective -- as Symphony has endured them and as they have impacted competition -- their impact has been devastating and far outweigh any procompetitive justifications.

**IMS's Anticompetitive and Conspiratorial Acts:**
**Bundling of T&C and Global Data Products**

86.     IMS has monopoly power in the U.S. market(s) and/or sub-markets for pharmaceutical data products, including the market(s) and/or sub-markets s for T&C data products (approximately 86% market share) and for global data products (100% market share in the U.S.).  IMS is the only pharmaceutical data company with a comprehensive wholesale T&C offering (DDD) and a global data product offering (MIDAS) and holds a dominant position in the market(s) and/or sub-markets for these products.

87.     IMS's MIDAS line of products are key to IMS's ability to offer the full line of pharmaceutical data products.  MIDAS integrates global data from over 100 different countries, including the 11 countries that represent 75% of the world's prescription drug market.  MIDAS offers the world's largest compilation of integrated global pharmaceutical data.

88.     To gain insight into the foreign markets, pharmaceutical companies are forced to use IMS's MIDAS products.  No other company selling pharmaceutical data products in the

U.S., *e.g.,* T&C, Managed Markets, or APLD products, has ever had the capability to offer such a broad compilation of integrated global market data.

89.     Taking full advantage of its dominant positions, IMS leverages its 100% monopolist share of the global data market or sub-market to protect and grow its 86% percent monopolist share of the T&C data market or sub-market and other pharmaceutical data markets or sub-markets.

90.     For at least the last seven years, IMS has unlawfully bundled its global data products with its domestic T&C data products (in a bundle that often includes its Managed Markets and APLD products) to coerce clients not to purchase Symphony's T&C data products.

91.     IMS offers customers so-called "discounts" for purchasing a bundle of products, including its T&C products (Xponent, DDD, etc.) and MIDAS.  In reality, however, these "discounts" represent payments to customers for refusing to deal with competitors.  If a customer attempts to "break the bundle" by buying products from Symphony, IMS taxes customers by raising prices.

92.      IMS in particular threatens its customers that it will raise prices on its industry-essential MIDAS, the global data product, if the client does not buy its U.S. T&C data from IMS. In other words, if an IMS customer buys its T&C data from Symphony, IMS will punish that customer by dramatically raising pricing for MIDAS and related services.  In some instances, IMS has threatened to increase the price of its MIDAS product by over 50%.  Because Symphony does not offer a competitive global data product, IMS can dictate prices customers must pay for global data products—a hallmark trait of a monopolist.

93.     Thus, Symphony's current and potential customers have no choice but to adhere to IMS's exclusionary bundle.  There have been several instances where this exclusionary bundle

has proven to be the major factor in multinational pharmaceutical companies' decisions not to switch their T&C data subscriptions from IMS to Symphony, despite Symphony's ability to offer a T&C data product with a better sampling of retail data. Because of IMS's bundling, some customers have declined to purchase T&C data from Symphony. Symphony has lost market share in the T&C data market, and over time, will continue to lose market share. Since the original complaint was filed in this case, Symphony has now lost additional T&C business to IMS. Upon information and belief, IMS's bundling of MIDAS played a role in forcing a customer to leave Symphony for IMS in 2015.

94. IMS impresses on customers that sales are conditioned upon purchasing a bundle of its products. There have been reports that when a pharmaceutical company customer switched to or threatened to switch to Symphony, pricing for IMS's MIDAS product and other IMS services increased dramatically. Moreover, IMS uses its monopoly profits to pay off its multinational pharmaceutical customers to encourage them to purchase even more volume from IMS. These pay offs are sometimes disguised as "global rebates" and are dependent upon the exclusion of Symphony.

95. Thus, IMS has threatened and coerced customers into buying its T&C products and refusing to purchase competing products from Symphony. IMS's threat is credible because pharmaceutical companies are susceptible to retaliation by IMS as they can never substitute all of their IMS pharmaceutical data products with competing products. Straying from IMS's bundle creates a competitive disadvantage for pharmaceutical companies by causing them to pay higher costs than their competitors for similar data and analytics. This penalizes or "taxes" customers' transactions with Symphony and other competitors, which permits IMS to maintain supracompetitive net prices in the T&C data market or sub-market.

96.     Symphony continues to be unable to grow its market share for T&C products and, in fact, is continuing to lose market share to IMS's growing monopoly in T&C data products due to IMS's anticompetitive conduct.  In addition, Symphony cannot counter IMS's bundling of its global data products with its T&C data products as Symphony lacks a global data product.  Symphony's efforts to develop and compete with a global data product have been thwarted by IMS.  IMS creates barriers to entry principally by acquiring or entering into exclusionary contracts with global data suppliers with whom Symphony has sought to collaborate.

97.     IMS is using its monopoly power from its 100% share of the market or sub-market for global data products (where it offers the only integrated product) to protect its approximately 86% monopolist share of the market for T&C data products (where Symphony is its only competitor).

98.     The effect of IMS's conduct is that when IMS, a monopolist, threatens to increase prices of its global data products if a customer purchases its T&C data subscription from Symphony, IMS forecloses the T&C market or sub-market to Symphony and other potential market entrants because they lack an equally diverse group of pharmaceutical data products.  IMS's conduct increases prices for customers, eliminates competition, and reduces innovation and customer choice.

**IMS's Anticompetitive and Conspiratorial Acts:
Bundling and Predatory Pricing of Managed Markets Products**

99.     IMS also engages in unlawful bundling and predatory pricing of its Managed Markets products, such as its Formulary Impact Analyzer ("FIA"), with the intent to maintain or obtain monopoly power in the market or sub-market for Managed Market data products, maintain its dominant share in the market or sub-market for T&C data products, and drive Symphony out of business.  IMS has approached Symphony's current and potential customers

27

and has either offered them FIA and other services for free or engaged in conditional sales requiring customers to buy or continue to buy IMS's T&C products. IMS used its acquisition of SDI, the pharmaceutical data industry's third largest competitor, to further this strategy. Through the acquisition, IMS was able to enhance its Managed Markets offerings by among other things acquiring SDI's FIA product, and was able to remove SDI as a competitive threat.

100. Upon information and belief, IMS often masks its higher net prices for individual products by forcing clients to purchase bundles of its products and conditioning sales on additional required purchases.

101. Symphony has learned of various examples of IMS's predatory offerings. For example, in late 2012 to early 2013, one international pharmaceutical company that has subscribed to Symphony's DCL service (a Managed Markets data product) and uses IMS's T&C data products discussed renewal options with Symphony. Simultaneously, former Symphony employees that IMS poached were engaging that customer and detailing purported advantages that FIA had over DCL. Symphony fashioned a competitive package for the company and submitted a bid. Afterwards, the company informed Symphony that IMS was offering FIA for a significantly reduced price. Symphony had to significantly adjust its price to respond to IMS's extremely low price for FIA. IMS then began offering the company its FIA product for free. "Free" is below any measure of IMS's costs and, therefore, is predatory. The company still decided to buy Symphony's products, but only after Symphony cut its prices in response to IMS's anticompetitive offering. Symphony lost significant profits as a result of IMS's conduct.

102. This kind of pernicious predatory practice by IMS is intended to ensure that even if Symphony makes a sale, it is a sale that ultimately results in a financial loss to Symphony. Thus, Symphony will continue to get weaker and weaker until it is no longer able to compete and

IMS can recoup any short-term losses in revenues when it displaces Symphony and becomes the industry's only provider of pharmaceutical data products.

103.    Furthermore, the customer's true cost of buying Symphony's products is the low price it pays Symphony plus the amount of so-called "rebates" and "discounts" it forgoes on products it continues to purchase from IMS, which in reality are payments to customers for refusals to deal with competitors.  This is not the type of pricing that antitrust laws encourage because the true net prices that customers pay are higher than they would be in a competitive market.

104.    Another customer subscribes to Symphony's DCL service and uses IMS's T&C products.  During informal discussions about the customer's renewal of DCL, the customer informed Symphony that IMS offered FIA for free.  A representative from the customer informed Symphony that it would not be contacting Symphony to provide alternative pricing because Symphony could not compete with IMS's offer to supply Managed Markets data for free.

105.    IMS approached another customer of Symphony's and offered FIA for free as a part of a bundle.  The customer accepted IMS's offer and switched to IMS when its contract with Symphony expired in 2014.

106.    Symphony had a contract with another customer that it had to restructure downward because IMS made an offer to that customer that bundled Managed Markets data with T&C data.  After IMS's offer, the customer decreased the number of therapeutic classes it purchased from Symphony.

107.    In yet another example, Symphony lost a T&C contract worth millions of dollars with one of the largest pharmaceutical companies in the world because of IMS's anticompetitive bundling and other conduct.

108.    Immediately before Symphony filed this action, IMS approached one of Symphony's most valuable customers and offered that customer an anticompetitive bundle in an attempt to steal that client's T&C business (which amounts to millions of dollars) from Symphony.  IMS offered the customer its Managed Markets products (*i.e.*, FIA) for free.  IMS also touted that its data products have the specialty data that Symphony could not obtain because of IMS's exclusive contracts with data suppliers that ran through 2013.

109.    These companies, each current or former clients of Symphony, either have entered into long-term, staggered agreements with IMS or are in danger of doing so in the near future when their current contracts with Symphony expire.

110.    IMS's share in the market or sub-market for Managed Markets products is growing and IMS has, or has a dangerous probability of attaining, a monopoly in the market or sub-market for these products.

### IMS's Anticompetitive and Conspiratorial Acts: Exclusive Dealing Contracts with Suppliers

111.    Another weapon in IMS's anticompetitive arsenal is its practice of entering into exclusionary contracts with suppliers of data, preventing Symphony and other actual or potential competitors and customers from obtaining the same data or in enduring crippling costs to do so.

112.    One example of this anticompetitive practice is IMS's dealings with long-term care ("LTC") providers for their prescription-level information.  Long-term care prescription data comes from long-term care facilities, nursing home facilities and mental health facilities.

Long-term care data is extremely valuable to customers, particularly those who manufacture products utilized by long-term care providers.

113.    IMS has entered into exclusive contracts with the largest and second largest LTC providers in the United States, as well as other LTC providers, effectively preventing Symphony and other actual and potential competitors from competing with IMS.

114.    The data of these providers combined—which Symphony cannot access—constitutes over 80% of the long-term care data in the United States.  IMS's exclusivity with the largest LTC provider dates back at least a decade.  And due to IMS's most recent negotiations in late 2013 or early 2014, IMS was able to maintain its exclusivity with this provider at least through 2016.  Thus, IMS's exclusivity has been entrenched through a series of long-term agreements spanning approximately 3-5 years each.   IMS is the only pharmaceutical company in the country with access to that data and has had the exclusive access to this data, and the ability to charge supracompetitive prices for it, for over a decade.

115.    As a result of these contracts, Symphony has lost business with then-existing customers and has been unable to secure additional business from new or existing customers.

116.    The exclusive contracts effectively force pharmaceutical clients with products used in nursing homes, LTC facilities, and mental health facilities to use IMS for their physician T&C data needs.

117.    IMS also substantially foreclosed all competitors from accessing a significant portion of the specialty drug data in the United States until 2014.  For years, IMS used its monopoly profits to payoff CVS/Caremark for an exclusive relationship.  Caremark is a key distributor of specialty drugs.  Caremark generates data on classes of specialty drugs that are critically important to many pharmaceutical manufacturers.  IMS was the only data company

with access to Caremark's specialty data from at least 2008 through 2013 -- and therefore had the ability to charge supracompetitive prices for this specialty data as well as to foreclose all competition from offering this data to customers.

118.　Even once IMS's exclusive agreement with Caremark terminated, Symphony was forced to pay inflated prices to access this data due to, upon information and belief, exclusionary conduct by IMS, including but not limited to securing express or de facto MFNs with Caremark to ensure that IMS's rival would pay inflated prices.

119.　IMS also maintains an exclusionary relationship with the second largest distributor of specialty drugs for at least a decade.  Over the years, IMS's agreements with this data supplier have contained MFN provisions ensuring that no competitor receives a more favorable agreement than IMS has.  Without access to these two sources, Symphony for years could not compete meaningfully with IMS in the T&C data market or sub-market.

120.　IMS's exclusionary and anticompetitive contracts with these data suppliers are even more pernicious because they work in tandem with IMS's anticompetitive long-term, staggered agreements with customers, which often lock customers into contracts for 3-5 years. This means that even if IMS's exclusivity with a data supplier expires and Symphony is permitted to access the data, it cannot win customers until IMS's customer contracts are up for renewal.

121.　Due to IMS's exclusionary contracts with these providers of specialty drug data, Symphony has lost and continues to lose significant profits.  In 2012, for example, Symphony's Source line of business lost a customer who had a contract with Symphony that was worth millions of dollars in annual revenue.  The client did not renew with Symphony because Symphony could not access the specialty drug data that IMS blocked off from its competitors

and for which IMS had artificially inflated the price using payoffs to the data suppliers from IMS's monopoly profits.

122.    By being the only provider, for years, of essential specialty and long-term care data, IMS has been able to prevent customers from buying Symphony's products by bundling that data into their T&C product offerings.  Because of the increasing importance of specialty and long-term care drugs, pharmaceutical companies cannot effectively market their entire drug portfolios without this data.  While Symphony offers comprehensive data for the traditional drug channels, IMS's restriction of competitor access to specialty and long-term care data forces customers to purchase from IMS.  IMS compounds this exclusionary activity by implementing long-term agreements with customers that are staggered across the years, so that in any given year, only a handful of customers may be able to enter into new agreements with IMS's competitors.

123.    IMS also uses exclusionary and exclusive agreements with foreign data providers. For instance, Symphony cannot obtain certain pharmaceutical data generated by one of the largest drug wholesalers in the United Kingdom because of an exclusive agreement between that provider and IMS.

124.    In still another example, Symphony entered into a data supply contract with a Swiss company, Pharmexpert, which was the leading local provider of market intelligence for pharmaceutical industry in Russia and countries participating in the Commonwealth of Independent States.  The contract provided Symphony with access to Russian pharmaceutical data.  Afterwards, IMS acquired all of the intellectual property assets of Pharmexpert, and subsequently shut off the data feed to Symphony.

125.     Similarly, IMS acquired a data supplier in Canada, Brogan, Inc., to prevent Symphony from acquiring Canadian data, which gave IMS the exclusive ability to offer Canadian data in its integrated global data products.

126.     Given its entrenched position globally, and its predatory pricing and bundling practices, these contracts have a substantial impact on competition and hurt customers. In particular, these practices have diminished the market presence of Symphony, have impeded its ability to compete, and have prevented other entrants into the market. IMS's purpose in entering into these agreements is to expand, protect, and entrench its monopoly power in the relevant market(s) and/or sub-markets.

127.     These exclusive and exclusionary contracts have blocked Symphony's access to critical data for years. As a result, Symphony lost significant profits and continues to lose profits.

### IMS's Anticompetitive and Conspiratorial Acts: Most Favored Nations Clauses

128.     Access to data is the lifeblood of this industry. Where IMS has not negotiated exclusive contracts with data suppliers to choke off access to Symphony, IMS has abused its monopoly power to integrate anticompetitive Most Favored Nations clauses ("MFNs") or de facto MFNs into its contracts or has otherwise secured commitments that have substantial exclusionary effects (collectively, "IMS's MFNs").

129.     IMS's MFNs required data suppliers to sell their data at an artificially high price. Thus, IMS was able to abuse its monopoly power to control and artificially raise the price that Symphony pays for critical data supply inputs.

130.     IMS's MFNs have caused data suppliers to raise prices charged to IMS's competitors by substantial amounts. In some instances, the prices that IMS has caused the

suppliers to charge are so high that purchasing that data has become unprofitable. Because of IMS's MFNs with data suppliers, Symphony has been unable to acquire data and/or cannot compete effectively.

131.   Even where IMS has entered into new contracts with critical data suppliers that do not contain explicit MFNs, IMS has secured commitments from its suppliers that operate as MFNs. Additionally, the effects of IMS's MFNs (whether explicit or implicit) persist because IMS inflated the price that suppliers charged for their data. As IMS intended, prices have been inflated to an amount that only IMS can profitably afford.

132.   IMS's MFNs exclude competitors from the market(s) and/or sub-markets and protect IMS's monopoly position. IMS's MFNs serve as barriers to entry into the relevant product markets.

133.   IMS has aggressively enforced its MFN rights against data suppliers. IMS's MFNs also permit IMS to charge supracompetitive prices to customers for the data protected under IMS's MFNs.

134.   The antitrust enforcement agencies—the Antitrust Division of the Department of Justice ("DOJ") and the Federal Trade Commission—have begun scrutinizing MFNs, particularly in the healthcare context. As the former head of the DOJ Antitrust Division recognized, "[MFNs] have the potential to inflict significant harm to consumers and competitors."

135.   IMS's MFNs significantly restrain competition and serve no purpose other than to preserve and increase IMS's market shares and to harm Symphony.

### IMS's Anticompetitive and Conspiratorial Acts:
### Anticompetitive Acquisitions

136.   IMS has also engaged in a series of anticompetitive acquisitions that are designed to prevent collaboration among smaller firms in competition with IMS and serve to maintain and enhance its monopoly power and ability to engage in unlawful monopoly practices, such as bundling.

137.   In October 2010, when IMS got wind of rumors that Source (now Symphony) and SDI were in merger talks, IMS determined it would derail the merger. IMS's Senior Vice President Strategy & Global Product Management, Stefan Linn, wrote to IMS's private equity owners that there "are persistent rumors that SDI is acquiring [Source].  Have you heard anything?  That would not be good for us.  It would create a pretty good solution in the market place with better assets than IMS in the growth markets..."  In light of this potential for a stronger competitor to compete with IMS in the markets and/or sub-markets, IMS intentionally interfered with the Source-SDI merger negotiations.

138.   IMS thus acted to unlawfully disrupt a potential Source-SDI merger and to increase its competitor's costs.  In little more than a month's time, IMS's board of directors approved the purchase of SDI for $340 million in order to block a merger between SDI and Source that would have been good for competition, and would have offered better innovation and better choice for customers, but which would be bad for IMS.  IMS acquired SDI, the last remaining competitor to IMS and Symphony, as a part of an overall scheme to prevent customers from dividing their data uses among various competing providers, to harm Symphony, and to exclude potential competitors.  IMS's anticompetitive conduct has resulted in higher net prices for customers in the relevant market(s) and/or sub-markets.

36

139.     When IMS entered into an agreement to acquire SDI, the United States Federal Trade Commission ("FTC") initiated an investigation focused on IMS's and SDI's market shares in a market the FTC defined for audit products.  Ultimately, the FTC determined that permitting IMS to keep SDI's promotional and medical audits business would have anticompetitive consequences in the market for audit products.  The FTC required IMS to sell SDI's promotional audit and medical audit businesses, but even after selling SDI's medical audit business per the FTC's mandate, IMS maintains a monopolist's share of 78% of the United States market for audit products.  Upon information and belief, the acquirer of that business has struggled to maintain a foothold in that market, losing sales due to IMS's anticompetitive conduct similar the conduct Symphony has experienced in the relevant antitrust market(s) and/or sub-markets at issue in this case.

140.     When IMS acquired SDI, it resulted in the merger of the first (IMS) and third (SDI) largest firms providing pharmaceutical data products.  The acquisition has since had anticompetitive effects in the pharmaceutical data market(s) and/or sub-markets, including the market(s) and/or sub-markets for T&C, Managed Markets, and APLD data products.  By acquiring SDI, IMS's intent was to protect its monopoly power by expanding its bundles with SDI products.  As noted above, IMS bundles SDI's legacy product, FIA, oftentimes offering it for free, with IMS's T&C data products.  IMS includes SDI's APLD products in its bundles as well.

141.     More recently, IMS used an acquisition to interfere with Symphony's agreement with Tarheel Trading ("THT").  Symphony had an agreement with THT to supply THT with hundreds of thousands of dollars' worth of data in three tranches to be delivered in June, August, and December of 2012.  The first two deliveries were made without incident.  In or around

August of 2012, IMS purchased THT, and THT refused to pay monies owed to Symphony. THT claimed that it could not pay Symphony because IMS would not allow it.

142. In 2012, IMS acquired Pharmexpert, a Swiss company that was a leading provider of market intelligence for the pharmaceutical industry in Russia and countries participating in the Commonwealth of Independent States. Prior to IMS's acquisition, Symphony entered into a data supply contract with Pharmexpert that provided Symphony with access to Russian pharmaceutical data. Symphony desired access to this data to increase its ability to compete with IMS's MIDAS line of products. IMS, having acquired Pharmexpert, shut off the data feed to Symphony and cause Pharmexpert to breach its agreement with Symphony for the purpose of causing competitive harm to Symphony.

143. In July 2010, IMS acquired Brogan, Inc., a company in the business of tracking drug sales in the Canadian healthcare market. According to IMS, Brogan had the largest drug claims database in Canada. Symphony had intended for Brogan to be a key participant in a network of non-U.S data suppliers of international data. IMS's acquisition eliminated Symphony's ability to obtain any data from Brogan. Thus, the acquisition gave IMS the exclusive ability to offer Canadian data in its integrated global data products to U.S. customers. IMS's reason for acquiring Brogan was to protect IMS's monopolies and to prevent Symphony from accessing the data. And, as a result, Symphony lost access to a potentially significant data supplier.

144. In March 2013, IMS acquired Appature, Inc., a technology company that provides cloud-based marketing solutions designed exclusively for healthcare companies. Symphony entered into a contract with Appature to provide Appature's marketing tool in conjunction with

Symphony's data products for a particular client. IMS has used this acquisition to further injure and interfere with Symphony's business.

145. In December 2013, IMS acquired the Amundsen Group, a consulting firm with expertise in Managed Markets analytics and services. Prior to IMS's acquisition, the Amundsen Group and Symphony had a close partnership and worked collectively on projects for Symphony's customers. Upon information and belief, IMS has used this acquisition to further injure and interfere with Symphony's business by using customers' goodwill and history with the Amundsen Group, combined with IMS's aggressive bundling and conditional sales practices, to force customers to leave Symphony for IMS. As a result, in 2015, Symphony lost the entire book of business from one of its customers.

146. In April 2015, IMS completed its acquisition of certain customer relationship management (CRM) and strategic data businesses of competitor Cegedim. The acquisition added 4,500 employees to IMS's workforce. This acquisition will further cement IMS's monopoly position.

**IMS's Anticompetitive and Conspiratorial Acts:**
**Refusal to Sign Third Party Agreements**

147. In addition to all of the foregoing anticompetitive conduct, IMS abuses its monopoly power through refusals to deal and by abusing its third-party access agreement ("TPA") program.

148. Clients of pharmaceutical data companies historically have used outside companies to provide pharmaceutical consulting and analytics services. Oftentimes, a competitor performing a project for a mutual client will need access to another competitor's data compiled for the same client. A customary practice in the industry—dating back decades—is for

companies who have compiled data for clients to grant access to the data if the competitor company signed a TPA. For years, IMS followed this industry practice.

149. Before Symphony acquired ImpactRx, IMS routinely granted TPAs to ImpactRx. ImpactRx is a pharmaceutical research company that analyzes physicians' prescribing behaviors, measures the impact of its clients' promotional efforts, and gauges physicians' attitudes toward certain drugs. ImpactRx garners information from thousands of doctors across the country through surveys and syndicated panels. ImpactRx can tell clients, among other things, whether they are leaders in certain therapeutic areas; what companies and drugs are most competitive; how aggressive their competitors' promotion efforts are; and key data sales representative visit to certain doctors.

150. Pharmaceutical companies value syndicated data for physicians that prescribe their drugs (as well as those of their competitors) with relatively high frequency. These doctors are "target doctors," because their prescribing habits and impressions of clients' drugs are of significant commercial interest to pharmaceutical companies. ImpactRx's products are only valuable to clients if they measure information about the client's target doctors.

151. Because of its monopoly in the T&C data market, IMS has compiled national "target lists" of prescribing doctors for almost every major pharmaceutical company in the United States. IMS has claimed these lists as proprietary and does not permit its clients, *i.e.,* the pharmaceutical companies for whom IMS compiled the lists, to freely share these lists with non-IMS researchers and consultants.

152. Prior to ImpactRx becoming a Symphony company, IMS would freely sign TPAs for ImpactRx to access the target lists that IMS compiled. For years, ImpactRx had unfettered access.

153.     After Symphony acquired ImpactRx, however, IMS refused to sign TPAs for ImpactRx, though there was no pro-competitive justification for doing so.  A U.S. Director of Sales at IMS stated via email on October 5, 2012 that the reason for IMS's change of heart was that "in March of this year, ImpactRx was purchased by Symphony Health which is a direct competitor of IMS."   IMS was able to abuse its monopoly power in the T&C data market or sub-market to prevent ImpactRx from doing business with its clients.  IMS's obvious goal was to injure Symphony.

154.     Upon information and belief, Symphony lost at least hundreds of thousands of dollars of business as a result of IMS's refusal to sign TPAs.  IMS also caused significant damage to Symphony's and ImpactRx's goodwill and reputation by causing project delays and aggravating ImpactRx's clients.

155.     For example, Symphony (per Impact Rx) was engaged by an international pharmaceutical company to perform a pilot project that required access to that client's list of target doctors in multiple U.S. territories.  The list, which IMS compiled, included basic (and some publicly available) information, such as each doctor's name, address, specialty, and Medical Education number.  The client had the list in its possession, but IMS told that client that it could not share the list with ImpactRx because ImpactRx had been acquired by Symphony. The client explicitly stated that Symphony could not proceed with the pilot project because of IMS's refusal to provide Symphony with access to the data.  As a result, Symphony lost a significant amount of profits, including hundreds of thousands of dollars in recurring profits from future projects that would have been awarded after Symphony successfully completed the pilot project.

156.     IMS refused to deal with ImpactRx in an attempt to injure Symphony as a whole—because Symphony is a competitor and a threat to IMS's unlawful monopoly maintenance or attempted monopolization in the relevant product markets.

157.     While IMS offered certain "workarounds" (*e.g*., access only at the pharmaceutical company's location and on its hardware, using a third party to do matches), these workarounds were pretextual and were not feasible for much of the business.  Eventually, and only after the filing of this lawsuit, Symphony and IMS were able to agree on a protocol for ImpactRx TPAs. However, IMS refused to put the agreement in writing.  Therefore, Symphony has no assurances that IMS will not resume this behavior.  IMS's refusal to grant TPAs from 2012 through 2013 lacked any business justification and was designed to inflict harm on Symphony, as a competitor to IMS.

158.     As a result of these refusals to permit access, Symphony has been foreclosed from certain work with customers, and thereby has lost a substantial amount of money and may continue to lose a substantial amount of money due to customers' ongoing expectations that IMS will continue to disapprove TPAs in favor of Symphony.

159.     Moreover, upon information and belief, IMS further induces customers not to deal with Symphony by offering them so-called "discounts" on data if they agree not to sign a third party agreement with any competing vendors without coming to IMS first with the opportunity. In reality, these so-called "discounts" are payments of IMS's monopoly profits in exchange for exclusivity and/or refusals to deal with IMS's competitors.

160.     IMS additionally abuses its TPA process by using TPAs to target competitive services it can offer to customers.  IMS mines the TPAs for competitive and customer insights that it would not otherwise have access to if it were not the global monopolist that it is.  This

further enables IMS to engage in bundling and other predatory practices, as well as delaying the TPA process.

161.    IMS's abuse of the TPA process further induces customers not to deal with Symphony.

**IMS's Anticompetitive Acts:**
**Misrepresentations to Symphony's Customers**

162.    IMS has also initiated a campaign to defame and disparage Symphony's business in an attempt to steal clients and to prevent prospective clients from buying Symphony's products.

163.    IMS has made misrepresentations that are false and material.  Clients and potential clients, who have no independent knowledge of the subject matter, have relied on IMS's misrepresentations.

164.    For example, an IMS representative told the senior vice president of sales for a pharmaceutical company customer that Symphony did not get complete weekly data and as a result, Symphony performs "modeling" rather than using or analyzing real data.  IMS also stated that Symphony's data feeds were less accurate and could not support weekly reports; IMS then touted that it had more accurate data.  As a result, the client expressed its desire to move away from Symphony to IMS.

165.    IMS told another customer's business and procurement teams that Symphony Health is "unethical and [you] should not do business with [Symphony]."

166.    IMS sales representatives told Symphony's customers that Symphony would lose access to a key data supplier.  This false representation benefitted IMS.  IMS's statements caused customers and potential customers to delay purchasing and switching decisions.

43

167.     IMS told another customer that Symphony will never have access to key data on specialty drug products.  IMS hid the fact that it uses exclusionary contracts to block Symphony from that data.

168.     Symphony has worked to undo the effects of IMS's defamation, but upon information and belief, clients have decided to buy products from IMS instead of Symphony, as a result of IMS's disparaging statements.

169.     As a result of IMS's conduct, Symphony has lost and continues to lose profits, as well as suffer damage to its reputation and goodwill.

### IMS's Anticompetitive and Conspiratorial Acts:
### Misappropriation of Trade Secrets and Predatory Hiring of Symphony Employees

170.     Compounding IMS's anticompetitive and conspiratorial conduct described above, IMS has routinely targeted Symphony's employees to expand its monopoly in the pharmaceutical data market(s) and/or sub-markets, including the T&C data market or sub-market, and to attempt to monopolize the market or sub-market for Managed Markets data products.   IMS has poached client-facing employees in accounts up for renewals or bids.  And, between 2011 and 2012, IMS poached three key Symphony employees who had contributed to the success of Symphony's Managed Markets products.  These employees possessed Symphony's institutional knowledge and trade secrets about Symphony's business and products.

171.     Due to IMS's poaching of these key employees, its use of Symphony's trade secrets and confidential information, and the unlawful bundling and predatory pricing described above, Symphony's revenues from the sale of Managed Markets data products and other pharmaceutical data products has declined significantly.

172.     Through the use of Symphony's trade secrets and confidential information, these employees have targeted Symphony's existing and prospective clients with the intention to harm Symphony and steal its customers.

173.     Upon information and belief, these actions are ongoing and IMS continues to attempt to injure Symphony by targeting Symphony's employees through unsolicited communications and with offers of substantial raises.

174.     As a direct result of IMS's anticompetitive poaching of Symphony's employees, Symphony lost significant profits while IMS has increased its market shares and profits.

### Anticompetitive Effects

175.     IMS's collective anticompetitive and conspiratorial conduct described herein has had the effect of excluding Symphony from the relevant market(s) and/or sub-markets and denying customers the benefit of lower net prices, better service, and increased innovation that would prevail in a more competitive environment.

176.     IMS's collective anticompetitive and conspiratorial conduct described herein has prevented current and potential customers and critical data suppliers from doing business with Symphony.

177.     IMS's anticompetitive and conspiratorial conduct described herein has harmed competition and customers by limiting customer choice, eliminating checks on IMS's quality and reliability, pricing, and coercive power, stunting technological innovation in the industry, and excluding efficient and formidable competitors, such as Symphony, among others.  IMS's conduct also has prevented Symphony from researching, developing, and investing in new products that would increase efficiency and profitability of the pharmaceutical and biotechnology industry.  IMS's conduct creates disincentives for Symphony and other potential

competitors to engage in research and development because they know sales of their products will be "taxed" by IMS's coercive bundling and conditional sales, thus reducing the profitability of new products. IMS is the only competitor with an unfettered incentive to innovate—and yet it does not.

## Lack of Pro-Competitive Justifications

178. There are no pro-competitive justifications for IMS's actions. The only reason for this interconnected web of anticompetitive and conspiratorial conduct is that IMS intends to foreclose competition from rivals such as Symphony. IMS's behavior does not benefit consumers, will drive up net prices for consumers, and stunt innovation of new products.

179. IMS's collective anticompetitive and conspiratorial actions have no corresponding efficiencies and offer no downstream enhancements. For instance, IMS's exclusive dealing arrangements and IMS's MFNs provide no benefit to the customers that they impact. Likewise, IMS's refusals to sign TPAs had no conceivable pro-competitive justification. IMS's stated purpose of restricting access to ImpactRx was to injure Symphony. Further, IMS's bundling and conditional sales practices are not beneficial to customers because these practices penalize customers when they buy products from Symphony and result in higher net prices for customers. Rather, IMS's bundling protects IMS's monopoly power and inhibits the ability of its only remaining rival, Symphony, to compete in the relevant antitrust market(s) and/or sub-markets. Thus, taken in the collective, it is even clearer that there is no market justification for any of IMS's behavior.

## Antitrust Injury

180. Symphony is seeking redress under Sections 4 and 16 of the Clayton Act, because it has suffered injury and/or competes against IMS in the relevant antitrust market(s) and/or sub-

markets, which have been restrained and monopolized by IMS.  It has suffered direct antitrust injury as a result of IMS's conduct and/or conspiracy to engage in such conduct.

181.    Symphony's business has suffered injuries that the antitrust laws were intended to prevent and those injuries flow directly from IMS's anticompetitive conduct, including IMS's bundling of products, entering into exclusive contracts or MFN clauses, engaging in anticompetitive acquisitions intended to restrict data access to competitors, disparaging competitors, refusals to deal, poaching Symphony's employees, and misappropriating Symphony's trade secrets and confidential information.

182.    But for IMS's anticompetitive scheme to restrain trade and monopolize the relevant market(s) and/or sub-markets, Symphony would have increased its size, profitability, market shares, and market value.

183.    Symphony's presence in the market(s) and/or sub-markets is good for competition and customers.  Without Symphony's continued presence in the relevant market(s) and/or sub-markets, IMS's abuse of its monopoly power and its market manipulation would increase and cause further harm to customers through increased prices and reduced innovation.  Symphony's continued presence will curb IMS's harmful concentration and abuse of monopoly power.

## COUNT ONE

### Unlawful Monopolization
### (Section 2 of the Sherman Act, 15 U.S.C. § 2)
### All Plaintiffs Against IMS

184.    Plaintiffs incorporate by reference the preceding paragraphs as if set forth fully herein.

185.    IMS possesses monopoly power in the relevant market(s) and/or sub-markets, including the pharmaceutical data market or sub-markets for T&C data products, APLD data

products, and integrated global data products. IMS has the power to control prices and exclude competition in those market(s), and has used that power for anticompetitive purposes.

186. Substantial barriers to entry exist in the relevant market(s) and/or sub-markets, including the market for pharmaceutical data products and the market(s) and/or sub-markets consisting of T&C data products, Managed Markets data products, integrated global data products, and APLD data products.

187. IMS has willfully acquired and maintained and/or conspired to acquire and maintain its monopoly power through exclusionary and anticompetitive conduct, including but not limited to, bundling products, forcing customers to agree to conditional sales, entering into long-term data supply contracts that are exclusionary, entering into long-term data supply contracts with exclusionary MFN clauses, entering into exclusionary, long-term, staggered contracts with customers, making anticompetitive acquisitions intended to restrict data access to competitors, disparaging competitors, poaching competitors' employees, misappropriating competitors' confidential information and trade secrets, and engaging in refusals to deal.

188. IMS's anticompetitive and exclusionary conduct has injured competition and deprived customers of access to higher quality, diverse product offerings and lower prices.

189. The anticompetitive effects of IMS's conduct far outweigh any purported procompetitive justifications.

190. The willful acquisition and/or maintenance of IMS's monopoly power has not occurred due to growth or development as a consequence of IMS's superior products, business acumen, or historic accident.

191.     As a direct result of IMS's exclusionary, anticompetitive, and conspiratorial conduct, Plaintiffs have suffered and continue to suffer injury to their business and property, including but not limited to lost sales and profits.

### COUNT TWO

### Attempted Monopolization
### (Section 2 of the Sherman Act, 15 U.S.C. § 2)
### All Plaintiffs Against IMS

192.     Plaintiffs incorporate by reference the preceding paragraphs as if set forth fully herein.

193.     IMS has willfully and wrongfully attempted to acquire and maintain monopoly power in the market(s) and/or sub-markets for pharmaceutical data products, including the market(s) and/or sub-markets for Managed Markets data products and APLD data products through exclusionary, anticompetitive , and conspiratorial conduct, including but not limited to, bundling products, forcing customers to agree to conditional sales, entering into long-term data supply contracts that are exclusionary, entering into long-term data supply contracts with exclusionary MFN clauses, entering into exclusionary, long-term, staggered contracts with customers, making anticompetitive acquisitions intended to restrict data access to competitors, disparaging competitors, poaching competitors' employees, misappropriating competitors' confidential information and trade secrets, and engaging in refusals to deal.

194.     IMS has unlawfully acquired, maintained, and abused its monopoly power in the market(s) and/or sub-markets for pharmaceutical data products, including the market(s) and/or sub-markets for T&C data products and integrated global data products; however, Symphony pleads, in the alternative, that IMS is unlawfully attempting, and/or conspiring, to obtain monopoly power in the market or sub-markets for T&C data products and integrated global data

products through exclusionary, anticompetitive, and conspiratorial conduct, including but not limited to, bundling products, forcing customers to agree to conditional sales, entering into long-term data supply contracts that are exclusionary, entering into long-term data supply contracts with exclusionary MFN clauses, entering into exclusionary, long-term, staggered contracts with customers, making anticompetitive acquisitions intended to restrict competitors' access to data, disparaging competitors, poaching competitors' employees, misappropriating competitors' confidential information and trade secrets, and engaging in refusals to deal.

195.    IMS acted with specific intent to monopolize the market(s) and/or sub-markets for T&C data products, Managed Markets data products, integrated global data products, and APLD data products.

196.    IMS's exclusionary and anticompetitive conduct has given IMS a dangerous probability of successfully attaining monopoly power.  In fact, IMS already has a dominant position and possesses a monopoly share of the relevant market(s) and/or sub-markets for pharmaceutical data products, including 100% of the market and/or sub-market for integrated global data products, 86% of the market and/or sub-market for T&C data products, and more than 80% of the market and/or sub-market for APLD products.

197.    IMS's anticompetitive, exclusionary, and conspiratorial conduct has injured competition and deprived customers of access to higher quality, diverse product offerings and lower prices.

198.    The anticompetitive effects of IMS's conduct far outweigh any purported procompetitive justifications.

199.    Substantial barriers to entry exist in the relevant market(s) and/or sub-markets.

200. As a direct result of IMS's exclusionary, anticompetitive, and conspiratorial conduct, Plaintiffs have suffered and continue to suffer injury to their business and property, including but not limited to lost sales and profits.

## COUNT THREE

**Monopoly Leveraging**
**(Section 2 of the Sherman Act, 15 U.S.C. § 2)**
**All Plaintiffs Against IMS**

201. Plaintiffs incorporate by reference the preceding paragraphs as if set forth fully herein.

202. IMS possesses monopoly power in certain market(s) and/or sub-markets for pharmaceutical data products. IMS has the power to control price and exclude competition and is the only U.S. pharmaceutical data company with comprehensive product offerings across the entirety of the relevant antitrust market(s) and/or sub-markets.

203. IMS abuses its monopoly power in certain market(s) and/or sub-markets to gain a dangerous probability of successfully attaining monopoly power in other market(s) and/or sub-markets. IMS abuses its monopoly power in certain market(s) or sub-markets to acquire, maintain, or grow its monopoly in each of the market(s) and/or submarkets, including those in which it already possesses monopoly power.

204. IMS possesses monopoly power in the market(s) and/or sub-markets for integrated global data products. IMS has the power to control price and exclude competition and is the only U.S. pharmaceutical data company with comprehensive global data product offerings.

205. IMS abuses its monopoly power in the market(s) and/or sub-market for integrated global data products to gain, and/or conspire to gain, a dangerous probability of successfully attaining monopoly power in other markets or sub-markets. In particular, IMS uses its monopoly

power in the market or sub-market for global data products to grow and maintain its monopoly in the market or sub-market for T&C data products and to exclude Symphony from the market or sub-market for T&C data products.

206. IMS also possesses monopoly power in the market or sub-market for T&C data products. IMS has the power to control price and exclude competition.

207. IMS uses its monopoly power in the market or sub-market for T&C data products to gain, and/or conspire to gain, a dangerous probability of successfully attaining monopoly power in other markets or sub-markets for other pharmaceutical data products. In particular, IMS uses its monopoly power in the market or sub-market for T&C data products in an attempt to monopolize the market or sub-market for Managed Markets data products and to attempt to exclude Symphony from the market or sub-market for T&C data products.

208. IMS leverages its monopoly power in the market(s) and/or sub-markets to (i) protect and strengthen its monopolies in other products and/or markets; and/or (ii) attempt to gain monopoly power in other products and/or markets. IMS's actions constitute unlawful monopoly leveraging.

209. IMS's market power in the relevant market(s) and/or sub-markets results from IMS's abuse of its monopoly power, not from any lawful advantages as a result of size and integration.

210. As a direct result of IMS's exclusionary, anticompetitive, and conspiratorial conduct, Plaintiffs have suffered and continue to suffer injury to their business and property, including but not limited to lost sales and profits.

## COUNT FOUR

**Agreements in Unreasonable Restraint of Trade**
**(Section 1 and Section 2 of the Sherman Act, 15 U.S.C. §§ 1, 2)**
**All Plaintiffs Against IMS**

211.    Plaintiffs incorporate by reference the preceding paragraphs as if set forth fully herein.

212.    IMS entered into long-term, exclusive contracts with the providers of long-term care data.  The contracts prohibited the data providers from selling their data to Symphony.  Through these exclusionary contracts, IMS has blocked Symphony's access to over 80% of the long-term care data in the entire country.  IMS has deprived customers of access to higher quality, diverse product offerings and lower prices for long-term care data offerings.

213.    IMS has also entered into long-term agreements with data suppliers containing exclusionary MFN provisions and other exclusionary provisions.  Through these MFNs and other exclusionary provisions, IMS artificially raises prices for data to a level that eliminates competition by making data acquisition cost-prohibitive for competitors and raising barriers to entry for competitors.

214.    IMS entered into long-term, exclusive contracts with providers of specialty drug data.  The contracts prohibited the data providers from selling their data to Symphony.  Through these exclusionary contracts, IMS has substantially foreclosed Symphony's access to a significant portion of the specialty drug data in the entire country.  IMS has deprived customers of access to higher quality, diverse product offerings and lower prices for specialty-drug data offerings.

215.    IMS entered into long-term, staggered exclusionary agreements with customers.  The agreements conditioned sales on forcing customers to purchase product bundles from IMS

and/or not purchasing comparable products from Symphony. Through these exclusionary contracts, IMS has deprived customers' access to higher quality, diverse product offerings and lower prices.

216. IMS also acquired competitors and key foreign data suppliers to harm and prevent competition.

217. These anticompetitive contracts or agreements have achieved their intended effect: Symphony cannot compete on equal footing with IMS in the market(s) and/or sub-markets for pharmaceutical data products.

218. IMS's exclusionary contracts unreasonably restrain trade and harm competition in the relevant market(s) and/or sub-markets.

219. IMS has used these exclusive contracts to protect its monopolies in the relevant market(s) and/or sub-markets and in an attempt to monopolize the relevant market(s) and/or sub-markets.

220. As a direct result of IMS's exclusionary, anticompetitive, and conspiratorial conduct, Plaintiffs have suffered and continue to suffer injury to their business and property, including but not limited to lost sales and profits.

## COUNT FIVE

### Tortious Interference with Existing and Prospective Contractual Relationships
### (Pennsylvania Common Law)
### All Plaintiffs Against IMS

221. Plaintiffs incorporate by reference the preceding paragraphs as if set forth fully herein.

222. Plaintiffs had existing and prospective contractual relationships with multiple clients to offer them pharmaceutical data products.

223.    IMS has taken purposeful action, specifically intended to harm existing relationships between Plaintiffs and their customers and to prevent new ones from forming.

224.    IMS has bundled and predatorily priced its products, which was intended to and has tortiously interfered with Plaintiffs' existing and potential contractual relationships.

225.    IMS has entered into exclusionary contracts and MFNs to block Plaintiffs' access to critical data, which unfairly limited the data it could provide to current and potential clients.

(a)    IMS has entered into exclusionary contracts with key data suppliers to limit Symphony's access to data, which was intended to and has tortiously interfered with Symphony's existing and potential contractual relationships.

(b)    IMS has entered into exclusionary contracts with providers of long-term care data to block Symphony's access to critical data, which unfairly limited the data Symphony could provide to current and potential clients.

(c)    IMS has entered into exclusionary contracts with providers of specialty drug data to block Symphony's access to critical data, which unfairly limited the data Symphony could provide to current and potential clients.

(d)    IMS has entered into exclusionary contracts in the market and/or sub-market for global data products to block Symphony's access to critical data, which unfairly limited the data Symphony could provide to current and potential clients.

226.    IMS has falsely represented and disparaged the quality of Plaintiffs' products and its corporate character, which was intended to and has tortiously interfered with Plaintiffs' existing and potential contractual relationships.

227.    IMS stopped granting customary access to data to ImpactRx after Symphony acquired ImpactRx, which resulted in clients terminating projects or declining to buy products

from Symphony.  In other instances, IMS's conduct stonewalled or delayed Symphony's performance of projects for clients, causing harm to goodwill and reputation.

228.    IMS purposefully interfered with the aforementioned contracts and prospective contracts in violation of the common law of the Commonwealth of Pennsylvania.

229.    Such interference caused harm to Plaintiffs.  Moreover, IMS's conduct not only was not privileged or justified, but also was intentionally undertaken to harm Plaintiffs' current and prospective contractual relationships and to undermine competition.

230.    Plaintiffs have been damaged as a result of IMS's conduct and will continue to be as a result of IMS's tortious interference with its current and prospective customers.

**COUNT SIX**

**Unfair Competition**
**(Pennsylvania Common Law)**
**All Plaintiffs Against IMS**

231.    Plaintiffs incorporate by reference the preceding paragraphs as if set forth fully herein.

232.    Symphony and IMS are direct competitors and vie against one another for market share in the relevant market(s) and/or sub-markets.

233.    IMS has wrongfully and intentionally injured and attempted to injure Symphony's business by, among other things:

- bundling and predatorily pricing its pharmaceutical data products;

- entering into long-term, exclusionary contracts with data suppliers containing exclusivity, MFN, and other exclusionary provisions;

- refusing to deal with ImpactRx because it was acquired by Symphony, a competitor of IMS;

- making intentional misrepresentations regarding Symphony's service and products to Symphony customers and prospective customers;

56

- improper inducement of Symphony employees;

- improperly acquiring and using confidential information;

- acquiring data suppliers in order to deny Symphony access to key data;

- acquiring competitors in order to injure Symphony; and

- tortiously interfering with Symphony's current and prospective contracts.

234.    IMS's conduct is without privilege or justification in that, through its actions, IMS intended to create or continue an illegal restraint of competition.

235.    IMS's improper business practices have harmed, and threaten to further harm, Plaintiffs by stifling competition and interfering with Plaintiffs' actual and prospective business relationships and goodwill.

236.    IMS's actions have been willful and wanton and have been carried out with a specific intent to injure Plaintiffs in the conduct of their business, and to gain an unfair competitive advantage over Plaintiffs.

237.    The acts and conduct of IMS, as alleged above in this Complaint, constitute unfair competition pursuant to the common law of the Commonwealth of Pennsylvania.

238.    The acts and conduct of IMS, as alleged above in this Complaint, are contrary to honest commercial business practices.

239.    As a direct result of IMS's unlawful conduct, Plaintiffs have suffered and continue to suffer injury to their business and property, including but not limited to lost sales and profits.

## PRAYER FOR RELIEF

For the foregoing reasons, Plaintiffs pray for a judgment against IMS and respectfully request that this Court:

a. Award Plaintiffs their actual damages, trebled pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, along with the appropriate interest;

b. Award Plaintiffs the costs of this action, including reasonable attorneys' fees pursuant to 15 U.S.C. § 15;

c. Order IMS to pay punitive damages for its willful violation of state laws;

d. Grant injunctive relief prohibiting IMS from engaging in any of the unlawful anticompetitive practices set forth in this Complaint, including ordering IMS to:

    (i) terminate, and refrain from, all bundling and conditional sales programs that involve T&C data products (including but not limited to DDD), integrated global data products (including but not limited to MIDAS), Managed Markets data products (including but not limited to FIA), and APLD products (collectively "IMS data products");

    (ii) use transparent pricing in all IMS data products;

    (iii) cease entering into contracts with customers for IMS data products that persist longer than two years;

    (iv) cease, and refrain from, conditionally pricing one IMS data product on the purchase of other IMS data products;

    (v) terminate, and refrain from entering into, all exclusive contracts with IMS data suppliers (foreign and domestic);

    (vi) void, and refrain from entering into, all MFNs (whether implicit or explicit) in IMS contracts with data suppliers (foreign and domestic);

    (vii) cease, and refrain from, refusing to sign TPAs with Symphony and require TPAs with Symphony to be decided within 3 business days;

    (viii) permit Symphony access to data held by domestic and international suppliers that IMS has acquired; and

    (ix) refrain from disparaging Symphony to its current and potential clients.

e.  Order any other relief that the Court deems just and proper as may be in the interests

of justice.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs request a

trial by jury of any issues so triable by right.

Dated:  April 16, 2015

*/s/ Leslie E. John*
Leslie E. John (I.D. No. 62290)
john@ballardspahr.com
Jason A. Leckerman (I.D. No. 87915)
leckermanj@ballardspahr.com
Ruth S. Uselton (I.D. No. 208089)
useltonr@ballardspahr.com
Marcel S. Pratt (I.D. No. 307483)
prattm@ballardspahr.com

**BALLARD SPAHR LLP**
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Telephone:  (215) 665-8500
Facsimile:  (215) 864-8999

Jay N. Fastow (*Admitted Pro Hac Vice*)
fastowj@ballardspahr.com
**BALLARD SPAHR LLP**
919 Third Avenue, 37th Floor
New York, NY 10022
Telephone:  (646) 346-8049
Facsimile:   (212) 223-2392

*Attorneys for Plaintiffs Symphony Health*
*Solutions Corporation, Source Healthcare*
*Analytics LLC, and ImpactRx, Inc.*